**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA**

|  |  |
|---|---|
| In re: | Jointly Administered Under
Case No. 17-30673 (MER) |
| Gander Mountain Company,
Overton's, Inc., | Case No. 17-30673
Case No. 17-30675 |
| Debtors. | Chapter 11 Cases |

**ORDER AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS
FREE AND CLEAR OF LIENS, CLAIMS, RIGHTS, ENCUMBRANCES, AND OTHER
INTERESTS**

Upon consideration of the *Motion for (A) an Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially all of the Debtors' Assets, (II) Approving the Form and Manner of Notice, and (III) Setting Further Hearing on Approval of Sale, and (B) an Order Authorizing (I) the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests and (II) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Doc. No. 31] (the "Motion");[1] and it appearing that the relief requested is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion having been given and it appearing that no other notice need be given; and the Debtors and a contractual joint venture of Tiger Capital Group, LLC, Great American Group

---

[1]   All capitalized terms not otherwise defined in this Order have the meaning ascribed to them in the Motion or in the Agency Agreement.

WF, LLC, Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (collectively, the "Agent") having agreed upon terms and conditions for the Agent to act as the Debtors' exclusive agent to conduct sales (the "Sale") of certain of the Debtors' assets, including, without limitation, the Merchandise, Merchant Consignment Goods and Owned FF&E ("Assets"), which terms and conditions are set forth in that certain Agency Agreement, by and between the Agent and the Debtors, a form of which is attached hereto as Exhibit A (the "Agency Agreement"); and the transaction represented by the Agency Agreement having been determined to be the highest and best offer for the Assets at the auction held on April 27 and 28, 2017 (the "Auction"); and a hearing having been held on March 30, 2017, whereupon the Court entered an Order approving bidding procedures [Docket No. 301] (the "Bidding Procedures Order"); and a sale hearing having been held on May 3, 2017 (the "Sale Hearing") to consider the remaining relief requested in the Motion and approval of the Agency Agreement; and appearances of all interested parties having been noted on the record of the Sale Hearing; and upon the Declaration of Timothy G. Becker in Support of Chapter 11 Petitions and Initial Motions dated March 10, 2017 [Doc. No. 38] (the "First Day Declaration"); and upon all of the proceedings had before the Court (including but not limited to the testimony and other evidence proffered or adduced at the Sale Hearing); and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT**:[2]

A.     **Jurisdiction:**   This Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1134.   Approval of the Debtors' entry into the Agency Agreement, and the transactions contemplated thereby is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (D), (N) and (O).

B.     **Venue:**   Venue of these cases in this district is proper pursuant to 28 U.S.C. § 1409(a).

C.     **Statutory Predicates:**   The statutory predicates for the approval of the Agency Agreement and transactions contemplated therein are sections 105, 363, 364 and 554 of the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") .

D.     **Notice:**   Proper, timely, adequate and sufficient notice of the Motion and the Sale Hearing has been provided in accordance with sections 102(1), 105(a), and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 6004, and in compliance with the Bidding Procedures Order.   No other or further notice is required.

E.     **Opportunity to be Heard:**   A reasonable opportunity to object or be heard regarding the relief requested in the Motion and the transactions pursuant thereto has been afforded to all interested persons and entities, including, without limitation, the following: (i) the Office of the United States Trustee for the District of Minnesota, (ii) counsel to the DIP Agent and Pre-Petition Agents, (iii) the Office of the United States Attorney for the District of Minnesota, (iv) counsel to the Committee, (v) all parties who are known to assert any lien, claim,

---

[2]   The findings of fact and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.   To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

interest or encumbrance in or upon any of the Assets, (vi) all lessors of leases for the Stores and Distribution Centers, (vii) all applicable federal, state, and local taxing authorities (including, without limitation, the Internal Revenue Service) (collectively, the "Taxing Authorities"), (viii) the state attorney general for each state where the Debtors operate a Store or Distribution Center, (ix) the Agent, (x) all parties identified by the Debtors as potentially interested purchasers, (xi) all government entities that have an interest in regulating the Sale or any of the other Transactions and (xii) all other applicable parties in interest, including all entities on the general case service list as of the date of entry of the Bidding Procedures Order ((i) through (xii) collectively, the "Notice Parties"). The notice provided constitutes good and sufficient notice of the Motion and the Sale Hearing, and no other or further notice of the Motion, the Sale Hearing or the entry of this Order need be given. Objections, if any, to the Motion have been withdrawn or resolved and, to the extent not withdrawn or resolved, are hereby overruled.

F.      **Marketing Process:**  As demonstrated by: (i) the First Day Declaration, (ii) the Motion, (iii) the testimony and other evidence proffered or adduced at the Sale Hearing and (iv) the representations of counsel made on the record at the Sale Hearing, the Debtors have thoroughly marketed the Assets and have conducted the bidding solicitation fairly, with adequate opportunity for parties that either expressed an interest in acquiring or liquidating the Assets, or who the Debtors believed may have an interest in acquiring or liquidating the Assets, to submit competing bids. The Debtors and the Agent have respectively negotiated and undertaken their roles leading to the Sale and entry into the Agency Agreement in a diligent, noncollusive, fair and good faith manner.

G.      **Auction**:  At the Auction, the Debtors, in the exercise of their business judgment and in consultation with the DIP Agent, the Pre-Petition Agents, the Committee and their

respective counsel and financial advisors, determined that the Agency Agreement and the transactions contemplated thereby was the Successful Bid (as defined in the Bidding Procedures (as defined in the Bidding Procedures Order)) with respect to the Assets.  The Debtors' Report on the Auction Sale was filed with this Court on April 28, 2017, [Doc. No. 632].

H.      **Highest and Best Offer:**  The Agency Agreement attached hereto as <u>Exhibit A</u>, including the form and total consideration to be realized by the Debtors pursuant to the Agency Agreement, (i) is the highest and best offer received by the Debtors for the Assets, (ii) is fair and reasonable, and (iii) is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.  There is no legal or equitable reason to delay entry into the Agency Agreement, and the transactions contemplated therein, including, without limitation, the Sale.

I.      **Business Judgment:**  The Debtors' decision to (i) enter into the Agency Agreement and (ii) perform under and make payments required by the Agency Agreement is a reasonable exercise of the Debtors' sound business judgment consistent with their fiduciary duties and is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

J.      **Personally Identifiable Information:**  The transactions contemplated by the Agency Agreement do not include the sale or lease of personally identifiable information, as defined in section 101(41A) of the Bankruptcy Code ("Personally Identifiable Information") (or assets containing Personally Identifiable Information).

K.      **Time of the Essence:**  Time is of the essence in effectuating the Agency Agreement and proceeding with the Sale contemplated therein without interruption.  Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the Sale under the Agency Agreement must be commenced on the first day following entry of this

Order to maximize the value that the Agent may realize from the Sale, and the value that the Debtors may realize from entering into the Agency Agreement. Accordingly, cause exists to lift the stay to the extent necessary, as contemplated by Bankruptcy Rules 4001(a) and 6004(h) and permit the immediate effectiveness of this Order.

   L. **Sale Free and Clear:** The Debtors are the sole and lawful owners of the Assets. The Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. A sale of the Assets other than one free and clear of liens, claims, encumbrances, defenses (including, without limitation, rights of setoff and recoupment) and interests, including, without limitation, security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, liens, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, COBRA, CERCLA, alter ego and other liabilities, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances") and without the protections of this Order would hinder the Debtors' ability to

obtain the consideration provided for in the Agency Agreement and, thus, would impact materially and adversely the value that the Debtors' estates would be able to obtain for the sale of such Assets.  But for the protections afforded to the Agent under the Bankruptcy Code and this Order, the Agent would not have offered to pay the consideration contemplated in the Agency Agreement.  In addition, each entity with an Encumbrance upon the Assets, (i) has consented to the Sale (subject, in the case of the DIP Agent, the DIP Lenders, the Pre-Petition Agents and the Pre-Petition Lenders, to the terms and conditions of the Agency Agreement and this Order) or is deemed to have consented to the Sale, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Encumbrances who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Therefore, approval of the Agency Agreement and the consummation of the Sale free and clear of Encumbrances (subject to the terms and conditions of the Agency Agreement and this Order) is appropriate pursuant to section 363(f) of the Bankruptcy Code and is in the best interests of the Debtors' estates, their creditors and other parties in interest.  The Agent has not agreed to assume and shall have no obligations with respect to any liabilities of the Debtors or their subsidiaries or affiliates.

M.    **Arms-length Sale:**  The consideration to be paid by the Agent under the Agency Agreement was negotiated at arm's-length and constitutes reasonably equivalent value and fair and adequate consideration for the Assets under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance

Act and the laws of the United States, any state, territory, possession thereof or the District of Columbia. The terms and conditions set forth in the Agency Agreement are fair and reasonable under these circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Debtors or their creditors under any applicable laws.

N. **Good Faith:** The Debtors, their management and their board of directors, and the Agent, its members and its officers, directors, employees, agents and representatives, actively participated in the bidding process and acted in good faith. The Agency Agreement between the Agent and the Debtors was negotiated and entered into based upon arm's length bargaining, without collusion or fraud, and in good faith as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code. The Agent shall be protected by sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Order is reversed or modified on appeal. The Debtors were free to deal with any other party interested in buying or selling on behalf of the Debtors' estate some or all of the Assets. Neither the Debtors nor the Agent has engaged in any conduct that would cause or permit the Sale, the Agency Agreement, or any related action or the transactions contemplated thereby to be avoided under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) or 364(e) of the Bankruptcy Code. The Agent has not violated section 363(n) of the Bankruptcy Code by any action or inaction. Specifically, the Agent has not acted in a collusive manner with any person and was not controlled by any agreement among bidders. The Agent's prospective performance and payment of amounts owing under the Agency Agreement are in good faith and for valid business purposes and uses.

O.    **Insider Status:**  The Agent is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.  No common identity of directors or controlling stockholders exists between the Agent and the Debtors.

P.    **Security Interests:**  The liens provided for in the Agency Agreement and this Order to secure the obligations of the Debtors under the Agency Agreement to the Agent are necessary to induce the Agent to agree to terms for the Agency Agreement that maximize value for the Debtors' estates.  The absence of such protections would impact materially and adversely the value available to the Debtors in the liquidation of their stores in partnership with a liquidation agent.  But for the protections afforded to the Agent under the Bankruptcy Code, this Order, and the Agency Agreement, the Agent would not have agreed to pay the Debtors the compensation provided for under the Agency Agreement.  In addition, the DIP Agent, the DIP Lenders, the Pre-Petition Agents and the Pre-Petition Lenders, which hold security interests in the property to which the Agent's security interests attach, have consented to the security interests provided for in the Agency Agreement, subject to the satisfaction of the conditions set forth in the Agency Agreement and this Order.

Q.    **Corporate Authority:**  The Debtors (i) have full corporate or other power to execute, deliver and perform their obligations under the Agency Agreement and all other transactions contemplated thereby (including without limitation, reaching an agreement and resolution regarding the final reconciliation contemplated by the Agency Agreement), and entry into the Agency Agreement has been duly and validly authorized by all necessary corporate or similar action, (ii) have all of the corporate or other power and authority necessary to consummate the transactions contemplated by the Agency Agreement, and (iii) have taken all actions necessary to authorize and approve the Agency Agreement and the transactions

contemplated thereby.  No consents or approvals, other than those expressly provided for herein or in the Agency Agreement, are required for the Debtors to consummate such transactions.

R.    **No Successor Liability:**  No sale, transfer or other disposition of the Assets pursuant to the Agency Agreement or entry into the Agency Agreement will subject the Agent to any liability for claims, obligations or Encumbrances asserted against the Debtors or the Debtors' interests in such Assets by reason of such transfer under any laws, including, without limitation, any bulk-transfer laws or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories.  The Agent is not an alter ego of, a successor in interest to or a continuation of the Debtors or their respective estates and there is no continuity between the Agent and the Debtors.  The Agent is not holding itself out to the public as a continuation of the Debtors.  The Agent is not a successor to the Debtors or their estates and consummation of the Sale and the other transactions contemplated by the Agency Agreement does not amount to a consolidation, merger, or de facto merger of the Agent and the Debtors.

S.    **No Sub Rosa Plan:**  Entry into the Agency Agreement and the transactions contemplated thereby neither impermissibly restructure the rights of the Debtors' creditors, nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors.  Entry into the Agency Agreement does not constitute a sub rosa chapter 11 plan.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

A.    **Motion Granted, Objections Overruled**

1.    The relief requested in the Motion is granted as set forth herein.

2.    Any remaining objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections

are overruled in all respects and denied.

### B.     Agency Agreement Approved and Authorized

3.      The Agency Agreement is approved pursuant to sections 105, 363, 364 and 554 of

the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, 6006 and 9014.  The Debtors are

hereby authorized and empowered to enter into and perform under the Agency Agreement, and

the Agency Agreement (and each of the transactions contemplated therein (including without

limitation, consummating the Sale and reaching an agreement and resolution regarding the final

reconciliation contemplated by the Agency Agreement, which agreement and resolution shall be

binding on all parties (including (without limitation) the Debtors, the Committee, the DIP Agent,

the DIP Lenders, the Pre-Petition Agents and the Pre-Petition Lenders, any successor chapter 7

or chapter 11 trustee, and all other parties in interest) without further order of the Court)) is

hereby approved in its entirety and is incorporated herein by reference.  The failure to include

specifically any particular provision of the Agency Agreement in this Order shall not diminish or

impair the effectiveness of such provisions, it being the intent of the Court that the Agency

Agreement and all of its provisions, payments and transactions, be authorized and approved in

their entirety.   Likewise, all of the provisions of this Order are nonseverable and mutually

dependent.

4.      All amounts payable to the Agent under the Agency Agreement shall be payable

to the Agent without the need for any application of the Agent therefor or any further order of the

Court.

5.      Subject to the provisions of this Order, the Debtors and the Agent are hereby

authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to conduct the

Sale in accordance with the Agency Agreement and the sale guidelines attached hereto as Exhibit

B (the "GOB Sale Guidelines"), which GOB Sale Guidelines are hereby approved in their

entirety.

6.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors, the Agent and each of their respective members, directors, officers, employees and agents are hereby authorized and directed to execute such documents and to do such acts as are necessary or desirable to carry out the Sale and effectuate the Agency Agreement and each of the transactions and related actions contemplated or set forth therein.   James Bartholomew and Timothy Becker of Lighthouse Management Group, Inc., the Debtors' Chief Restructuring Officer, are specifically authorized to act on behalf of the Debtors in connection with the Sale and the other transactions contemplated by the Agency Agreement and no other consents or approvals are necessary or required for the Debtors to carry out the Sale, effectuate the Agency Agreement and each of the transactions and related actions contemplated or set forth therein.

### C.      Order Binding

7.      This Order shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets.

8.      This Order and the terms and provisions of the Agency Agreement shall be binding on all of the Debtors' creditors (whether known or unknown), the Debtors, the Agent, and their respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting an interest in the Assets, notwithstanding any subsequent appointment of any trustee, party, entity or other fiduciary under any section of the Bankruptcy

Code with respect to the forgoing parties, and as to such trustee, party, entity or other fiduciary, such terms and provisions likewise shall be binding.  The provisions of this Order and the terms and provisions of the Agency Agreement, and any actions taken pursuant hereto or thereto shall survive the entry of any order which may be entered confirming or consummating any plan(s) of the Debtors or converting the Debtors' cases from chapter 11 to chapter 7, and the terms and provisions of the Agency Agreement, as well as the rights and interests granted pursuant to this Order and the Agency Agreement, shall continue in these or any superseding cases and shall be binding upon the Debtors, the Agent and their respective successors and permitted assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.  Any trustee appointed in this case shall be and hereby is authorized and directed to operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of this Order and the Agency Agreement, and Agent and any such trustee shall be and hereby are authorized to perform under the Agency Agreement upon the appointment of such trustee without the need for further order of this Court.

**D.    Good Faith.**

9.    Entry into, and performance under, the Agency Agreement (including, without limitation, the payment of the Guaranteed Amount and any other amounts payable by Agent) is undertaken by the parties thereto in good faith, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code, and Agent shall be protected by sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Order is reversed or modified on appeal.  The reversal or modification on appeal of the authorization provided herein to enter into the Agency Agreement and consummate the transactions contemplated thereby shall not affect the validity of such transactions, unless such authorization is duly stayed pending such appeal.  The Agent is entitled

to all of the benefits and protections afforded by sections 363(m) and 364(e) of the Bankruptcy

Code. The transactions contemplated by the Agency Agreement are not subject to avoidance

pursuant to section 363(n) of the Bankruptcy Code.

### E.    Conduct of the Sale

10.    Except as otherwise provided in the Agency Agreement, pursuant to section

363(f) of the Bankruptcy Code, the Agent shall be authorized to sell all Merchandise, Merchant

Consignment Goods, Owned FF&E and other Assets to be sold pursuant to the Agency

Agreement free and clear of any and all Encumbrances, including, without limitation,

reclamation rights, and the liens and security interests, as the same may have been amended from

time to time, of the DIP Agent, the DIP Lenders, the Pre-Petition Agents and the Pre-Petition

Lenders (subject in each case to the terms and conditions of the Agency Agreement and this

Order), whether arising by agreement, any statute or otherwise and whether arising before, on or

after the date on which these chapter 11 cases were commenced, with any presently existing

security interests, liens or reclamation rights encumbering all or any portion of the Assets, the

Proceeds or the proceeds of the foregoing (including, but not limited to, the first-priority security

interest of the DIP Agent, the DIP Lenders, the Pre-Petition Agents and the Pre-Petition Lenders

and any interests or claims of CWI, Inc., ("CWI") under that certain Asset Purchase Agreement

between the Debtors and CWI, as approved by order of this Court contemporaneously herewith

(the "CWI Purchase Agreement")) attaching only to the Guaranteed Amount and, subject to the

Agent's liens granted pursuant to the Agency Agreement and this Order, all other amounts

payable by the Agent to the Debtors under the Agency Agreement, with the same validity, force,

priority and effect as the same had with respect to the assets at issue, subject to any and all

defenses, claims and/or counterclaims or setoffs that may exist. The DIP Agent, on behalf of the

DIP Lenders (and, after payment in full of the DIP Obligations, the Term Agent), is authorized to

receive payment of the Guaranteed Amount and other amounts payable to the Debtors pursuant

to the Agency Agreement, as the Debtors' designee, as and to the extent set forth in the Agency

Agreement, and all such amounts shall be applied by the DIP Agent (or the Term Agent, as

applicable) in accordance with paragraph 18(a) of the Final DIP Order.[3]  Until such time as the

DIP Obligations are paid in full in cash, if and to the extent the DIP Agent is entitled to draw on

the Letter of Credit in accordance with Section 3.1(f) of the Agency Agreement, the DIP Agent

may direct the Term Agent to make, and the Term Agent shall make, such draw on the TGA

Letter of Credit.  All proceeds from such drawing shall be turned over by the Term Agent to the

DIP Agent for application in accordance with the DIP Credit Agreement until the DIP

Obligations are paid in full in cash.  For the sake of clarity, nothing in this paragraph is intended

to diminish the liens granted in favor of the Agent, as reflected in the Agency Agreement and

this Order, that attach to, among other things, the Proceeds of the Sale and certain Assets and

other amounts.

    11.    If any person or entity that has filed financing statements, mortgages, construction

or mechanic's liens, lis pendens or other documents or agreement evidencing Encumbrances on

the Assets shall not have delivered to the Debtors, in proper form for filing and executed by the

appropriate parties, termination statements, instruments of satisfaction, or releases of any

Encumbrances which the person or entity has with respect to the Assets, each such person or

entity is hereby directed to deliver all such statements, instruments and releases and the Debtors

and the Agent are hereby authorized to execute and file such statements, instruments, releases

and other documents on behalf of the person or entity asserting the same and the Agent is

---

[3] The "Final DIP Order" means that *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Approving Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* [D.I. 443], entered on April 14, 2017, as amended on or about May 4, 2017.

authorized to file a copy of this Order which, upon filing, shall be conclusive evidence of the release and termination of such interest; provided, however, that nothing in this paragraph shall compel the DIP Agent or the Pre-Petition Agents to, or grant the Debtors or the Agent the authority to, terminate or release the DIP Liens, the Prepetition Senior Liens or the Adequate Protection Liens (each as defined in the Final DIP Order) other than as permitted under the Final DIP Order, the DIP Credit Agreement or the Prepetition Credit Agreements. Each and every federal, state and local governmental unit is hereby directed to accept any and all documents and instruments necessary or appropriate to give effect to the Sale and related transactions.

12.     All entities that are presently in possession of some or all of the Assets or other property in which the Debtors hold an interest that are or may be subject to the Agency Agreement hereby are directed to surrender possession of such Assets or other property to the Agent.

13.     The Debtors and the Agent shall not extend the Sale Termination Date beyond August 31, 2017 unless extended by mutual written agreement of the Debtors and the Agent following a commensurate extension of the expiration date of the Letter of Credit.

14.     Unless otherwise ordered by the Court, all newspapers and other advertising media in which the Sale and the other transactions contemplated by the Agency Agreement may be advertised and each landlord for any Store or Distribution Center are directed to accept this Order as binding authority so as to authorize the Debtors and the Agent to effect the Agency Agreement and to consummate the Sale and the other transactions contemplated by the Agency Agreement, including, without limitation, to conduct and advertise the Sale and the other transactions contemplated by the Agency Agreement (at the contractual rates charged to the Debtors prior to the Petition Date) in the manner contemplated by the Agency Agreement, the

GOB Sale Guidelines, and this Order.

15.     Nothing in this Order or the Agency Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order.  Nothing contained in this Order or in the Agency Agreement shall in any way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.   Nothing herein shall be construed to be a determination that the Agent is an operator with respect to any environmental law or regulation.  Moreover, the Sale shall not be exempt from, and the Debtors and/or Agent, as applicable, shall be required to comply with, laws of general applicability, including, without limitation, public health and safety, fire-arm and ammunition sales, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws").  Nothing in this Order shall alter or affect the Debtors' and Agent's obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Order shall be deemed to bar any Governmental Unit (as defined in Bankruptcy Code section 101(27)) from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' or the Agent's right to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Order, or otherwise, pursuant to Paragraph 18 hereunder.  Notwithstanding any other provision in this Order, no party waives any rights to argue any position with respect to whether the conduct was

in compliance with this Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Order shall be deemed to have made any rulings on any such issues.

16.    <u>Disputes Between Government Units and the Debtor or the Agent</u>. To the extent that the Sale is subject to any federal, state or local statute, ordinance, or rule, or licensing requirement solely directed at regulating "going out of business," "total liquidation," "store closing," "sale on everything," "everything must go," "everything on sale" or similar inventory liquidation sales, or bulk sale laws (each a "<u>GOB Law</u>," and together, the "<u>GOB Laws</u>"), including laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the Sale and the other transactions contemplated by the Agency Agreement and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the Sale and other transactions contemplated by the Agency Agreement (collectively, the "<u>Liquidation Laws</u>"), the following provisions shall apply:

a.    Provided that the Sale is conducted in accordance with the terms of this Order, the Agency Agreement and the GOB Sale Guidelines, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors shall be presumed to be in compliance with any GOB Laws and Liquidation Laws and, subject to Paragraphs 16 and 17 herein, are authorized to conduct the Sale in accordance with the terms of this Order and the GOB Sale Guidelines without the necessity of further showing compliance with any such GOB Laws and Liquidation Laws.

b.    Within five (5) business days of entry of this Order, the Debtors shall serve copies of this Order, the Agency Agreement and the Sale Guidelines via e-mail, facsimile or regular

mail, on: (i) the Attorney General's office for each state where the Sale is being held, (ii) the

county consumer protection agency or similar agency for each county where the Sale will be

held, (iii) the division of consumer protection for each state where the Sale will be held; and (iv)

the chief legal counsel for the local jurisdiction.

c.      To the extent there is a dispute arising from or relating to the Sale, this Order, the

Agency Agreement, or the GOB Sale Guidelines, which dispute relates to any GOB Laws or

Liquidation Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve

the Reserved Dispute.  Any time within fifteen (15) days following service of this Order, any

Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such

Reserved Dispute to counsel for the Debtors and counsel for the Agent at the addresses set forth

in the Agency Agreement so as to ensure delivery thereof within one (1) business day thereafter.

Such notice shall be promptly delivered by the Debtors to the affected landlord, and to the extent

known, such landlord's counsel of record.  If the Debtors, the Agent and the Governmental Unit

are unable to resolve the Reserved Dispute within fifteen (15) days of service of the notice, the

aggrieved party may file a motion with this Court requesting that this Court resolve the Reserved

Dispute (a "Dispute Resolution Motion").

d.      In the event a Dispute Resolution Motion is filed, nothing in this Order shall

preclude the Debtors, a landlord, the Agent or other interested party from asserting (i) that the

provisions of any GOB Laws and/or Liquidation Laws are preempted by the Bankruptcy Code or

(ii) that neither the terms of this Order, nor the Debtors or the Agent's conduct pursuant to this

Order, violates such GOB Laws and/or Liquidation Laws.  Filing a Dispute Resolution Motion as

set forth herein shall not be deemed to affect the finality of this Order or to limit or interfere with

the Debtors' or the Agent's ability to conduct or to continue to conduct the Sale pursuant to this

Order and the Agency Agreement, absent further order of this Court. The Court grants authority for the Debtors and the Agent to conduct the Sale pursuant to the terms of this Order, the Agency Agreement, and/or the GOB Sale Guidelines attached hereto and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit shall be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Laws or the lack of any preemption of such GOB Laws and/or Liquidation Laws by the Bankruptcy Code. Nothing in this Order shall constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e.     If, at any time, a dispute arises between the Debtors and/or the Agent and a Governmental Unit as to whether a particular law is a GOB Law and/or Liquidation Law, and subject to any provisions contained in this Order related to GOB Laws and/or Liquidation Laws, then any party to that dispute may utilize the provisions of Subparagraphs (b) and (c) hereunder by serving a notice to the other party and proceeding thereunder in accordance with those Paragraphs. Any determination with respect to whether a particular law is a GOB Law and/or Liquidation Law shall be made de novo.

17.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the Sale, to the extent that disputes arise during the course of the Sale regarding laws regulating the use of sign-walkers and banner advertising and the Debtors and the Agent are unable to resolve the matter consensually with the Governmental Unit, any party may request an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will, to the extent practicable, be scheduled initially within two (2) business days of such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

18.     Except to the extent of the reserved rights of Governmental Units expressly granted elsewhere in this Order, the Debtors and Agent are hereby authorized to take such actions as may be necessary and appropriate to implement the Agency Agreement and to conduct, advertise and otherwise promote the Sale as a "going out of business," "total liquidation," "store closing," "sale on everything," "everything must go," "everything on sale," or similar-themed sale (including, without limitation, by means of media advertising, interior and exterior banners, A-frames and similar signage and the use of sign walkers and street signage) without necessity of further order of this Court or further consent of any person, in accordance with the terms of the Agency Agreement or the GOB Sale Guidelines and without further compliance with Liquidation Laws, except those designed to protect public health and safety.

19.     The Sale shall be conducted by the Debtors and the Agent notwithstanding any restrictive provision of any lease, sublease or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sale, abandonment of assets or "going dark" or similar provisions.  The Agent and landlords of the Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the GOB Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Agent and any such landlords, provided that nothing in such Side Letters affects the provisions of Paragraphs 16 and 17.  In the event of any conflict between the GOB Sale Guidelines and any Side Letter, the terms of such Side Letter shall control.  In the event of a dispute regarding the Guidelines or any Side Letter, counsel for each of the Debtors, the applicable landlord, and the Agent shall meet and confer to resolve the dispute.  In the event that the parties are unable to resolve the dispute, any party seeking relief may request a prompt hearing before the Court to resolve such dispute.

20.     Except as expressly provided for herein or in the GOB Sale Guidelines, and

except with respect to any Governmental Unit (as to which Paragraphs 16 and 17 shall apply), no

person or entity, including but not limited to any utility company, internet service provider,

website service or hosting provider, landlord, licensor, creditor or other interested party or any

person acting for or on behalf of the foregoing, shall take any action to directly or indirectly

prevent, interfere with, impede or otherwise hinder consummation of the Sale or the other

transactions contemplated by the Agency Agreement, or the advertising and promotion

(including the posting of signs and interior and exterior banners or the use of sign-walkers) of

such Sale and other transactions, and all such parties and persons of every nature and description,

including landlords, licensors, creditors, utility companies, internet service providers, website

service or hosting providers and other interested parties and all those acting for or on behalf of

such parties, are prohibited and enjoined from (i) interfering in any way with, or otherwise

impeding, the advertising, promotion or conduct of the Sale and the other transactions

contemplated by the Agency Agreement (including the posting of signs and interior and exterior

banners or the use of sign-walkers) and/or (ii) instituting any action or proceeding in any court or

administrative body seeking an order or judgment against, among others, the Debtors, the Agent,

or the landlords at the Stores that might in any way directly or indirectly obstruct or otherwise

interfere with or adversely affect the advertising, promotion or conduct of the Sale and the other

transactions contemplated by the Agency Agreement (including the posting of signs and interior

and exterior banners or the use of sign-walkers) and/or seek to recover damages for breach(es) of

covenants or provisions in any lease, sublease or license based upon any relief authorized herein.

21.    The Agent shall have the right to use the Stores and all related services, furniture,

fixtures, equipment and other assets of the Debtors for the purpose of conducting the Sale and

the other transactions contemplated by the Agency Agreement, free of any interference from any

entity or person, subject to compliance with the GOB Sale Guidelines and this Order and subject to Paragraphs 16 and 17 of this Order, and subject to any relief granted to the FF&E Lenders (as defined in Paragraph 37 of this Order), such as relief from stay or adequate protection. Nothing in the foregoing statement forecloses any remedies the Agent may have against the Debtors under the Agency Agreement if such action by the FF&E Lenders is successful.

22.     Nothing in this Order shall (a) alter or affect the Debtors' obligations to comply with section 365(d)(3) of the Bankruptcy Code or (b) alter or modify the rights of any lessor or other counterparty to a lease with the Debtors to file an appropriate motion or otherwise seek appropriate relief if the Debtors fail to comply with section 365(d)(3) of the Bankruptcy Code; provided that the conduct of the Sale and the other transactions contemplated by the Agency Agreement in accordance with the Sale Guidelines, as may have been modified by Side Letter, shall not be a violation of section 365(d)(3) of the Bankruptcy Code.

23.     Pursuant to section 554(a) of the Bankruptcy Code, the Debtors and the Agent, as applicable, are permitted to abandon property of the Debtors' estates (including, without limitation, Merchant Consignment Goods and Owned FF&E) in accordance with the terms and provisions of the Agency Agreement, without incurring liability to any person or entity; provided, however, that, unless the Agent otherwise consents, the Debtors may only abandon property located in any Store or Distribution Center on or after the earlier of the applicable Vacate Date or Sale Termination Date; provided, further, that the Debtors shall provide five days' prior written notice of any such abandonment by the Debtors or the Agent, as applicable, to the DIP Agent and the Pre-Petition Agents. In the event of any abandonment of FF&E Lender Collateral (as defined in paragraph 37 of this Order), the Debtors shall provide written notice of Agent's notice of intent to vacate, immediately upon Debtors' receipt of such notice, to each

applicable FF&E Lender (as defined in paragraph 37 of this Order) and permit at such time such FF&E Lender to recover such FF&E Lender Collateral at any time prior to such abandonment. The written notice shall reasonably describe the FF&E Lender Collateral to be abandoned and the effective date of the rejection for the underlying lease respective to the store at which the FF&E Lender Collateral to be abandoned is located.  Following the rejection of the lease for the affected Store or Distribution Center, all applicable landlords shall be authorized to dispose of any such property remaining at the affected Store or Distribution Center, unless otherwise agreed between the applicable landlord and the applicable FF&E Lender, without any liability to any individual or entity that may claim an interest in such abandoned property, and such abandonment shall be without prejudice to any landlord's right to assert any claim based on such abandonment and without prejudice to the Debtors or other party in interest to object thereto.

24.     Before any sale, abandonment or other disposition of the Debtors' computers (including software) and/or cash registers and any other point of sale Owned FF&E located at the Stores (collectively, "POS Equipment") that may contain customer lists, identifiable personal and/or confidential information about the Debtors' employees and/or customers, or credit card numbers ("Confidential Information") takes effect, the Debtors (and not the Agent) shall remove or cause to be removed the Confidential Information from the POS Equipment, and unless otherwise notified by the Debtors in writing to the contrary, the Agent shall be entitled to assume and presume that the Debtors have satisfactorily completed such steps at or prior to the time of any such sale, abandonment or other disposition.

25.     The Agent shall accept as payment the Debtors' validly-issued gift certificates, gift cards, merchandise credits and other similar credits issued by the Debtors that were issued by the Debtors prior to the Sale Commencement Date until (and inclusive of) the date that is

fourteen (14) days after the Sale Commencement Date, and the Debtors shall reimburse Agent for such amounts during each weekly sale reconciliation, in each case in accordance with the terms set forth in Section 8.6 of the Agency Agreement. The Agent shall accept returns of merchandise sold by the Debtors prior to the Sale Commencement Date for the first thirty (30) days of the Sale, provided that such return is otherwise in compliance with the Debtors' return policies in effect as of the date such item was purchased, and the Debtors shall reimburse Agent for any refunds or credits the Agent is required to issue customers in respect of any Returned Merchandise during each weekly sale reconciliation, in each case in accordance with the terms set forth in Section 8.5 of the Agency Agreement. Agent may accept and honor the Debtors' employee discount terms on the price of Merchandise as in effect immediately prior to the commencement of the Sale Term so that such employee discount shall not be additive to any other discount that may become available after the commencement of the Sale Term, including as otherwise provided for in the Agency Agreement. The Debtors shall reimburse Agent in cash for all amounts related to the Debtors' employee discount terms during each weekly sale reconciliation; provided that, the Debtors shall only be obligated to reimburse Agent for the Debtors' employee discount terms honored by Agent during the first fourteen (14) days of the Sale. During the Sale Term, Agent shall not accept coupons or groupons. Agent may permit, but shall not be required to permit, customers to take advantage of Membership Program Discounts.

26.     During the Sale Term, the Agent shall be granted a limited non-exclusive royalty-free license and right to use the trademarks, trade names, logos, customer, mailing and e-mail lists, websites and social media (including, without limitation, Facebook and Twitter accounts) relating to and used in connection with the operation of the Stores, solely for the purpose of

promoting, conducting and advertising the Sale in accordance with the terms of the Agency

Agreement; provided, however, that the Agent shall not receive Personally Identifiable

Information from the Debtors.

27.     Nothing in this Order or the Agency Agreement, and none of the Agent's actions

taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of the

Debtors' obligations relating to any of the Debtors' employees.  Moreover, the Agent shall not

become liable under any collective bargaining or employment agreement or be deemed a joint or

successor employer with respect to such employees.

28.     Except as expressly provided in the Agency Agreement, the Agent shall not be

liable for sales taxes and the collection, reporting and payment of any and all sales taxes is the

responsibility of the Debtors.  The Debtors are directed to remit all taxes arising from the Sale to

the applicable Taxing Authorities as and when due, provided that in the case of a bona fide

dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and

to the extent that the dispute is decided in favor of the taxing authority.  For the avoidance of

doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor

or any other party, other than the taxing authority for which the sales taxes are collected.  The

Agent shall collect, remit to the Debtors and account for sales taxes as and to the extent provided

in the Agency Agreement.  This Order does not enjoin, suspend or restrain the assessment, levy

or collection of any tax under State law, and does not constitute a declaratory judgment with

respect to any party's liability for taxes under State law.

29.     Subject to the terms and limitations set forth in the Agency Agreement, the

Debtors and/or the Agent (as the case may be) are authorized and empowered to transfer Assets

among the Stores and the Distribution Centers; provided, however, the Debtors and/or Agents (as

the case may be) shall not transfer any furniture, fixtures and equipment from or to Stores and

Distribution Centers at which any FF&E Lender Collateral is located (the list of which shall be

delivered by the Debtors to the Agent and the FF&E Lenders within one day following the Sale

Commencement Date). In the event that there is a dispute between any of the FF&E Lenders and

the Debtors regarding the Stores and Distribution Centers where FF&E Lender Collateral is

located, the FF&E Lender(s) or the Debtor may bring such dispute to the Court for resolution.

Other than FF&E Lender Collateral, the Agent is authorized to sell the Debtor's furniture,

fixtures and equipment and abandon the same, in each case, as provided for and in accordance

with the terms of the Agency Agreement, but as limited by the terms of this Order.

30.     Agent shall be permitted to include in the Sale Additional Agent Merchandise in

accordance with the terms and provisions of the Agency Agreement. Any transactions relating

to the Additional Agent Merchandise are, and shall be construed as, a true consignment from

Agent to the Debtors. The Debtors acknowledge that the Additional Agent Merchandise shall be

consigned to the Debtors as a true consignment under Article 9 of the Uniform Commercial

Code in effect in the State of Minnesota (the "UCC"). Subject to Agent's obligation to pay the

Additional Agent Merchandise Fee, if any, Agent is hereby granted a legal, valid and binding

first priority senior security interest in and lien upon (i) the Additional Agent Merchandise and

(ii) the Additional Agent Merchandise Proceeds, which security interest shall be deemed

perfected pursuant to this Order without the requirement of filing UCC financing statements or

providing notifications to any prior secured parties (provided that Agent is hereby authorized to

deliver all required or desirable notices and file all necessary or desirable financing statements

and amendments thereof under the applicable UCC identifying Agent's interest in the Additional

Agent Merchandise and the Additional Agent Merchandise Proceeds as consigned goods

thereunder and the Debtors as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Merchandise and Additional Agent Merchandise Proceeds).

31.     During the Sale Term applicable to any Store or Distribution Center and for purposes of conducting the Sale at such Store or Distribution Center, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, such Store or Distribution Center and the assets currently located at such Store or Distribution Center, in each case subject to the extent of the Debtors' rights and entitlement to use the same, and the services provided at such Store or Distribution Center to the extent the Debtors are entitled to such services, and also in each case, subject to any relief granted to the FF&E Lenders (as defined in paragraph 37 of this Order), such as relief from stay or adequate protection.  Nothing in the foregoing statement forecloses any remedies the Agent may have against the Debtors under the Agency Agreement if such action by the FF&E Lenders is successful.  The Debtors shall not assign, reject or otherwise terminate any lease relating to any such Store or Distribution Center or vacate any such Store or Distribution Center until the applicable Sale Termination Date or Vacate Date.

### F.     Superpriority Claims and Liens Granted To Agent

32.     Subject to the Agent having satisfied its obligations under the Agency Agreement, any amounts owed by the Debtors to the Agent under the Agency Agreement shall be granted the status of superpriority claims with priority over any or all administrative expenses in the Bankruptcy Cases pursuant to section 364(c) of the Bankruptcy Code senior to all other superpriority claims including, without limitation, the superpriority claims of the DIP Agent, the DIP Lenders, the Pre-Petition Agents and the Pre-Petition Lenders; provided that until the Debtors receive payment in full of the Guaranteed Amount, Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent's FF&E Commission) or the FF&E Guaranty

Amount, as applicable, and all other amounts due to the Debtors under the Agency Agreement, any superpriority claim granted to the Agent hereunder shall be junior and subordinate in all respects to the superpriority claims of the DIP Agent, the DIP Lenders, the Pre-Petition Agents and the Pre-Petition Lenders, but solely to the extent of the amount of the unpaid portion of the Guaranteed Amount, Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent's FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to the Debtors under the Agency Agreement.

33.     Pursuant to Bankruptcy Code section 364(d) and the Agency Agreement, and in consideration of and effective upon payment by the Agent of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit to the DIP Agent, on behalf of the DIP Lenders, the Debtors granted to the Agent first priority, senior security interests in and liens (subject to the subordination provisions set forth in the Agency Agreement) on the Agent Collateral to secure the full payment and performance of all obligations of the Debtors to the Agent under the Agency Agreement.  Upon entry of this Order, payment of the Initial Guaranty Payment on the Payment Date, and delivery of the Letter of Credit to the DIP Agent, on behalf of the DIP Lenders, the security interest granted to the Agent in the Agent Collateral under the Agency Agreement and this Order shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.  Upon the payment in full of the DIP Obligations, the DIP Agent, on behalf of the DIP Lenders, shall promptly deliver the Letter of Credit to the  Term Agent in accordance with the Agency Agreement.

34.     Without any further act by or on behalf of the Agent or any other party (including (without limitation) the Debtors, the DIP Agent, the DIP Lenders, the Pre-Petition Agents and the Pre-Petition Lenders), the Agent's security interests and liens in the Agent Collateral created

under the Agency Agreement and this Order are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other liens and security interests; provided, however, that (x) until the Debtors receive payment in full of the Guaranteed Amount, the Additional Agent Merchandise Fee, Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and all other amounts due to Debtors hereunder, the security interest granted to Agent hereunder shall be junior and subordinate in all respects to the security interests of the DIP Agent, on behalf of the DIP Lenders, and the Pre-Petition Agents, on behalf of the Pre-Petition Lenders, in the Agent Collateral but solely to the extent and amount of the unpaid portion of the any of the Guaranteed Amount, the Additional Agent Merchandise Fee (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to Debtors by Agent, and (y) upon payment in full of the Guaranteed Amount, the Additional Agent Merchandise Fee (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and all other amounts due to the Debtors under the Agency Agreement or hereunder, any security interest or lien of the DIP Agent, the DIP Lenders, the Pre-Petition Agents, or the Pre-Petition Lenders in the Agent Collateral shall be junior and subordinate in all respects to the security interest and liens of the Agent in the Agent Collateral.  The Debtors shall cooperate with the Agent with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by the Agent in connection with the security interests and liens granted under the Agency Agreement.

35.    If and to the extent that the Agent properly exercises its right to require a disgorgement or remittance from the DIP Agent, the DIP Lenders, the Term Agent or the Term

Lenders pursuant to the Agency Agreement: (i) the Term Agent and Term Lenders shall first satisfy the obligation to the Agent (regardless of whether the disgorgement or remittance is sought from the DIP Agent, DIP Lenders, Term Agent or Term Lenders) to the extent the Term Agent or Term Lenders have received any funds from or on behalf of the Debtors in payment of the Term Loan Obligations after the entry of this Order and (ii) to the extent the DIP Agent or DIP Lenders have received payment from Merchant of any funds in respect to such overpayment the DIP Agent and DIP Lenders shall satisfy the obligation to the extent that the disgorgement or remittance exceeds the amounts in clause (i); provided that (x) the limitations set forth in this Paragraph 35 only establish the relative rights of the DIP Agent, the DIP Lenders, the Term Agent and the Term Lenders and shall not limit the rights of Agent and (y) in furtherance of the foregoing, nothing in this Paragraph 35 shall prevent Agent from seeking any disgorgement or remittance from any of the DIP Agent, the DIP Lenders, the Pre-Petition Agents or the Pre-Petition Lenders in accordance with the terms of the Agency Agreement.

36.     Subject in all respects to the terms of the Agency Agreement, the obligations and liabilities of the Debtors under the DIP Credit Agreement, the Pre-Petition Credit Agreements and the Final DIP Order, and the liens securing those obligations and liabilities, shall be reinstated with full force and effect and in such amount as is disgorged or remitted if, at any time following the DIP Agent's, the DIP Lenders', the Term Agent's or Term Lenders' receipt of amounts under the Agency Agreement, all or any portion of these amounts is voided, rescinded, refunded, remitted or disgorged for any reason, including without limitation, reversal, modification or vacatur of the Final DIP Order or the exercise of any rights set forth in the Agency Agreement, all as though such payment had not been paid.

**G.     Other Provisions**

37.     U.S. Bank National Association, Bank of the West, Key Bank, Scott Trade,

Central Bank of St. Louis, and Fifth Third Equipment Finance (each, a "FF&E Lender") each asserts an interest in certain furniture, fixtures and equipment owned by the Debtors at certain Stores and Distribution Centers (the "FF&E Lender Collateral").  Upon a written agreement by the Debtors, the Agent, the DIP Agent, the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Committee, and the applicable FF&E Lender agreeing to the terms of the sale of FF&E Lender Collateral (an "FF&E Lender Agreement") or further order of the Court, the Debtors may sell FF&E Collateral in which the applicable FF&E Lender asserts an interest free and clear of all Encumbrances, including the interests of the applicable FF&E Lender.

38.     Absent an FF&E Lender Agreement, neither the Debtors nor the Agent shall sell any furniture, fixtures, and equipment, including Owned FF&E, located at any Store or Distribution Center at which any FF&E Lender Collateral is located.  In the event that an FF&E Lender has not entered into an FF&E Lender Agreement, a representative of such FF&E Lender may mark the items that it claims in good faith constitute the FF&E Lender Collateral by May 24, 2017 or such later date as agreed by the Debtor and the applicable FF&E Lender, or as ordered by the Court.  Any dispute between the FF&E Lender, the Debtors, the DIP Agent, and the Prepetition Agents concerning the designation of FF&E Lender Collateral may be determined by this Court.  The Debtors and the Agent are not authorized to sell any items marked as FF&E Lender Collateral absent an FF&E Lender Agreement or further order of the Court.  After May 24, 2017 or such later date (i) as agreed by the Debtors, the Agent, and the applicable FF&E Lender or (ii) as ordered by the Court, the Agent is authorized to sell as Owned FF&E all furniture, fixtures and equipment located at each Store or (to the extent the Debtors elect to have the Agent sell such furniture, fixtures and equipment) Distribution Center other than marked FF&E Lender Collateral, except as may otherwise by ordered by the Court.

39.     Except as expressly set forth in the Agency Agreement, the Agent shall not assume, or in any way be liable or responsible for, any claims or liabilities of any kind against any of the Debtors, whether known or unknown, whether asserted or unasserted, whether accrued or unaccrued, whether contingent or not, whether at law or in equity or otherwise, whether existing on the date hereof or arising thereafter and whether relating to or arising out of the Debtors' business, the Assets, any excluded assets or otherwise (including, without limitation, (x) liabilities based on any successor liability theory and (y) liabilities relating to the pre-petition or post-petition operation of the Debtors' business or the Assets (or the use of the Assets)).  The Agent shall have no successor liability whatsoever with respect to any Encumbrances or claims of any nature that may exist against the Debtors (or any predecessor or affiliate of any of the Debtors), including, without limitation, the Agent shall not be, or be deemed to be: (i) a successor in interest or within the meaning of any law, including any revenue, successor liability, pension, labor, ERISA, bulk-transfer, products liability, tax or environmental law, rule or regulation, or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories; or (ii) a joint employer, co-employer or successor employer with the Debtors, and the Agent shall have no obligation to pay the Debtors' wages, bonuses, severance pay, vacation pay, WARN act claims (if any), benefits or any other payments to employees of the Debtors, including pursuant to any collective bargaining agreement, employee pension plan, or otherwise, except as expressly set forth in the Agency Agreement.

40.     The Agent is a party in interest and shall have the ability to appear and be heard on all issues in any way related to or otherwise connected to this Order, the various procedures contemplated  herein, any issues related to or otherwise connected to the Sale, and the Agency

Agreement.

41.     Nothing contained in any plan confirmed in the Debtors' chapter 11 cases or any order of this Court confirming such plan or in any other order in this chapter 11 cases (including any order entered after any conversion of this case to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Agency Agreement or the terms of this Order.

42.     The Agency Agreement and any related documents may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court; provided that, with respect to any such modification, amendment or supplement that would reasonably be expected to be materially adverse to the Debtors, the Committee shall have consented thereto (which consent shall not be unreasonably withheld or delayed).

43.     Except with respect to any Governmental Unit (as to which the provisions of Paragraph 16 and 17 shall apply), this Court shall retain exclusive jurisdiction with regard to all issues or disputes relating to this Order or the Agency Agreement, including, but not limited to, (i) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and signwalker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (ii) any claim of the Debtors, the landlords and/or the Agent for protection from interference with the Sale, (iii) any other disputes related to the Sale or the enforcement of the Agency Agreement (including, without limitation, by or against the Debtors, the Agent, the DIP Agent, the Pre-Petition Agents, the Pre-Petition Lenders or the landlords), and (iv) to protect the Debtors and/or the Agent against any assertions of Encumbrances.  No parties or person shall take any action against the Debtors, the Agent, the DIP Agent, the Pre-Petition Agents, the Pre-Petition Lenders,

the landlords or the Sale with respect to any such dispute until this Court has resolved such dispute. This Court shall hear the request of any parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

44. This Order constitutes an authorization of the conduct of the Debtors and the Agent in connection herewith.

45. The Debtors shall retain sufficient funds to enable the Debtors to fully satisfy and perform their obligations under the Agency Agreement and the Debtors shall be authorized and directed to use those funds to fully satisfy and perform their obligations under the Agency Agreement.

46. In the event the Debtors, the DIP Agent or any Pre-Petition Agent notifies the Agent of its intention to draw on the Letter of Credit, the Court shall grant the Agent, upon the Agent's request, an emergency hearing before the Court (on at least one day's notice to the Court) prior to the date that is three days after the date of delivery of notice of such intention to the Agent to determine whether such draw is permitted under the terms of the Agency Agreement.

47. Notwithstanding anything to the contrary set forth herein or otherwise, (i) the Agent has no obligations under the CWI Purchase Agreement or the related designation rights agreement and (ii) the Agent's obligations hereunder and under the Agency Agreement, on the one hand, and CWI's obligations under the CWI Purchase Agreement and the related designation rights agreement, on the other hand, are several and not joint.

48. Nothing in the Agency Agreement, the Consulting Agreement, this Order, or the order approving the Consulting Agreement (collectively, the "Liquidator Transaction Documents") is intended to conflict with or to release the Debtors' obligations to comply with

the terms of the CWI Purchase Agreement, the related designation rights agreement, or any Court order approving them (collectively, the "CWI Transaction Documents"). Nothing in the CWI Transaction Documents is intended to conflict with or to release the Debtors' obligations to comply with the terms of the Liquidator Transaction Documents.

49.     Notwithstanding anything to the contrary in the Bidding Procedures Order or the Stalking Horse AA (as defined in the Bidding Procedures Order), no party, including but not limited to the Stalking Horse (as defined in the Bidding Procedures Order), shall be entitled to payment of the Break-Up Fee or Expense Reimbursement (each as defined in the Bidding Procedures Order).

50.     Notwithstanding anything to the contrary in this Order or the Agency Agreement, the Debtors, the Agent, and their respective agents, successors and assigns shall not accept or process any purchase or return by means of the use of the Debtors' private label credit cards during the Sale and cardholders will be unable to use such private label credit cards during the Sale; provided, however, that the Debtors shall take all commercially reasonable steps necessary to ensure that the Debtors' private label credit cards are not accepted during the Sale (including, without limitation, using commercially reasonable efforts to cause the point-of-sale systems in the Stores not to accept such private label credit cards), (and the Agent shall not be responsible for any failure of the Debtors to do so); provided further that, notwithstanding any provision of this Order or the Agency Agreement to the contrary, in the event of a return by a customer of goods purchased with such a private label credit card that are otherwise eligible for return pursuant to the terms of this Order and the Agency Agreement, the Agent may reimburse such customer with cash or store credit, rather than through use of such private label credit cards, and receive reimbursement for the same from the Debtors. The foregoing shall not constitute a

breach of any agreement between the Debtors and Comenity Bank ("Comenity") relating to such private label credit cards. This provision shall not affect the use of Comenity's co-branded credit cards in the Sale.

51.    Notwithstanding anything to the contrary in this Order or the Agency Agreement, the Agent shall maintain the confidentiality of the Comenity Agreement and the Comenity Information (each as defined in the Comenity Bank's Revised Limited Objection and Reservation of Rights with Respect to the Proposed Sale Objection [Doc. No. 669] and shall not disclose same to any third party without Comenity's written consent (except to the extent required by applicable law, rule or regulation, mandatory court process or request of regulatory agency; provided that, to the extent reasonably practicable and permitted by applicable law, rule or regulation, Agent shall provide reasonable advance notice of any such disclosure to Comenity).

52.    In accordance with the Bidding Procedures (as defined in the Bidding Procedures Order), the bid submitted by the Backup Bidder for, among other things, the Acquired Assets shall be open and irrevocable until the earlier of: (i) June 2, 2017 and (ii) the second day following the occurrence of the Closing Date, in each case subject to the express terms thereof. Prior to consummating the Backup Bid, the Debtors shall obtain a Court order after notice and a hearing authorizing the consummation of such Backup Bid.

53.    Notwithstanding Bankruptcy Rules 4001 and 6004, or any other law that would serve to stay or limit the immediate effect of this Order, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Agent are free to perform under the Agency Agreement at any time, subject to the terms of the Agency

Agreement.

54.    To the extent that anything contained in this Order explicitly conflicts with a

provision in the Agency Agreement, the GOB Sale Guidelines or any other order in the

Bankruptcy Cases except for the Final DIP Order, this Order shall govern and control.

Dated:    _May 4, 2017_

                                              */e/ Michael E. Ridgway*
                                              Michael E. Ridgway
                                              United States Bankruptcy Judge

> NOTICE OF ELECTRONIC ENTRY AND
> FILING ORDER OR JUDGMENT
> Filed and Docket Entry made on *05/04/2017*
> Lori Vosejpka, Clerk, by MJS

61307728_2

Exhibit A

## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is entered into as of this ___ day of April, 2017, by and between Gander Mountain Company, a Minnesota corporation and Overton's, Inc., a North Carolina corporation, debtors and debtors in possession (collectively, "Merchant"), and a contractual joint venture comprised of Tiger Capital Group, LLC, Great American Group WF, LLC, Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC (jointly, severally and collectively, the "Agent"; and collectively with Merchant, the "Parties").

## RECITALS

WHEREAS, on March 10, 2017, Merchant filed a voluntary petition for relief under chapter 11 of Title 11, United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"). Merchant's chapter 11 cases are currently pending before the Bankruptcy Court under case numbers 17-30673 and 17-30675 (the "Bankruptcy Case").

WHEREAS, on March 15, 2017, Merchant entered into a Consulting Agreement (as amended, supplemented or otherwise modified from time to time, the "Consulting Agreement") with a joint venture of Tiger Capital Group, LLC and Great American Group, LLC to sell all merchandise, and furniture, fixtures and equipment located at 32 retail stores and two warehouses identified on Exhibit A-3 (the "Fee Stores").

WHEREAS, Merchant and CWI, Inc. ("Camping World") entered into an Asset Purchase Agreement and related documents (as amended, supplemented or otherwise modified from time to time, the "Camping World APA") to sell certain Overton's merchandise, and furniture, fixtures and equipment located at two distribution centers identified on Exhibit A-4 (the "Camping World Distribution Centers") and two retail stores identified on Exhibit A-4 (together with the Camping World Distribution Centers, the "Camping World Locations") as well as all other Acquired Assets (as defined in the Camping World APA) (the "Camping World Acquired Assets").

WHEREAS, Merchant operates certain retail stores in the United States and desires that Agent act as Merchant's exclusive agent for the limited purpose of (a) selling all of the Merchandise (as hereinafter defined) located in certain of Merchant's retail store locations identified on Exhibit A-1 attached hereto (each individually a "Store", and collectively the "Stores") and certain of Merchant's distribution centers identified on Exhibit A-2 attached hereto (the "Distribution Centers"), inclusive of In-Transit Merchandise and Distribution Center Merchandise (each as defined below) that is received in the Stores on or before the Receipt Deadline (defined below), and (b) selling all of the Owned FF&E (as hereinafter defined) located in the Stores, the Distribution Centers, and Merchant's corporate offices (collectively, the "COs") (subject to Section 15 below), in each case by means of such themed sale as more fully set forth herein (as further described below, the "Sale").

WHEREAS, reference is made to (i) that certain credit agreement, dated as of April 11, 2011 (as amended, supplemented or otherwise modified from time to time, the "Pre-Petition ABL Credit Agreement"), by and among Merchant, the other borrowers party thereto from time

- 1 -

to time, the guarantors party thereto from time to time, Wells Fargo Bank, National Association, in its capacity as administrative agent and collateral agent (the "<u>Revolving Agent</u>"), and the lenders party thereto (and other parties secured jointly therewith) from time to time (the "<u>Revolving Lenders</u>"), (ii) that certain credit agreement, dated July 17, 2015 (as amended, supplemented or otherwise modified from time to time, the "<u>Pre-Petition Term Loan Agreement</u>," and together with the Pre-Petition ABL Credit Agreement, the "<u>Pre-Petition Credit Agreements</u>"), by and among Merchant, the other borrowers party thereto from time to time, the guarantors party thereto from time to time, Pathlight Capital LLC, in its capacity as administrative agent and collateral agent (the "<u>Term Agent</u>" and, together with the Revolving Agent, collectively, the "<u>Pre-Petition Agents</u>"), and the lenders party thereto (and other parties secured jointly therewith) from time to time (the "<u>Term Lenders</u>" and, together with the Revolving Lenders, the "<u>Pre-Petition Lenders</u>"); and (iii) that certain debtor-in-possession credit agreement, dated as of March 14, 2017 (as amended, supplemented or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), by and among Merchant, the other borrowers party thereto from time to time, the guarantors party thereto from time to time, Wells Fargo Bank, National Association, in its capacity as administrative agent and collateral agent (the "<u>DIP Agent</u>"), and the lenders party thereto (and other parties secured jointly therewith) from time to time (the "<u>DIP Lenders</u>").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.    <u>Definitions and Exhibits</u>

1.1    <u>Defined Terms</u>.  The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section Reference |
| --- | --- |
| Additional Agent Merchandise | Section 8.10(a) |
| Additional Agent Merchandise Fee | Section 3.1(c) |
| Additional Agent Merchandise Proceeds | Section 3.1(c) |
| Additional Taxes and Penalties | Section 8.3(a) |
| Adjustment Amount | Section 3.3(a) |
| Agency Accounts | Section 3.3(b)(ii) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent's FF&E Commission | Section 15(a) |
| Agent Claim | Section 12.5 |
| Agent Collateral | Section 16.12(a) |
| Agent Indemnified Parties | Section 8.3(a) |
| Agreement | Preamble |
| Applicable General Laws | Section 2(c) |
| Approval Order | Section 2(b) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |

| | |
|---|---|
| Bankruptcy Court | Recitals |
| Benefits Cap | Section 4.1(c) |
| Bidding Procedures Order | Section 10.1(b) |
| Break-Up Fee | Section 16.11(b) |
| Camping World | Recitals |
| Camping World Acquired Assets | Recitals |
| Camping World APA | Recitals |
| Camping World Distribution Centers | Recitals |
| Camping World Locations | Recitals |
| Central Services | Section 4.1 |
| Central Services Expenses | Section 4.1 |
| Certain FF&E Lenders | Section 15 |
| Competing Bid | Section 16.12(a) |
| COs | Recitals |
| Cost Factor | Section 3.1(d) |
| Cost Factor Threshold | Section 3.1(d) |
| Cost File | Section 5.3(a) |
| Cost Value | Section 5.3(a) |
| Defective Merchandise | Section 5.2(b) |
| Designated Deposit Accounts | Section 3.3(b)(i) |
| DIP Agent | Recitals |
| DIP Credit Agreement | Recitals |
| DIP Lenders | Recitals |
| Distribution Centers | Recitals |
| Distribution Center Expenses | Section 4.1 |
| Distribution Center Merchandise | Section 5.2 |
| Estimated Guaranteed Amount | Section 3.3(a) |
| Estimated Guaranty Merchandise Amount | Section 3.3(a) |
| Events of Default | Section 14 |
| Excluded Benefits | Section 4.1 |
| Excluded Defective Merchandise | Section 5.2(b) |
| Excluded Price Adjustments | Section 3.1(c)(ii) |
| Expenses | Section 4.1 |
| Expense Reimbursement | Section 16.11(c) |
| Fifth Third | Section 15 |
| Final Inventory Report | Section 3.3(a) |
| Final Reconciliation | Section 8.7(b)(i) |
| Final Reconciliation Settlement Date | Section 8.7(b)(i) |
| Force Majeure Event | Section 8.8 |
| FF&E Commission Option | Section 15(a) |
| FF&E Disposition Budget | Section 15(a) |
| FF&E Disposition Expenses | Section 15(a) |
| FF&E Guaranty Amount | Section 15(a) |
| FF&E Guaranty Option | Section 15(a) |
| FF&E Sale Election Deadline | Section 15(a) |
| FF&E Sale Option | Section 15(a) |

| | |
|---|---|
| GC Transaction | Section 16.11(b) |
| GOB Transaction | Section 16.11(b) |
| Gross Rings | Section 5.3(b)(vi) |
| Gross Rings Period | Section 5.3(b)(vi) |
| Guaranteed Amount | Section 3.1(a) |
| Guaranteed Merchandise Amount | Section 3.1(a) |
| Guaranty Percentage | Section 3.1(a) |
| Hazardous Materials | Section 15(d) |
| In-Transit Merchandise | Section 5.2(b) |
| Initial Guaranty Payment | Section 3.3(a) |
| Inventory Date | Section 5.1(a) |
| Inventory Taking | Section 5.1(a) |
| Inventory Taking Instructions | Section 5.1(a) |
| Inventory Taking Service | Section 5.1(a) |
| Lease Extension Motion | Section 10.1(g) |
| Letter of Credit | Section 3.1(h) |
| Liquidation Sale Laws | Section 2(c) |
| Lowest Location Price | Section 3.1(d)(i) |
| Membership Program Discount | Section 8.6(b) |
| Merchandise | Section 5.2(a) |
| Merchant | Preamble |
| Merchant Consigned Goods | Section 5.4 |
| Merchant's Designated Account | Section 3.3(a) |
| Merchant Indemnified Parties | Section 8.3(a) |
| Minimum Bid | Section 16.11(b) |
| Minimum Bid Increment | Section 16.11(b) |
| Net FF&E Proceeds | Section 15(a) |
| Non-CAM Trash Removal Charges | Section 4.1 |
| Occupancy Expenses | Section 4.1 |
| Owned FF&E | Section 15(a) |
| Parties | Preamble |
| Payment Date | Section 3.3(a) |
| Pre-Petition ABL Credit Agreement | Recitals |
| Pre-Petition Agents | Recitals |
| Pre-Petition Credit Agreements | Recitals |
| Pre-Petition Lenders | Recitals |
| Pre-Petition Term Loan Agreement | Recitals |
| Prevailing Discount Adjustment | Section 5.3(b)(i) |
| Proceeds | Section 3.3(b) |
| Receipt Deadline | Section 5.2 |
| Reconciled Merchandise Receipts | Section 5.1(b) |
| Remaining Merchandise | Section 3.2 |
| Rent and Wage Advance | Section 3.3(a) |
| Retail Price | Section 3.1(d)(i) |
| Retained Employee | Section 9.1 |
| Retention Bonus | Section 9.4 |

| | |
|---|---|
| Returned Merchandise | Section 8.5 |
| Revolving Agent | Recitals |
| Revolving Lenders | Recitals |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Guidelines | Section 8.1 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3(a) |
| Sales Tax Account | Section 8.3(a) |
| Shipping Variance | Section 5.1(b) |
| Shipping Variance Response | Section 5.1(b) |
| Store(s) | Recitals |
| TGA Letter of Credit | Section 3.3(f) |
| Term Agent | Recitals |
| Term Lenders | Recitals |
| Third Party | Section 4.1 |
| UCC | Section 8.10(d) |
| Vacate Date | Section 6.2 |
| Vacate Notice | Section 6.1 |
| WARN Act | Section 9.1 |

1.2    <u>Exhibits</u>.  The Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

| Exhibit | Section Reference | Description |
|---|---|---|
| Exhibit A-1 | Recitals | Stores |
| Exhibit A-2 | Recitals | Distribution Centers |
| Exhibit A-3 | Recitals | Fee Stores |
| Exhibit A-4 | Recitals | Camping World Locations |
| Exhibit 2(c) | Section 2(c) | Firearms and Ammunition Sales |
| Exhibit 3.1(d) | Section 3.1(d) | Cost Factor Adjustment |
| Exhibit 3.1(f) | Section 3.1(f) | Merchandise Threshold |
| Exhibit 3.3(a) | Section 3.3(a) | Merchant's Designated Account |
| Exhibit 3.3(h) | Section 3.3(h) | Form of Letter of Credit |
| Exhibit 4.1(a) | Section 4.1(a) | Store Occupancy Expense Schedule |
| Exhibit 5.1(a) | Section 5.1(a) | Inventory Taking Instructions |
| Exhibit 5.2(b)(1) | Section 5.1(b) | Distribution Center Merchandise |
| Exhibit 5.2(b)(2) | Section 5.1(b) | In-Transit Merchandise |
| Exhibit 5.2(b)(3) | Section 5.1(b) | Division 9 Goods |
| Exhibit 8.1 | Section 8.1 | Sale Guidelines |
| Exhibit 10.1(c) | Section 10.1(c) | Form of Approval Order |
| Exhibit 11.1(c) | Section 11.1(c) | Pre-Existing Liens |
| Exhibit 11.1 (k) | Section 11.1(k) | Pending Matters |
| Exhibit 11.1(s) | Section 11.1(s) | Promotional Activity |

- 5 -

Section 2.    <u>Appointment of Agent/Liquidation Sale Laws/Approval Order</u>

(a)    <u>Appointment of Agent</u>.  Effective on the date hereof and subject to the entry of the Approval Order, Merchant hereby irrevocably appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and, in accordance with the terms of Section 15, disposing of Merchant's Owned FF&E at the Stores, the Distribution Centers, and the COs, in accordance with the terms and conditions of this Agreement.

(b)    <u>Approval Order</u>.  Merchant shall seek entry of an order from the Bankruptcy Court approving this Agreement and authorizing Merchant and Agent to conduct the Sale in accordance with the terms hereof (the "<u>Approval Order</u>") subject to the Bidding Procedures and Bidding Procedures Order.  The Approval Order shall be in substantially the form annexed hereto as <u>Exhibit 10.1(c)</u>, and otherwise be reasonably satisfactory to the Merchant and Agent, and provide, <u>inter alia</u>, that:

(i)    this Agreement (and each of the transactions contemplated hereby, including without limitation the Sale) is approved in its entirety;

(ii)    Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby (including, without limitation, the Sale and completing the Final Reconciliation);

(iii)    Agent shall be entitled to sell all Merchandise, Additional Agent Merchandise, Merchant Consignment Goods and Owned FF&E hereunder free and clear of all liens, claims, interests or encumbrances thereon (including, without limitation, any liens, claims, interests or encumbrances in favor of the DIP Agent, the DIP Lenders, the Pre-Petition Agents or the Pre-Petition Lenders), with any such presently existing liens encumbering all or any portion of the Merchandise, Merchant Consignment Goods, Owned FF&E, the Proceeds or any proceeds of the foregoing attaching, as applicable, only to the Guaranteed Amount and other proceeds thereof to be received by Merchant under this Agreement;

(iv)    Agent shall have the right to use the Stores, Distribution Centers, COs, and all related services, furniture, fixtures, equipment and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person subject to compliance with the Sale Guidelines and Approval Order;

(v)    Agent, as agent for Merchant, is authorized to conduct, advertise, post signs and otherwise promote the Sale as set forth in Sections 2(c) and 8.1 below;

(vi)    Agent shall be granted a limited non-exclusive royalty-free license and right to use until the Sale Termination Date the trademarks, trade names, logos, customer lists, website, URL, social media sites (including Facebook and Twitter), mailing lists and email lists relating to and used in connection with the operation of the Stores, solely for the purpose of promoting, conducting, and advertising the Sale in

accordance with the terms of this Agreement and all of which assets, rights and interests shall remain property of the Merchant or Camping World;

(vii)    all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting, promoting, and advertising of the Sale in the manner contemplated by this Agreement;

(viii)    all utilities, internet service providers, website service or hosting providers, landlords, creditors, governmental authorities, and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct or advertising of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or otherwise impedes the conduct or advertising of the Sale;

(ix)    the Bankruptcy Court shall retain jurisdiction over all parties to this Agreement (including, without limitation, the DIP Agent, the DIP Lenders, the Pre-Petition Agents and the Pre-Petition Lenders) to enforce this Agreement;

(x)    Agent shall not be the successor to Merchant or any predecessor or affiliate of Merchant and Agent will not assume, or in any way be liable or responsible for, any claim or liability, whether known or unknown, whether asserted or unasserted, whether accrued or unaccrued, whether contingent or not, whether at law or in equity or otherwise, whether existing on the date hereof or arising thereafter and whether relating to or arising out of Merchant's business, the Merchandise or otherwise, other than as expressly provided for in this Agreement;

(xi)    Agent shall be authorized to include Additional Agent Merchandise in the Sale subject to the provisions hereof;

(xii)    subject to Agent having satisfied its obligations hereunder, any amounts owed by Merchant to Agent under this Agreement shall be granted the status of superpriority claims in Merchant's Bankruptcy Case pursuant to section 364(c) of Bankruptcy Code senior to all other superpriority claims, including, without limitation, to the superpriority claims of DIP Agent, DIP Lenders, Pre-Petition Agents, and Pre-Petition Lenders; provided that until the Merchant receives payment in full of the Guaranteed Amount, Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to Merchant hereunder, any superpriority claim granted to Agent hereunder shall be junior and subordinate in all respects to the security interests and superpriority claims of the DIP Agent, DIP Lenders, Pre-Petition Agents, and Pre-Petition Lenders, but solely to the extent of the amount of the unpaid portion of the Guaranteed Amount, Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to Merchant hereunder;

(xiii)   Agent shall be granted a valid, binding, enforceable and perfected security interest and lien as provided for in Section 16.12 hereof without the necessity of filing financing statements or other steps to perfect the security interest or lien (other than entry of the Approval Order);

(xiv)   the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and proceeding with the Sale at the Stores uninterrupted;

(xv)   Merchant's decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement is a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest;

(xvi)   this Agreement was negotiated in good faith and at arms' length between the Merchant and Agent and Agent is entitled to the protection of Sections 363(m) and 364(e) of the Bankruptcy Code;

(xvii)   Agent's performance under this Agreement will be, and payment of the Guaranteed Amount, and other amounts payable under this Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of Sections 363(m) and 364(e) of the Bankruptcy Code;

(xviii)  in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Sections 363(m) and 364(e) of the Bankruptcy Code, and no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order;

(xix)   this Agreement is approved pursuant to Section 363 of the Bankruptcy Code;

(xx)   (A) the terms of this Agreement shall be binding on any trustee appointed for the Merchant under any provision of the Bankruptcy Code, whether the Bankruptcy Case of the Merchant is proceeding under chapter 7 or chapter 11 of the Bankruptcy Code (the "Trustee"); (B) any such Trustee shall be authorized and directed to operate the business of Merchant to the fullest extent necessary to permit compliance with the terms of this Agreement; and (C) Agent and any such Trustee shall be authorized to perform under this Agreement upon the appointment of a Trustee without the need for further order of the Bankruptcy Court;

(xxi)   the application of any automatic stay of enforcement of the Approval Order is waived;

(xxii)   the Approval Order constitutes an authorization of the conduct of Merchant and Agent in connection herewith;

(xxiii) Agent shall be entitled to be heard on all issues in the Bankruptcy Case in any way related to or otherwise connected with this Agreement or the transactions contemplated hereby;

(xxiv) nothing contained in this Agreement and none of Agent's actions taken in respect of this Agreement or the transactions contemplated hereby shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees (except for Agent's obligations to pay Expenses in accordance with the terms of this Agreement), nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees;

(xxv) Merchant shall retain sufficient funds to enable Merchant to fully satisfy and perform its obligations under this Agreement and Merchant shall be authorized and directed to use those funds to fully satisfy and perform its obligations under this Agreement;

(xxvi) In the event the Merchant, the DIP Agent or any Pre-Petition Agent notifies the Agent of its intention to draw on the Letter of Credit, the Bankruptcy Court shall grant the Agent, upon the Agent's request, an emergency hearing before the Bankruptcy Court (on at least one day's notice to the Bankruptcy Court) prior to the date that is three days after the date of delivery of notice of such intention to the Agent to determine whether such draw is permitted under the terms of this Agreement; and

(xxvii) (A) during the Sale Term applicable to any Store or Distribution Center and for purposes of conducting the Sale at such Store or Distribution Center until the applicable Vacate Date, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, such Store or Distribution Center and the assets currently located at such Store or Distribution Center, in each case subject to the extent of Merchant's rights and entitlement to use the same, and the services provided at such Store or Distribution Center to the extent Merchant is entitled to such services and (B) Merchant shall not assign, reject or otherwise terminate any lease relating to any such Store or Distribution Center or vacate any such Store or Distribution Center until the applicable Sale Termination Date or Vacate Date.

(c)      Advertisement.  Subject to entry of the Approval Order, Agent shall be authorized to conduct and advertise the Sale as a "going out of business", "total liquidation", "store closing", "sale on everything", "everything must go", "everything on sale", or similar-themed sale, and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, permitting, privacy, consumer protection, occupational health and safety, the environment, and, as more specifically provided on Exhibit 2(c), firearm and ammunition sales, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "going out of business", "total liquidation", "store closing", "sale on everything", "everything must go", "everything on sale", or similar-themed sales, including laws restricting safe,

- 9 -

professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the Sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply to the Sale, but excluding those designed to protect public health and safety (collectively, the "Liquidation Sale Laws"), provided that such Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines and Approval Order and the provisions of Section 8.1 below.

(d)    Authority.  Except as otherwise specifically provided in this Agreement, Agent shall have no authority, and shall not represent that it has any authority, to enter into any contract, agreement, or other arrangement or take any other action by or on behalf of Merchant, that would have the effect of creating any obligation or liability, present or contingent, on behalf of or for the account of Merchant without Merchant's prior written consent.

Section 3.    Guaranteed Amount and Other Payments

3.1    Payments to Merchant and Agent.

(a)    As a guaranty of Agent's performance hereunder, in addition to the payment of Expenses (as provided for in Section 4.1 hereof), Agent guarantees that Merchant shall receive an amount equal to ninety-two and one half percent (92.5%) (the "Guaranty Percentage") of the aggregate Cost Value of Merchandise (the "Guaranteed Amount").  The Guaranteed Amount will be calculated based upon the product of (x) the Guaranty Percentage *multiplied by* (y) the aggregate Cost Value of the Merchandise (in the case of (y), as determined by (A) the Final Inventory Report at the conclusion of the Inventory Taking by the Inventory Taking Service after verification and reconciliation thereof by Merchant (in consultation with DIP Agent and Pre-Petition Agents) and Agent, (B) the aggregate amount of Merchandise subject to Gross Rings (as adjusted for shrinkage per this Agreement), (C) to the extent not included in 3.1(a)(A) or (B), the aggregate Cost Value of In-Transit Merchandise and Distribution Center Merchandise included in the Sale (as counted and calculated in accordance with the terms of this Agreement); (D) to the extent not included in 3.1(a)(A), (B) or (C), the aggregate Cost Value of Returned Merchandise not otherwise included in the Inventory Taking; and (E) any other adjustments to Cost Value as expressly contemplated by this Agreement).  Agent shall pay to Merchant (or its designee) the Guaranteed Amount in the manner and at the times specified in Section 3.3 below.

(b)    [Intentionally Omitted.]

(c)    In addition to the Guaranteed Amount, Agent shall pay to Merchant an amount equal to the greater of (i) $3,150,000 or (ii) five percent (5%) of the gross proceeds (net of sales taxes) of the sale of Additional Agent Merchandise (the "Additional Agent Merchandise Fee").  All proceeds of the sale of Additional Agent Merchandise in excess of the Additional Agent Merchandise Fee shall be retained by Agent (the "Additional Agent Merchandise Proceeds").  The amount in subpart (i) of the foregoing sentence shall be paid together with Initial Guaranty Payment on account of the Additional Agent Merchandise Fee and reconciled as part of the Final Reconciliation.

(d)     The Guaranty Percentage has also been fixed based upon the assumption that the aggregate Cost Value of the Merchandise included in the Sale as a percentage of aggregate Retail Price of the Merchandise included in the Sale (without taking into account any Prevailing Discount Adjustment and/or Excluded Price Adjustments) (the "Cost Factor") shall not be greater than fifty-seven percent (57%) (the "Cost Factor Threshold").  In the event that the Cost Factor is greater than the Cost Factor Threshold, then such deviation shall not constitute a breach of any representation or warranty, or an Event of Default; provided, however, that, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(d).  Any adjustment to the Guaranty Percentage provided for under this Section 3.1(d) shall be cumulative with, and in addition to, any other adjustment provided for under this Agreement, including, but not limited to, any adjustment provided for under Section 3.1(f) hereof.  For purposes of this Agreement:

(i)     "Retail Price" means, with respect to each item of Merchandise, the lower of (a) the lowest of the ticketed price, shelf price, hang-tag price, stickered price, PLU or other hard-marked price as determined in each case during the Inventory Taking (provided that, Agent hereby covenants and agrees with the Merchant and the DIP Agent, DIP Lenders, Pre-Petition Agents, and the Pre-Petition Lenders that Agent shall not alter any of the ticketed price, shelf price, hang-tag price, stickered price, PLU or other hard-marked price of any Merchandise at any Store from and after the Sale Commencement Date through the Inventory Date with respect to such Store), or (b) the Retail File Price, excluding in all instances Excluded Price Adjustments.  For purposes of calculating Retail Price, if an item of Merchandise has more than one ticketed price, shelf price, hang-tag price, stickered price, PLU or other hard-marked price, or if multiple items of the same SKU have different ticketed prices, shelf prices, hangtag prices, stickered prices, PLU or other hard-marked prices and such pricing does not otherwise qualify as an Excluded Price Adjustment, the lowest ticketed price, shelf price, hang-tag price, stickered price, or other hard-marked price on any such item shall prevail for such item or for all such items within the same SKU (as determined in each case during the Inventory Taking), as the case may be, that are located within the same location (as the case may be, the "Lowest Location Price"), unless it is reasonably determined by Merchant and Agent that the applicable Lowest Location Price was mismarked, normal course markdowns had not been reflected or taken, or such item was priced because it was damaged or marked as "as is," in which case the correct price shall control; provided, however, in determining the Lowest Location Price with respect to any item of Merchandise at a Store, the Lowest Location Price shall be determined based upon the lowest Retail Price for such item on a per Store basis.  No adjustment to Retail Price shall be made with respect to different Retail Prices for items located in different Stores, the e-commerce site, Fee Stores or Camping World Locations.  The "Retail File Price" with regard to any item of Merchandise shall be the lesser of the price contained in the "REGULAR_UNIT_RETAIL" column and the price contained in the "CURRENT_NON_PROMO_RETAIL" column, which columns are contained in Merchant's inventory item master file, entitled "item_loc_inv_20170313.txt" and which file structure and columns are identified in the "Project Big FTP Instructions" file dated April 17, 2017 (as updated and provided by the Merchant to the Agent, the DIP Agent and the Pre-Petition Agents, the "Retail Price File") and excludes all instances of Excluded Price Adjustments.  For purposes of calculating the Retail Price, (i) if the Retail Price for any SKU in the Retail Price File as updated and provided by the Merchant to the

Agent as of the Sale Commencement Date differs from the Retail Price for such SKU in the Retail Price File dated April 17, 2017, the lower Retail Price for such SKU shall control and (ii) if the Retail Price File as updated and provided by the Merchant to the Agent as of the Sale Commencement Date contains a new SKU, the Retail Price of that new SKU set forth in the Retail Price File as updated and provided by Merchant to Agent as of the Sale Commencement Date shall control.

(ii)     "Excluded Price Adjustments" means the following discounts or price adjustments offered by the Merchant:  (i) point of sale discounts or similar adjustments (regardless of duration); (ii) employee discounts; (iii) member or customer appreciation points or coupons; (iv) multi-unit purchase discounts; (v) coupons (Merchant's or competitors'), catalog, website, or circular prices, or "buy one get one" type discounts; (vi) customer savings pass discounts or "bounce back" coupons, or discounts for future purchases based on dollar value of past purchases; (vii) obvious ticketing or marking errors;(viii) instant (in-store) or mail in rebates; (ix) similar customer specific, temporary, or employee non-product specific discounts or pricing accommodations; (x) the price contained in the "ORIGINAL_RETAIL" column and "PROMO_RETAIL" column in Merchant's inventory item master file, entitled "item_loc_inv_20170313.txt", which file structure and columns are identified in the "Project Big FTP Instructions" file; and (xi) discounts relating to store closing sales conducted in the Fee Stores or Camping World Locations.

(e)     To ensure accurate sales audit functions, Agent shall use Merchant's existing point-of-sale system for recording all sales (including any sales of Additional Agent Merchandise) in the Stores, and Merchant shall ensure that Agent shall have access and use of such point of sale system for the duration of the Sale Term.

(f)     The Guaranty Percentage has been fixed based upon the Merchant's representation that the aggregate Cost Value of the Merchandise included in the Sale is not less than $374,500,000 (the "Merchandise Threshold") and not greater than $414,500,000 (the "Merchandise Ceiling").  To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less than the Merchandise Threshold, or higher than the Merchandise Ceiling, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(f) attached hereto, as and where applicable.  Any adjustment to the Guaranty Percentage provided for under this Section 3.1(f) shall be cumulative with, and in addition to, any other adjustment provided for under this Agreement, including, but not limited to, any adjustment provided for under Section 3.1(d) hereof.

3.2     Payments to Agent.  Subject to Agent's obligation to pay in full the Guaranteed Amount and all Expenses, Agent shall be entitled to retain any remaining Proceeds.  Provided that no Event of Default has occurred and continues to exist on the part of Agent, all Merchandise remaining at the conclusion of the Sale ("Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims, interests and encumbrances of any kind or nature.  Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo.

3.3    Time of Payments; Proceeds; Control of Proceeds

(a)    Subject to entry of the Approval Order, on May 4, 2017 (or, if later, the first business day occurring on or after the date on which the Approval Order shall be entered) (the "Payment Date"), Agent shall pay to DIP Agent, as Merchant's designee, to the Merchant's Designated Account (as hereinafter defined) an amount (the "Initial Guaranty Payment") equal to (i) ninety percent (90%) of the product of the Guaranty Percentage *multiplied by* the estimated aggregate Cost Value of the Merchandise in the Stores and Distribution Centers as reflected on Merchant's books and records maintained in the ordinary course of business at the close of business on the last day immediately preceding the Sale Commencement Date (the "Estimated Guaranteed Amount") plus (ii) all Occupancy Expenses for the portion of the month of May 2017 occurring on or after the Sale Commencement Date and one week of estimated wages and commissions of Retained Employees (the "Rent and Wage Advance"); provided that the Estimated Guaranteed Amount payable by Agent on the Payment Date shall be calculated based on Merchandise located in the Stores and Distribution Centers as of the close of business on the last business day immediately preceding the Sale Commencement Date and shall expressly exclude any In-Transit Merchandise not then located at a Store or Distribution Centers.  On the Payment Date, the Initial Guaranty Payment shall be made by wire transfer of immediately available funds to the account designated on Exhibit 3.3(a) attached hereto (the "Merchant's Designated Account").  The balance of the Guaranteed Amount, if any (including, without limitation, any portion of the Guaranteed Amount attributable to any In-Transit Merchandise reconciled and reported as part of the Final Inventory Report), shall be paid by Agent by wire transfer of immediately available funds to the Merchant's Designated Account on the earlier of: (x) the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise counted by the Inventory Taking Service following the completion of the Inventory Taking, after review, reconciliation and mutual written verification thereof by Merchant (in consultation with DIP Agent and Pre-Petition Agents) and Agent (the "Final Inventory Report"), and (y) the date that is thirty (30) days after the Sale Commencement Date (in the case of (y) above, Agent shall tender payment of the undisputed portion only on account of any remaining portion of the Guaranteed Amount).  In the event of a dispute as to the calculation of the remaining portion of the Guaranteed Amount, any such dispute shall be resolved in the manner and at the times set forth in Section 8.7(b)(ii) hereof, and Agent's failure to pay such balance or undisputed portion shall entitle the Merchant and the DIP Agent, on behalf of the DIP Lenders, and Pre-Petition Agents, on behalf of the Pre-Petition Lenders (individually or collectively) to draw upon the Letter of Credit in accordance with Section 3.3(g) hereof to the extent of such balance or undisputed portion.  Merchant and Agent shall exercise reasonable best efforts to reconcile the Inventory Taking within ten (10) days after its completion.  In the event that the excess of (I) the Initial Guaranty Payment over (II) the Rent and Wage Advance is either less than or exceeds the Guaranteed Amount, as applicable, Agent or Merchant, as the case may be, shall pay to Merchant or Agent, as the case may be, the amount (the "Adjustment Amount") by which the actual Guaranteed Amount exceeds or is less than the excess of (A) the Initial Guaranty Payment over (B) the Rent and Wage Advance.

For purposes of this Agreement, "Proceeds" shall mean the aggregate of (i) the total amount (in dollars) of all sales of Merchandise (inclusive of any Distribution Center Merchandise and In-Transit Merchandise included in the Sale) made under this Agreement and all service revenue received by Merchant with respect to the Sale, in each case during the Sale

Term and exclusive of Sales Taxes, (ii) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term relating to the Merchandise, and (iii) any and all proceeds received by Agent from the disposition of Remaining Merchandise. For the avoidance of doubt: (1) all proceeds from the sales at Merchant's Stores for periods prior to the Sale Commencement Date, including the cash or checks located at the Stores or Distribution Centers on the Sale Commencement Date, and for the avoidance of doubt cash or checks in transit; (2) the proceeds from the sale of Merchant Consignment Goods pursuant to Section 5.4 hereof (subject to Agent's right to receive the commission under Section 5.4 below); (3) all proceeds from sales pursuant to the Consulting Agreement and the Camping World APA; (4) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring prior to the Sale Commencement Date; (5) proceeds from the sale or other disposition of Owned FF&E (subject to Agent's right to receive the FF&E Commission under Section 15 below) or the FF&E Guaranty Amount, as applicable; (6) proceeds of the sale of Additional Agent Merchandise; and (7) payments made by Agent on account of the Guaranteed Amount, Expenses, the Letter of Credit, shall, in each case, not constitute "Proceeds" hereunder.

        (b)     All Proceeds shall be controlled by Agent in the manner provided for below:

        (i)     Prior to the date Agent establishes the Agency Accounts (see clause (ii) below), all Proceeds (including credit card Proceeds) and proceeds of the sale of Additional Agent Merchandise, Merchant Consignment Goods, and Owned FF&E shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, owned and in the name of, Merchant for the Stores, which accounts shall be designated for the deposit of Proceeds (including all cash, credit card payments, checks and similar items of payment, deposits and any other amounts contemplated by this Agreement (including proceeds from the sale of Owned FF&E, Additional Agent Merchandise, and Merchant Consignment Goods)), and the disbursement of amounts payable to or by Agent hereunder (the "<u>Designated Deposit Accounts</u>"). Subject to the provisions of Section 16.12 hereof, the Approval Order shall provide (a) that Merchant grants to Agent a first priority security interest in and lien upon each Designated Deposit Account to the extent of any Proceeds and any other amounts payable to Agent deposited therein, and (b) for turnover to Agent of any such Proceeds (and any other amounts payable to Agent deposited therein) in accordance with the terms and provisions of this Agreement and the Approval Order, as applicable. If, notwithstanding the provisions of this Section, Merchant, DIP Agent, any DIP Lender, any Pre-Petition Agent or any Pre-Petition Lender receives or otherwise has dominion over or control of any Proceeds, or other amounts due to Agent (including proceeds from the sale of Additional Agent Merchandise), Merchant, DIP Agent, DIP Lenders, Pre-Petition Agents, and Pre-Petition Lenders shall hold the same and other amounts in trust for Agent, and shall not deposit such Proceeds or other amounts due Agent hereunder in any account except a Designated Deposit Account or as otherwise instructed by Agent. Until such time as Agent establishes the Agency Accounts (see clause (ii) below), Merchant, Agent, the DIP Agent, on behalf of the DIP Lenders, and Pre-Petition Agents, on behalf of Pre-Petition Lenders, shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Agent, of all Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement that

- 14 -

are deposited into the Designated Deposit Accounts; and shall, to the extent requested by Agent, enter into deposit control agreement(s) for such accounts.

   (ii)  After payment of the Initial Guaranty Payment and delivery of the Letter of Credit, Agent may establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds (including credit card Proceeds), and other amounts contemplated by this Agreement, and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent may elect to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement, and the distribution of amounts payable hereunder; provided that, in the event (a) Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts, and (b) such accounts have amounts deposited therein by Merchant that do not constitute Proceeds and/or other amounts payable to Agent under this Agreement, then Merchant, Agent and the DIP Agent, on behalf of the DIP Lenders, and Pre-Petition Agents, on behalf of Pre-Petition Lenders, shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Agent, of all Proceeds (including credit card Proceeds) and other such amounts contemplated by this Agreement. Upon request, Agent shall deliver to Merchant, DIP Agent and Pre-Petition Agents copies of all bank statements and other information relating to the Agency Accounts; provided that, in the event Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts, Merchant shall deliver to Agent copies of all bank statements and other information relating to such accounts to enable Agent to track and trace deposited funds that constitute Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card Proceeds) and all other amounts contemplated by this Agreement shall be deposited into the Agency Accounts.

   (iii)  Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, and Merchant identification number(s) and existing bank accounts for credit card Proceeds solely for purposes of the Sale, and for processing transactions relating to Additional Agent Merchandise, Merchant Consignment Goods, and Owned FF&E. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request, Merchant shall cooperate with Agent to

establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds (and proceeds from Additional Agent Merchandise, Merchant Consignment Goods, and Owned FF&E) for Agent's own account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, and Owned FF&E sold during the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received, prior to, during or after the Sale Term.

(iv)   Commencing on the first business day following the Payment Date, and continuing on each business day thereafter, Merchant shall promptly pay to Agent by wire transfer of immediately available funds all funds constituting Proceeds (including, without limitation, Proceeds from credit card sales), and proceeds from Additional Agent Merchandise that are deposited into the Designated Deposit Accounts for the prior day. Agent shall, within a reasonable period of time after the date of each such payment by Merchant, notify Merchant, DIP Agent and Pre-Petition Agents of any shortfall in such payment, in which case, Merchant shall promptly pay to Agent funds in the amount of any undisputed shortfall.

(c)   Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after two (2) business days' notice to Merchant, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after two (2) business days' notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(d)   All amounts required to be paid by Agent or Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later than 2:00 p.m. (prevailing Eastern Time) on the date that such payment is due; provided that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (prevailing Eastern Time) on the date that such payment is due. In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

(e)   If, and to the extent, the Agent over-funds any amounts in respect of the Guaranteed Amount hereunder (as determined pursuant to the express terms of this Agreement) and such funding or payment cannot be recovered by the Agent from Merchant under Section 3.3(a) or Section 3.3(c), by means of an offset or otherwise, then Merchant agrees (or if Merchant shall be unable to or otherwise for any reason fails to, and any of (i) the Pre-Petition Lenders, (ii) the DIP Lenders, (iii) the Pre-Petition Agents and/or (iv) the DIP Agent have received payment from Merchant of any funds in respect of such overfunding, the Pre-Petition Agents or the DIP Agent, as applicable, agree, for their own account (and not jointly and severally, and in each case not to exceed the allocable portion of the overfunded amount actually

- 16 -

received by such applicable Pre-Petition Agent, for the respective Pre-Petition Lenders, or the DIP Agent, for the DIP Lenders) to reimburse the undisputed amount of such overfunded amount to Agent within two (2) business days of written demand thereof by Agent in the inverse order in which the overfunded amount (or portion thereof) was received by such applicable Pre-Petition Agent, for the respective Pre-Petition Lenders, or the DIP Agent, for the DIP Lenders.

    (f) <u>Guaranty Security</u>.  To secure payment of the balance of any unpaid portion of the Guaranteed Amount, Expenses, the Additional Agent Merchandise Fee, and other amounts due to Merchant hereunder, Agent shall deliver to DIP Agent, as Merchant's designee, until the obligations under the DIP Credit Agreement are paid in full, and then the applicable Pre-Petition Agent, an irrevocable standby letter of credit, substantially in the form of <u>Exhibit 3.3(h)</u> attached hereto, in an original stated amount equal to the aggregate of (x) ten percent (10%) of the product of the Guaranty Percentage *multiplied by* the estimated aggregate Cost Value of the Merchandise in the Stores and Distribution Centers (based upon Merchant's books and records maintained in the ordinary course at the close of business on the last day immediately preceding the Sale Commencement Date, but excluding for purposes hereof the In-Transit Merchandise), and (y) three (3) weeks' estimated Expenses (the "<u>Letter of Credit</u>").  The Letter of Credit shall name Merchant, the DIP Agent (on behalf of the DIP Lenders), as Merchant's designee, and the Pre-Petition Agents (on behalf of the Pre-Petition Lenders), as Merchant's designees, as co-beneficiaries, provided, that with respect to any Letter of Credit delivered by Tiger Capital Group, LLC or Great American Group WF, LLC (the "<u>TGA Letter of Credit</u>") neither the DIP Agent nor the Revolving Agent shall be named as a co-beneficiary thereon.    The Letter of Credit shall be delivered to DIP Agent, on behalf of the DIP Lenders (until the obligations under the DIP Credit Agreement are paid in full, and then the applicable Pre-Petition Agent, on behalf of the relevant Pre-Petition Lenders), as Merchant's designee, no later than the second business day following the Sale Commencement Date, and shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant.  In the event that Agent fails to timely pay any undisputed amount hereunder in respect of the Guaranteed Amount, Additional Agent Merchandise Fee (if any), Expenses and/or any other undisputed amounts due by Agent as required under this Agreement, Merchant and/or the DIP Agent, on behalf of the DIP Lenders, as Merchant's designee, and/or Pre-Petition Agents, on behalf of the Pre-Petition Lenders, as Merchant's designee, shall be entitled to draw, or in the case of the TGA Letter of Credit the DIP Agent shall be entitled to cause to be drawn, on the Letter of Credit to fund such undisputed amount or obligation after three (3) business days' written notice to Agent. DIP Agent, on behalf of the DIP Lenders, Pre-Petition Agents, on behalf of the Pre-Petition Lenders, Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount; <u>provided</u>, <u>however</u>, until the Final Reconciliation has been completed, under no circumstances shall the face amount of the Letter of Credit be reduced to an amount less than three (3) weeks' estimated Expenses (and Merchant, DIP Agent, on behalf of the DIP Lenders, and Pre-Petition Agents, on behalf of the Pre-Petition Lenders, shall cooperate with respect to each such request).  The Letter of Credit shall expire no earlier than forty-five (45) days after the Sale Termination Date; <u>provided</u> that, if, as of the tenth (10th) business day prior to the scheduled expiration date of the Letter of Credit, there remains any unresolved dispute as to the Guaranteed Amount and/or Expenses, Agent shall cause the expiration date of the Letter of Credit to be extended for successive thirty (30) day intervals (or such other longer duration as Merchant, DIP Agent, on behalf of the DIP Lenders, Pre-Petition

Agents, on behalf of the Pre-Petition Lenders, and Agent may agree) until the subject dispute has been resolved and any additional amounts due hereunder on account of the Guaranteed Amount and/or Expenses have been paid to Merchant.  If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) business days prior to the expiration date of the Letter of Credit (as may have been extended previously), Merchant, DIP Agent, on behalf of the DIP Lenders, and Pre-Petition Agents, on behalf of the Pre-Petition Lenders, shall have the right to make a drawing, or in the case of the TGA Letter of Credit the DIP Agent may cause a drawing, under the Letter of Credit in an amount equal to the amount(s) Merchant asserts are then owing to Merchant.  After completion of the Final Reconciliation and payment in full of all amounts owing by Agent (including but not limited to the Guaranteed Amount and Expenses), Merchant, DIP Agent and Pre-Petition Agents (as the case may be) shall surrender the original Letter of Credit to the issuer thereof together with written notification that the Letter of Credit may be terminated.  Upon receipt by DIP Agent and the DIP Lenders of payment in full of their claims against the Merchant under the DIP Credit Agreement (other than contingent or unliquidated obligations or liabilities not then due), DIP Agent, on behalf of the DIP Lenders, shall promptly deliver the Letter of Credit to the applicable Pre-Petition Agent, on behalf of the relevant Pre-Petition Lenders, and take all reasonable steps necessary to remove itself as a named co-beneficiary thereunder.  Upon receipt by (x) DIP Agent and the DIP Lenders of payment in full of their claims against Merchant under the DIP Credit Agreement (other than contingent or unliquidated obligations or liabilities not then due), and (y) Pre-Petition Agents and the Pre-Petition Lenders of payment in full of their claims against Merchant under the Pre-Petition Credit Agreements (other than contingent or unliquidated obligations or liabilities not then due), DIP Agent and Pre-Petition Agents shall promptly deliver the Letter of Credit to Merchant and take all reasonable steps necessary to remove themselves as named co-beneficiaries thereunder.  Notwithstanding anything to the contrary set forth herein or otherwise, none of Merchant, the DIP Agent or any Pre-Petition Agent may draw on the Letter of Credit if Merchant is in material default of any of its obligations under this Agreement (except that, so long as either (x) Merchant is in compliance with its obligations under Section 11.1(s) or (y) Agent is in material default of its obligations under this Agreement, the DIP Agent or the Pre-Petition Agents (but not Merchant) may draw on the Letter of Credit, to the extent otherwise permitted by the terms hereof, in respect of any undisputed portion of the Guaranteed Amount (but not any other obligation of Agent) even if Merchant is in material default of other obligations under this Agreement).

(g)     Agent shall purchase all cash in the Stores and Distribution Centers on and as of the start of business on the Sale Commencement Date on a dollar for dollar basis and such payment shall be made as part of the first weekly reconciliation pursuant to Section 8.7(a) below.

Section 4.    Expenses of the Sale

4.1    Expenses.  Agent shall be responsible for all "Expenses", which expenses shall be paid by Agent in accordance with Section 4.2 below.  Agent and/or Merchant may review or audit the Expenses at any time.  Beginning as of the Sale Commencement Date, Agent shall be obligated to subject to the funding of the Rent and Wage Advance to (i) pre-fund any Occupancy Expenses commencing on June 1, 2017 on a week-to-week basis in an amount no greater than the estimated Occupancy Expenses for the subsequent week and (ii) commencing on May 7, 2017 prefund payroll-related expenses consistent with Merchant's customary payroll funding

practices and timing (unless already funded by the Rent and Wage Advance).  As used herein, "Expenses" shall mean the Store-level (and where expressly applicable, Distribution Center-level and COs-level) operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

(a)    actual (i) Occupancy Expenses for the Stores on a per location and per diem basis in an amount, with respect to any category of Occupancy Expense, not to exceed the per location per diem amount set forth on Exhibit 4.1(a) hereto with respect to such category of Occupancy Expense, plus (ii) the portion of any percentage rent obligations allocable to the sale of Merchandise during the Sale to the extent set forth on Exhibit 4.1(a), plus (iii) the portion of any percentage rent obligations attributable to the sale of Additional Agent Merchandise during the Sale to the extent set forth on Exhibit 4.1(a) (in each case as determined in the manner described in the definition of "Occupancy Expenses" below in this Section 4.1);

(b)    actual wages for all Store-level Retained Employees used in conducting the Sale for actual days/hours worked during the Sale Term; provided that, Agent shall only be obligated to pay 50% of the payroll wages for Store-level Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining 50% of the wages for Retained Employees used during the Inventory Taking;

(c)    amounts payable by Merchant for benefits for Retained Employees (including payroll taxes, FICA, unemployment taxes, workers' compensation and health care insurance benefits, but excluding Excluded Benefits) for Store-level Retained Employees used in the Sale, in an amount equal to 20.2% percent of base wages for all Store-level Retained Employees (the "Benefits Cap");

(d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)    regardless of whether incurred prior to the beginning of the Sale Term, all costs and expenses associated with Agent's on-site supervision of the Stores, Distribution Centers, and COs, including but not limited to any and all fees, wages, bonuses, deferred compensation, taxes, and third party payroll costs and expenses of Agent's field personnel, travel to, from or between the Stores, Distribution Centers, and the COs, and all out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(f)    regardless of whether incurred prior to the beginning of the Sale Term, all costs and expenses associated with banners, sign walkers, and interior and exterior signs that are produced for the Sale;

(g)    regardless of whether incurred prior to the beginning of the Sale Term, the promotional costs including, without limitation, email blasts, sign walkers, television, ROP, other advertising and direct mail attributable to the Sale and ordered or requested by Agent;

(h)    the costs and expenses of obtaining additional supplies used at the Stores and Distribution Centers as may be required by Agent in the conduct of the Sale;

- 19 -

(i)      postage/overnight delivery/courier charges to and from or among the Stores to the extent relating to the Sale;

(j)      credit card and bank card fees, chargebacks, and discounts relating to the Sale;

(k)      any and all costs of moving, transferring, or consolidating Merchandise and/or Additional Agent Merchandise between the Stores;

(l)      a pro rata portion for the Sale Term of Merchant's premiums in respect of general liability, casualty, property, inventory, and other insurance policies attributable to the Merchandise, the Stores and the Distribution Centers;

(m)      third-party payroll processing fees associated with the Sale;

(n)      armored car service and security personnel;

(o)      Agent's (i) actual cost of capital, (ii) reasonable legal fees and expenses in an amount not to exceed $200,000 (iii) letter of credit fees and (iv) insurance (as provided in Section 12.4 hereof);

(p)      actual costs of the Designated Deposit Accounts (including Agent Accounts) attributable to the Sale Term, including bank fees and wire charges;

(q)      Agent's 50% of the third party fees and costs of the Inventory Taking

(r)      Central Service Expenses in an amount equal to $300 per Store per week (pro rated for partial weeks) for the Sale Term (payable to Merchant) in respect of the cost of Merchant providing Central Services in accordance with Section 8.1 hereof;

(s)      Store cash thefts and other Store cash shortfalls in registers;

(t)      [intentionally omitted;]

(u)      all fees and charges incurred by Merchant (in an amount not to exceed $100,000) and Agent to comply with Applicable General Laws in connection with the Sale, if applicable;

(v)      Distribution Center Expenses in an amount equal to $3,000 per Store per week (pro rated for partial weeks) until the earlier of (i) six (6) weeks after the Sale Commencement Date or (ii) the date on which all Merchandise is removed from the Distribution Centers, (payable to Merchant in respect of the cost of Merchant providing Distribution Center Services, including without limitation, as initiated by Agent, any and all delivery and freight costs of moving, transferring, or consolidating Merchandise between the Distribution Centers and the Stores);

(w)      costs and expenses associated with temporary labor requested or obtained by Agent for purposes of the Sale;

(x)     [intentionally omitted;]

(y)     [intentionally omitted;] and

(z)     the actual costs and expenses of Agent providing such additional services as the Agent deems appropriate for the Sale.

"Expenses" shall not include:  (i) Central Service Expenses in excess of the amount set forth in Section 4.1(r); (ii) Distribution Center Expenses in excess of the amount set forth in Section 4.1(v); (iii) Excluded Benefits; (iv) any rent or other occupancy expenses other than Occupancy Expenses in accordance with Section 4.1(a) hereof to the extent actually incurred; or (v) any costs, expenses or liabilities other than the Expenses listed above.  All costs or expenses related to the Sale not included as Expenses shall be paid by Merchant promptly when due during the Sale Term.  Notwithstanding anything to the contrary herein, to the extent that any Expense listed in Section 4.1 is also an Occupancy Expense, then Section 4.1(a) and Exhibit 4.1(a) shall control and such Expense shall not be double counted.  There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.  Notwithstanding anything herein to the contrary, Agent shall not have any obligation to pay any Expenses (including, without limitation, Occupancy Expenses and Distribution Center Expenses) with respect to any Store or Distribution Center incurred after the earlier of the Sale Termination Date or the applicable Vacate Date for such Store or Distribution Center.  Notwithstanding anything herein to the contrary, Agent shall not have any obligation to pay any Expenses (including, without limitation, Occupancy Expenses and Distribution Center Expenses) with respect to (i) any Fee Store or Camping World Location, or (ii) any Store or Distribution Center incurred prior to the Sale Commencement Date.

As used herein, the following terms have the following meanings:

"Central Service Expenses" means costs and expenses for Merchant's Central Services.

"Central Services" means those Merchant central administrative services necessary for the conduct and support of the Sale, including, but not limited to, use or and access to Merchant's:  (i) inventory control system, (ii) payroll system, (iii) accounting system, (iv) office facilities, (v) MIS and POS services, (vi) cash and inventory reconciliation, (vii) central administrative services and personnel to process and perform sales audit, banking, and other normal course administrative services customarily provided to or for the benefit of operating the Stores and including data processing and reporting, email preparation and distribution, information technology and E-Commerce Platform updates, functionality, and maintenance, (viii) such other central office services reasonably necessary (in the reasonable judgment of the Agent) for the Sale, and (vii) to use reasonably sized offices located at Merchant's central office facility to effect the Sale.

"Distribution Center Expenses" means the actual costs and expenses, including use and Occupancy Expenses and Distribution Center employee payroll and other obligations, of the operations of the Distribution Centers, and the actual costs and expenses (including inbound or outbound freight) related to the processing, transfer, and consolidation of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, and supplies in the Distribution

Centers and from the Distribution Centers to the Stores (and the provision of such services shall be referred to as collectively, the "Distribution Center Services").  Agent shall not use Merchant's Distribution Centers for purposes of receiving or shipping Additional Agent Merchandise unless otherwise agreed to by Merchant and Agent and the associated cost has been paid by Agent to Merchant.

"Excluded Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term:  (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Benefits Cap, including, without limitation, any payments due under the WARN Act.

"Occupancy Expenses" means rent, percentage rent, common-area maintenance, landlord promotional fees, real estate and use taxes, merchant association dues and charges, HVAC, utilities, telecom/telephone charges, point-of-sale systems maintenance, store security systems, routine repairs and maintenance, taxes and licenses, costs of all local, long-distance, and international telephone, satellite broadband connections, T-1 lines, broadband internet, and other telecommunications services, trash removal (to the extent excluded as a fixed charge component of lease obligation), snow removal, and ordinary course third-party cleanings, pest control services, and all other categories of expenses at the Stores as set forth on Exhibit 4.1(a) attached hereto and in an amount not to exceed the specific amounts set forth on Exhibit 4.1(a) attached hereto and calculated in accordance with Section 4.1(a), including any percentage rent obligations indicated thereon and incurred by Merchant under applicable leases or occupancy agreements that are allocable to the sales as part of the Sale during the Sale Term of: (x) Merchandise (including In-Transit Merchandise and Distribution Center Merchandise that arrives in the Stores on or prior to the Receipt Deadline) and (y) Additional Agent Merchandise included in the Sale.  Merchant and Agent agree that Exhibit 4.1(a) shall specify the actual applicable percentage and any applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s).  Merchant and Agent further agree that in the event Exhibit 4.1(a) does not specify the actual applicable percentage and/or the applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s), Agent shall have no obligation to pay percentage rent other than as set forth on Exhibit 4.1(a).  Notwithstanding anything to the contrary set forth in this Agreement, Merchant and Agent further agree that to the extent that, in connection with the conduct of the Sale and/or Agent's vacating of the Stores (but not in connection with the disposition of any unsold Owned FF&E or other non-Merchandise assets being abandoned or otherwise disposed of by Merchant), Merchant incurs additional trash removal charges at a Store, other than the fixed charge component of Merchant's lease obligation for a particular Store provided for on Exhibit 4.1(a) (the "Non-CAM Trash Removal Charges"), such Non-CAM Trash Removal Charges shall be paid by Agent as an Expense of the Sale, in addition to any trash removal charges as may be set forth in Exhibit 4.1(a) hereof.

"Third-party" means, with reference to any Expenses, a party that is not affiliated with or related to Merchant.

4.2     Payment of Expenses.  From and after the Sale Commencement Date, Agent shall be responsible for the payment of all Expenses, whether or not there are sufficient Proceeds collected to pay such Expenses after the payment of the Guaranteed Amount.  All Expenses incurred during each week of the Sale (i.e., Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant immediately following the weekly reconciliation by Merchant and Agent pursuant to Section 8.7(a) below, based upon invoices and other documentation reasonably satisfactory to Merchant and Agent.

Section 5.     Inventory Valuation; Merchandise.

5.1     Inventory Taking.

(a)     Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a SKU-level Cost Value and Retail Price physical inventory of the Merchandise located in the Stores (collectively, the "Inventory Taking").  Subject to the availability of the Inventory Taking Service, Merchant and Agent shall use commercially reasonable efforts to complete the Inventory Taking with respect to the Stores no later than twenty-eight (28) days after the Sale Commencement Date (the date of the Inventory Taking at each location being the "Inventory Date" for such location), which Inventory Taking with respect to Stores shall include In-Transit Merchandise and Distribution Center Merchandise that arrives at such Store prior to the Inventory Date for such Store.  Merchant and Agent shall jointly employ WIS International or another mutually acceptable independent inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking in each Store.  The Inventory Taking shall be conducted in accordance with the procedures and instructions to be mutually agreed upon by Merchant and Agent and made a part of this Agreement as Exhibit 5.1(a) (the "Inventory Taking Instructions").  As an Expense, Agent shall be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service and Merchant shall be responsible for the remaining fifty percent (50%).  Except as provided in the immediately preceding sentence, Merchant and Agent shall each bear their respective costs and expenses related to the Inventory Taking; provided that, Agent shall be obligated to pay fifty percent (50%) of the wages and commissions (if applicable) and related benefit costs (subject to the Benefits Cap) for Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining fifty percent (50%) of the wages and commissions (if applicable) and related benefit costs (in addition to benefit costs in excess of the Benefits Cap (if any) for Retained Employees used during the Inventory Taking.  Merchant, Agent, DIP Agent, and Pre-Petition Agents shall each have the right to have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service.  Merchant agrees that during the Inventory Taking in each of the Stores, the applicable Store shall be closed to the public and no sales or other transactions shall be conducted until the Inventory Taking has been completed, as agreed by Merchant and Agent.  The Inventory Taking shall not take place on Saturdays, Sundays and federal holidays.  Merchant and Agent further agree that until the Inventory Taking in each particular Store is complete, Agent and Merchant shall not (i) transfer any Merchandise to or from that Store (other than Distribution Center Merchandise and In-Transit Merchandise, in each case which is distinctly tagged or otherwise marked as such or recorded in Agent's transfer log), (ii) [reserved,] (iii) move Merchandise within or about such Store so as to make such items unavailable for counting as part of the Inventory Taking, or (iv) remove or add any Merchant hang tags, price tickets, inventory control

- 23 -

tags, or other indicia of pricing affixed to or related to any Merchandise.  If any Additional Agent Merchandise is sent to a Store prior to the Inventory Taking in that Store, such merchandise will be tracked by unique SKU that can be tracked separately.  Merchant (in consultation with the DIP Agent and Pre-Petition Agents) and Agent shall use their reasonable best efforts to reconcile the Inventory Taking (including, but not limited to, the determination of the aggregate Cost Value of the Merchandise), within ten (10) days after its completion.  In the event there is any dispute with respect to the reconciliation of the aggregate Cost Value of the Merchandise following completion of the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 8.7(b)(ii) hereof.

(b)     In-Transit Merchandise and Distribution Center Merchandise received at a Store after the Inventory Date for such Store shall be counted and reconciled within five (5) business days after receipt of such goods in the Stores in accordance with the procedures set forth below ("Reconciled Merchandise Receipts").  Absent prior notification and agreement of Merchant, failure to report any variance between the received shipment from the respective shipping documents (each a "Shipping Variance"), within such five (5) business day period shall, result in such receipts being confirmed received consistent with the applicable shipping documents.  Merchant shall have five (5) business days to verify a timely issued Shipping Variance (each a "Shipping Variance Response"), and absent prior notification and agreement of Agent, failure to respond to an asserted Shipping Variance within such five (5) business day period shall result in such Shipping Variance being deemed valid.  If Merchant timely issues a Shipping Variance Response that disputes the asserted Shipping Variance, Merchant and Agent shall cooperate with each other to verify and resolve such dispute; provided that, in the event Merchant and Agent are unable to resolve such dispute within ten (10) business days from Agent's receipt of a Shipping Variance Response from Merchant (or such greater period as Merchant and Agent may mutually agree), such dispute shall be resolved in the manner provided for resolution of disputes under Section 8.7(b)(ii) hereof.   In-Transit Merchandise and Distribution Center Merchandise received at a Store prior to the Inventory Date for such Store shall be counted using Gross Rings or as part of the Inventory Taking, as applicable.

5.2     Merchandise Subject to this Agreement.

(a)     For purposes of this Agreement, including but not limited to the calculation of the Guaranteed Amount, "Merchandise" means all new, first quality (other than as expressly set forth below), finished goods inventory that is owned by Merchant, customarily sold to customers in the ordinary course of Merchant's business and located in the Stores (or, with respect to Returned Merchandise, In-Transit Merchandise and Distribution Center Merchandise, received at the Stores by the dates specified in this Agreement), including, but not limited to, (i) Merchandise subject to Gross Rings; (ii) Merchandise located in the Stores on the Sale Commencement Date; (iii) Defective Merchandise (to the extent Merchant and Agent can mutually agree on the Cost Value applicable thereto); and (iv) In-Transit Merchandise and Distribution Center Merchandise received in the Stores on or before the date that is forty-two (42) days after the Sale Commencement Date (the "Receipt Deadline").  Notwithstanding the foregoing, "Merchandise" shall not include (i) goods that belong to sublessees, licensees, or concessionaires of Merchant; (ii) goods held by Merchant on memo, on consignment, or as bailee;  (iii)  Excluded  Defective  Merchandise;  (iv)  Additional  Agent  Merchandise; (v) furnishings, trade fixtures furniture, and equipment and improvements to real property that

are located in the Stores, Distribution Centers or COs; provided that Agent shall be permitted to sell Owned FF&E as set forth in this Agreement; (vi) In-Transit Merchandise and Distribution Center Merchandise that is received at the Stores after the Receipt Deadline; (vii) any merchandise subject to the Consulting Agreement; (viii) any inventory, including "Overton's" inventory, located at the Camping World Locations other than the Distribution Center Merchandise; and (ix) any asset, or interest in any asset, owned by Merchant except those assets expressly constituting Merchandise, including, but not limited to, accounts, cash, cash proceeds, chattel paper, commercial tort claims, deposit accounts, commercial tort claims, general intangibles other than consumer goods inventory, instruments, investment property, letter of credit rights, payment intangible, and records all as defined under UCC 9-102, real estate and interests in real estate, and intellectual property and interests in intellectual property, including copyrights, trademarks, patents, and brands.

(b)      As used in this Agreement, the following terms have the respective meanings set forth below:

"Defective Merchandise" means any item of Merchandise identified and agreed upon by Merchant and Agent as defective in that it is damaged, defective, scratched, soiled, ripped, torn, stained, faded, discolored, dented, out of box (if normally sold as new in-the-box), missing pieces, mismatched, mis-mated or near-sized, items typically sold as a set which are incomplete, or gift with purchase items, or otherwise affected by other similar defenses rendering it not first quality. Sample merchandise and merchandise on display in the Stores shall not per se be deemed to be Defective Merchandise.

"Distribution Center Merchandise" means those items of new, finished, first-quality, saleable in the ordinary course of business identified on Exhibit 5.2(b)(1) that are located in Merchant's Distribution Centers or the Camping World Distribution Centers and which inventory shall be delivered by Merchant to the Stores as directed by Agent after the Sale Commencement Date; provided, however, it is agreed and understood that between the date of this Agreement and the Sale Commencement Date, Merchant shall have the right to allocate and distribute Distribution Center Merchandise to the Stores in the ordinary course of business consistent with past practices. Merchant, Agent and (solely with respect to Distribution Center Merchandise in the Camping World Distribution Centers) Camping World shall cooperate with each other and shall mutually agree upon a schedule and allocation of the Distribution Center Merchandise to the Stores not later than two (2) days after the Sale Commencement Date; provided, further, that the Parties agree that the allocation schedule shall provide that all Distribution Center Merchandise shall be allocated and shipped to the Stores no later than the Receipt Deadline. For the avoidance of doubt, the inventory associated with the E-Commerce Platform shall be set forth on Exhibit 5.2(b)(1) and shall be treated as Distribution Center Merchandise.

"Excluded Defective Merchandise" means (a) any item of Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose, (b) any item of Defective Merchandise for which the parties cannot mutually agree upon a Cost Value, (c) items included in Division 9 (as identified on Exhibit 5.2(b)(3), the "Division 9 Goods"), (d) parts or components not sold separately by Merchant to consumers in the ordinary course of business, and/or (e) Spoiled Goods. Excluded

- 25 -

Defective Merchandise located in the Stores shall be identified and counted during the Inventory Taking and thereafter removed from the sales floor and segregated; Excluded Defective Merchandise located in the Distribution Centers shall be identified prior to being shipped from the Distribution Centers and segregated.   To the extent that goods in transit to the Stores constitute Excluded Defective Merchandise and such goods arrive at the Stores, such goods shall be identified during the Inventory Taking or, to the extent such goods arrive in a Store after the Inventory Date for such Store, such goods shall be reasonably identified by Agent within five (5) business days after receipt at such Store and shall be segregated.

"In-Transit Merchandise" mean items of inventory that were ordered by Merchant in the ordinary course of business as identified on Exhibit 5.2(b)(2) annexed hereto, which inventory (i) was in-transit to the Stores or Distribution Centers as of the Sale Commencement Date and (ii) consists of new, finished, first-quality goods inventory; provided, however, it is agreed and understood that between the date of this Agreement and the Sale Commencement Date, Merchant shall have the right to allocate and distribute In-Transit Merchandise to the Stores in the ordinary course of business consistent with past practices.   Merchant and Agent shall cooperate with each other and shall mutually agree upon a schedule and allocation of the In-Transit Merchandise to the Stores not later than two (2) days after the Sale Commencement Date; provided, further, that the Parties agree that the allocation schedule shall provide that all In-Transit Merchandise shall be allocated and shipped to the Stores no later than the Receipt Deadline.

"Spoiled Goods" means spoiled perishable inventory, including, without limitation, opened boxes, bottles or cans containing perishable inventory, near-dated goods (as determined pursuant to standards to be reasonably mutually agreed between Merchant and Agent), expired or out of date goods and goods that would not be bought by a customer in the ordinary course because they are rotted, spoiled, or subject to similar defect.

5.3   Valuation.

(a)   For purposes of this Agreement, "Cost Value" shall mean, with respect to each item of Merchandise (excluding Division 9 Goods), the lower of (i) Merchant's cost or, if multiple actual costs, Merchant's average cost of such item as reflected on the "AV_COST" column contained in Merchant's inventory item master file, entitled "item_loc_inv_20170313.txt", which file structure and columns are identified in the "Project Big FTP Instructions" file as dated April 17, 2017 (together with all updated files delivered by Merchant to Agent and specifically identified as an updated cost file on or prior to the entry of the Approval Order, the "Cost File") or (ii) the Retail Price for such item.   The Cost Value, as calculated in accordance with this definition, shall be inclusive of all costs of freight with respect to each item of Merchandise so long as such costs are reflected in the Cost File. For purposes of calculating the Cost Value, (i) if the Cost Value for any SKU in the Cost File as updated and provided by the Merchant to the Agent as of the Sale Commencement Date differs from the Cost Value for such SKU in the Cost File dated April 17, 2017, the lower Cost Value for such SKU shall control and (ii) if the Cost File as updated and provided by the Merchant to the Agent as of the Sale Commencement Date contains a new SKU, the Cost Value of that new SKU set forth in the Cost File as updated and provided by Merchant to Agent as of the Sale Commencement Date shall control.

(b)     Anything in Section 5.3(a) and 3.1(d) and (f) to the contrary notwithstanding, Merchant and Agent further agree as follows:

(i)     The Cost Value and Retail Price of any item of In-Transit Merchandise or Distribution Center Merchandise that is not received in a Store after the 28th day after the Sale Commencement Date, but on or before the Receipt Deadline, shall be the otherwise applicable Cost Value and Retail Price of such item (determined in accordance with Sections 3.1(d) and 5.3(a) above), *multiplied* by the inverse of the excess of the (i) the prevailing Sale discount in effect on the date such item arrives in the applicable Store or Distribution Center *over* (ii) the Merchant's discount with respect to such item as of the Sale Commencement Date (<u>provided</u> such excess is a positive number) (the "<u>Prevailing Discount Adjustment</u>").   Agent shall use commercially reasonable and good faith efforts to coordinate and schedule shipments of Distribution Center Merchandise and In-Transit Merchandise from the Distribution Centers to the Stores so as to minimize, where practicable (<u>i.e.</u>, giving due consideration to the needs and capacity of the Stores) the effect of the Prevailing Discount Adjustment;

(ii)     The Cost Value and Retail Price of Defective Merchandise shall be determined by mutual agreement of Merchant and Agent; if Merchant and Agent are unable to so agree, or if an item is determined to be Excluded Defective Merchandise, such goods shall be excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder, including, without limitation, calculation of the Guaranteed Amount, and Proceeds;

(iii)     Excluded Price Adjustments shall not be taken into account in determining the Cost Value of any item of Merchandise; and

(iv)     If the Sale commences prior to the completion of the Inventory Taking at any Store, then for the period from the Sale Commencement Date until the Inventory Date for such Store (the "<u>Gross Rings Period</u>"), Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("<u>Gross Rings</u>") and (ii) cash reports of sales within such Store.  Agent and Merchant shall keep a strict count of register receipts and reports to determine the aggregate Merchandise actually sold by SKU during the Gross Rings Period.  All such records and reports shall be made available to Merchant and Agent during regular business hours upon reasonable notice.  For each item of Merchandise included in the Sale using the Gross Rings inventory taking method, such item shall be included in Merchandise using the actual Cost Value of the Merchandise plus one and one half percent (1.5%) shrink provision.

5.4     <u>Excluded Goods</u>.  Merchant shall retain all rights and responsibility for any goods not included as "Merchandise" hereunder and shall remove, at Merchant's expense, such goods from the Stores and Distribution Centers prior to the Sale Commencement Date, or as soon thereafter as reasonably practicable.  If Merchant so elects during the first two (2) weeks of the Sale Term, Agent shall accept those goods not included as "Merchandise" hereunder and as identified by Merchant for sale (including for these purposes any In-Transit Merchandise or Distribution Center Merchandise that is not received at the Stores on or prior to the Receipt

- 27 -

Deadline) (collectively, the "Merchant Consignment Goods"). Merchant Consignment Goods shall be sold at prices mutually agreed upon by Merchant and Agent. Agent shall retain twenty percent (20%) of the sale price (less applicable Sales Taxes) for all sales of Merchant Consignment Goods, and Merchant shall receive eighty percent (80%) of the sale price (less applicable Sales Taxes) in respect of sales of Merchant Consignment Goods. Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the weekly reconciliation by Merchant and Agent pursuant to Section 8.7(a) below. Except as expressly provided in this Section 5.4, Agent shall have no cost, expense, or responsibility in connection with any goods not included in Merchandise, including but not limited to sales commissions and percentage rent.

Section 6.    Sale Term.

6.1    Term. Subject to entry of the Approval Order, the Sale shall commence at each of the Stores and Distribution Centers on May 4, 2017 (or such later date on which the Approval Order is entered) (the "Sale Commencement Date"). Agent shall complete the Sale and vacate the premises of each Store and Distribution Center in favor of Merchant or its representative or assignee on or before August 31, 2017 (the "Sale Termination Date"). The period beginning on the Sale Commencement Date through and including the Sale Termination Date shall be referred to herein as the "Sale Term." The Sale Termination Date as to any Store may be (a) extended by mutual written agreement of Agent and Merchant or (b) accelerated by Agent, in which case Agent shall provide Merchant and Camping World with not less than seven (7) days' advance written notice of any such planned accelerated Sale Termination Date (each such notice being a "Vacate Notice"). In the event Agent fails to deliver a Vacate Notice by the fifteenth (15th) day of a calendar month with respect to a Store or Distribution Center, Agent shall be liable for and shall pay any Occupancy Expenses for such calendar month with respect to such Store or Distribution Center in accordance with the terms of this Agreement. If Agent fails to provide Merchant with timely notice of an acceleration of the Sale Termination Date for a Store, Agent shall be liable for and shall pay any Occupancy Expenses resulting from such untimely notice in accordance with the terms of this Agreement.

6.2    Vacating the Closing Stores and Distribution Centers. Subject to the terms of Section 6.1 hereof, Agent shall provide Merchant and Camping World with not less than seven (7) days' advance written notice of its intention to vacate any Store or Distribution Center (as to each, as applicable, the "Vacate Date").

On the Vacate Date, Agent shall vacate such Store or Distribution Center in favor of Merchant or its representatives or assignee, (subject to Agent's right to abandonment) remove all Remaining Merchandise and any unsold Additional Agent Merchandise from the Store or Distribution Center, and leave such Store or Distribution Center in "broom clean" condition (ordinary wear and tear excepted) subject to the right to abandon, neatly in place, any assets of the Merchant (including, without limitation, any unsold Owned FF&E). Agent's obligations to pay all Expenses, including Occupancy Expenses or Distribution Center Expenses, for each Store or Distribution Center subject to Vacate Notice shall continue only until the earlier of the (a) applicable Vacate Date for such Store or Distribution Center, or (b) the Sale Termination Date; provided, however, that if a Vacate Date is a date before the fifteenth (15th) day of a calendar month, the Agent's obligation to pay Occupancy Expenses or Distribution Center Expenses for

- 28 -

the applicable Store or Distribution Center shall continue until the fifteenth (15th) day of such calendar month. All assets of Merchant used by Agent in the conduct of the Sale (e.g., FF&E, supplies, etc.) shall be returned by Agent to Merchant or left at the Stores or Distribution Centers, to the extent same have not been used in the conduct of the Sale or have not been otherwise disposed of through no fault of Agent. Any reference in this Section 6 to vacating the Stores or Distribution Centers means vacating the Stores or Distribution Centers, as applicable, in favor of Merchant, its representatives, or assignee and shall not mean Merchant vacating possession or disclaimer of lease in favor of the landlord or owner of the Store or Distribution Center premises. Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent, or licensee thereof) to any Store during the Sale Term, ordinary wear and tear excepted. Agent shall have the right to abandon in place any asset of Merchant (including, without limitation, any unsold Owned FF&E). Agent shall provide Merchant and Camping World with a Vacate Notice for the Distribution Centers such that the Vacate Date shall be no later than six (6) weeks from and after the Sale Commencement Date, subject to Merchant's compliance with the allocation schedule.

Section 7.    Intentionally Omitted.

Section 8.    Conduct of the Sale.

8.1    Rights of Agent and Merchant.    Subject to the Approval Order and the Sale Guidelines, Agent shall be permitted to conduct a "going out of business", "total liquidation", "store closing", "sale on everything", "everything must go", "everything on sale", or similar-themed sale at the Stores or Distribution Centers throughout the Sale Term. Agent shall conduct the Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and, except as modified by the Approval Order, all governing laws and applicable leases to which Merchant is a party. Agent shall conduct the Sale in accordance with the sale guidelines annexed hereto as Exhibit 8.1 and approved by the Approval Order (the "Sale Guidelines"), whether by in-store promotion, media advertising, or other promotional materials. Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business, so long as Merchant's presence does not unreasonably disrupt the conduct of the Sale. Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency. In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the following rights, limited by the Sale Guidelines:

(a)    except as otherwise provided in the Approval Order, to establish Stores' hours, which are consistent with the terms of applicable leases, mortgages, or other occupancy agreements and local laws or regulations, including, without limitation, Sunday closing laws; and will not extend the hours of operation at one or more of the Stores beyond the hours historically operated by Merchant;

(b)    to use without charge during the Sale Term (except where otherwise designated as an Expense pursuant to Section 4.1 hereof), (i) all furniture, fixtures and equipment and leasehold improvements, (ii) bank accounts, (iii) Store-level, Distribution Center-level, and corporate computer hardware and software, (iv) customer lists, mailing lists, email lists, and web

and social networking sites utilized by Merchant in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data), (v) existing supplies located at the Stores or Distribution Centers, (vi) intangible assets (including Merchant's names, logos, and tax identification numbers), (vii) Stores and Distribution Centers' keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores and Distribution Centers, (viii) reasonably sized and placed office space at Merchant's COs and Distribution Centers to coordinate the management of the Sale; and (ix) any other assets of Merchant located at the Stores or Distribution Centers (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses.  Agent shall exercise due care and return to Merchant immediately at the end of the Sale all materials and supplies except materials or supplies expended;

(c)     subject to Agent's payment (if applicable) in accordance with Sections 4.1(r) and (v) above in respect of Central Services Expenses and Distribution Center Expenses, Merchant agrees and covenants that it shall be responsible for performing and providing to Agent such Central Services and Distribution Center Services necessary or incident to the conduct of the Sale, including, but not limited to, use of Merchant's central office facilities, central administrative services, and personnel to process payroll, perform MIS, and provide other central office services necessary for the Sale; provided, however, that, in the event Agent expressly requests Merchant to provide services other than those normally provided to the Stores and/or Distribution Centers by Merchant in the ordinary course of business or as expressly contemplated by this Agreement, Agent shall be responsible to reimburse Merchant for the actual incremental cost of such services incurred by Merchant as an Expense of the Sale hereunder;

(d)     to establish Sale prices and implement advertising, signage (including A-frame, interior and exterior banners and signs and sign walkers), and promotional programs consistent with the sale theme described herein, and as otherwise provided in the Approval Order and the Sale Guidelines, as and where applicable (including, without limitation, by means of media advertising, A-frame, interior and exterior banners and signs, use of sign walkers and similar signage);

(e)     once the Inventory Taking is complete at both the transferring Store and the receiving Store, to transfer Merchandise between and among the Stores;

(f)     to use Merchant's website for the limited purposes of advertising and promoting the Sale at the Stores, periodically (no more than once per week or such greater frequency as Merchant and Agent may agree) updating such advertising and promotions and maintaining and updating the Store locator function;

(g)     to supplement the Merchandise at the Stores with Additional Agent Merchandise in accordance with Section 8.10 hereof; and

(h)     to conduct the Sale in accordance with the Sale Guidelines attached hereto as Exhibit 8.1.

8.2     Terms of Sales to Customers.  Subject to Agent's compliance with applicable law (as determined with reference to the Approval Order), all sales of Merchandise will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized credit and debit cards.  Agent may accept and honor Merchant's employee discount terms on the price of Merchandise as in effect immediately prior to the commencement of the Sale Term so as such employee discount shall not be additive to any other discount that may become available after the commencement of the Sale Term, including as otherwise provided for in this Agreement.  Merchant shall reimburse Agent in cash for all amounts related Merchant's employee discount terms, during each weekly sale reconciliation provided for in Section 8.7; provided that, Merchant shall only be obligated to reimburse Agent for Merchant's employee discount terms, honored by Agent during the first fourteen (14) days of the Sale.  During the Sale Term, Agent shall not accept coupons or groupons.  Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term, so as to distinguish such Merchandise from the merchandise sold prior to the Sale Commencement Date.

8.3     Sales Taxes.

(a)     During the Sale Term, all sales, excise, gross receipts, and other taxes attributable to sales of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods and/or Owned FF&E as indicated on Merchant's point of sale equipment (other than taxes on income, but specifically including, without limitation, gross receipts taxes) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods and/or Owned FF&E and collected by Agent in trust for Merchant at time of sale and paid over to Merchant. All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account").  If Agent does not timely remit Sales Taxes to Merchant, Merchant shall be permitted to draw on the Letter of Credit in the full amount of Sales Taxes collected by Agent in the preceding week in accordance with Section 3.3(f).  Provided that Agent has collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities.  Notwithstanding anything to the contrary herein, Agent shall reimburse Merchant for any additional Sales Taxes, interest, fines, penalties, and similar amounts payable to any taxing authority as the result of a Sales Tax audit conducted by or on behalf of such authority which discloses that the Sales Taxes collected by Agent and paid over to Merchant for any period during the Sale Term were less than those mandated by applicable law for the sale of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods and/or Owned FF&E, if any, that is sold by Agent under this Agreement (any such additional Sales Taxes and other amounts are collectively referred to herein as "Additional Taxes and Penalties").  Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections.  Agent shall add Sales Tax to the sales price of all Additional Agent Merchandise sold and Agent shall collect Sales Taxes attributable to the sales of Additional Agent Merchandise and deposit such amounts into the Sales Taxes Account or existing accounts, trust accounts, or other accounts designated by Agent, for remittance by Merchant, on behalf of Agent, to the appropriate taxing authority.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant

complies with its obligations in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant and its officers, directors, employees, agents and independent contractors (collectively, "Merchant Indemnified Parties") from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties (including but not limited to all Additional Taxes and Penalties) that Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and remit them to Merchant and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.  Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to the Merchant, DIP Agent, the DIP Lenders, the Pre-Petition Agents, the Pre-Petition Lenders, any taxing authority, or any other party, and Merchant (and DIP Agent, DIP Lenders, Pre-Petition Agents, and Pre-Petition Lenders to the extent such parties have received funds on account of any Sales Taxes in contest) shall indemnify and hold harmless Agent and its officers, directors, employees, agents and Supervisors (collectively, "Agent Indemnified Parties") from and against all claims, demands, assessments, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.

(b)     Without limiting the generality of Section 8.3(a) hereof, the Parties agree that because Agent will conduct the Sale solely as agent for Merchant, the various payments that this Agreement contemplates (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4     Supplies.  Agent shall have the right to use all existing supplies necessary to conduct the Sale (e.g., boxes, bags, and twine, but not gift certificates, rain checks, merchandise credits, or the like) located at the Stores and/or Distribution Centers at no charge to Agent.  In the event that additional supplies are required in any of the Stores or the Distribution Centers and Agent requests such additional supplies, the acquisition of such additional supplies shall be the responsibility of Agent as an Expense; provided, however, that if reasonably requested by Agent, Merchant shall assist Agent in obtaining supplies, at Agent's expense, from Merchant's vendors at Merchant's usual and customary costs for such supplies.  Merchant does not warrant that Merchant's existing supplies as of the Sale Commencement Date are adequate for purposes of the Sale.

8.5     Returns of Merchandise.  During the first thirty (30) days of the Sale, Agent shall accept returns of Merchandise sold by Merchant prior to the Sale Commencement Date in accordance with Merchant's return policies in effect at the time of purchase (to the extent presented in accordance with the foregoing terms, each such item being defined herein as "Returned Merchandise").  Merchant shall reimburse Agent in cash or credit against the following week's payment for the amount of any store credit or refund given to any customer in respect of Returned Merchandise.  To the extent Returned Merchandise is salable as first quality merchandise, it shall be included in Merchandise and for purposes of the calculation of the

Guaranteed Amount and shall be valued at the Cost Value and Retail Price applicable to such item, *multiplied* in each case by the inverse of the prevailing Sale discount in effect on the date such item arrives in the applicable Store.  Subject to Merchant's reimbursement to Agent of the amount of any store credit or refund granted for any such Returned Merchandise, the aggregate Cost Value of the Merchandise shall be increased by the Cost Value of any Returned Merchandise, and the Guaranteed Amount shall be adjusted accordingly.   If the Returned Merchandise is not first quality goods, Merchant and Agent shall negotiate in good faith to determine an appropriate Cost Value applicable to such merchandise for purposes of determining the Cost Value attributable thereto; provided that, in the event Merchant and Agent cannot agree on the Cost Value to be attributed to any particular item(s) of Returned Merchandise, than such item(s) shall be segregated form Merchandise and excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder.  Any reimbursements due to Agent as a result of Returned Merchandise shall be accounted for and paid by Merchant immediately following the weekly reconciliation pursuant to Section 8.7(a) hereof.  Any increases in payment on account of the Guaranteed Amount as a result of Returned Merchandise shall be paid by Agent as part of the final reconciliation provided for under Section 8.7(b) hereof.

8.6     Gift Cards; Merchandise Credits; Membership Program.

(a)     Until (and inclusive of) the date that is fourteen (14) days after the Sale Commencement Date, Agent shall accept Merchant's gift cards, gift certificates, merchandise credits and other similar Merchant-issued credits, if any; provided, however, Agent shall only advertise the acceptance of gift cards, gift certificates, merchandise credits and other similar Merchant issued credits through either or both of (i) signage at the point of sale of the Stores and (ii) advertisements in substantially the form of the sample advertisement form provided by Agent to Merchant before the execution of this Agreement.  Merchant shall reimburse Agent in cash for gift card, gift certificate, merchandise credit, and other similar Merchant issued credit amounts redeemed during the Sale Term as part of the weekly sale reconciliation provided for in Section 8.7(a).

(b)     To the extent Merchant maintains any customer membership or customer loyalty discount programs, Agent may permit said customers to take advantage of discounts afforded customers in connection with Merchant's customer membership or customer loyalty discount programs ("Membership Program Discounts") in addition to the then-prevailing Sale discounts being offered by Agent (for example, a "take an additional 10% off" Membership Program Discount may be combined with Agent's thirty percent (30%) prevailing sale discount, such that the affected customer would receive an effective discount of thirty-seven percent (37%)), but Agent shall not be reimbursed by Merchant for any incremental increased discount nor shall such increased discount constitute an Expense. During the Sale Term, Merchant and Agent shall not continue to accrue benefits under Merchant's customer membership or customer loyalty discount programs; provided that Merchant alone shall be obligated to prevent such accrual and Agent shall not be liable in any fashion for Merchant's failure to do so.

(c)     Except as expressly set forth in this Agreement, all sales will be made only for cash, nationally recognized bank credit cards, and, in Agent's discretion, personal checks, provided, however, if Agent determines to accept personal checks, Agent shall bear the risk of loss therefor.

8.7   <u>Sale Reconciliation</u>.

(a)   <u>Weekly Reconciliation</u>.   On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Merchant (in consultation with DIP Agent, Pre-Petition Agents, and the Official Committee of Unsecured Creditors appointed in this Bankruptcy Case (the "<u>Committee</u>")) and Agent shall cooperate to reconcile Expenses, Gross Rings, proceeds of Additional Agent Merchandise, and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (<u>i.e.</u>, Sunday through Saturday), pursuant to procedures agreed upon by Merchant (in consultation with DIP Agent and Pre-Petition Agents) and Agent.   On a weekly basis, Agent shall also provide Merchant (who shall provide a copy to DIP Agent, Pre-Petition Agents, and Committee) with a report (in electronic format acceptable to Merchant) of all sales of Additional Agent Merchandise, which report shall detail by Store, at a minimum, gross sales and type of items sold.   To ensure accurate sales audit functions, Agent shall use Merchant's existing point-of-sale system for recording all sales (including any sales of Additional Agent Merchandise) in the Stores.

(b)   <u>Final Reconciliation</u>.

(i)   Within thirty (30) days after the Sale Termination Date applicable to the last Store in which the Sale is concluded, Merchant (in consultation with the DIP Agent and Pre-Petition Agents) and Agent shall jointly prepare a final reconciliation of the Sale including, without limitation, a summary of Proceeds, Sales Taxes, Additional Agent Merchandise Proceeds, sales of Merchant Consignment Goods, proceeds of Owned FF&E, Expenses, and any other accountings required hereunder (the "<u>Final Reconciliation</u>").   Within five (5) days after completion of the Final Reconciliation (the "<u>Final Reconciliation Settlement Date</u>"), Agent shall pay to Merchant or Merchant shall pay to Agent (as the case may be) any and all amounts due the other as set forth in the Final Reconciliation, including, but not limited to, any undisputed and unpaid Expenses. In the absence of an order of the Bankruptcy Court to the contrary, no disputed amounts owing hereunder shall be paid until the dispute has been resolved by agreement of Merchant and Agent or as determined in the manner prescribed in Section 8.7(b)(ii) hereof.   During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant (in consultation with the DIP Agent and Pre-Petition Agents) and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds, Sales Taxes, Additional Agent Merchandise Proceeds, sales of Merchant Consignment Goods, proceeds of Owned FF&E, Expenses, and other Sale-related items to review and audit such records.

(ii)   In the event that there is any dispute with respect to either (x) the determination of the aggregate Cost Value of the Merchandise, (y) the Final Reconciliation and/or (z) any other dispute relating to this Agreement, such dispute shall be promptly (and in no event later than the fifth (5th) business day following a request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution.   In the event of a dispute as to (x), (y) or (z) above, Agent shall extend the Letter of Credit in accordance with the provisions of Sections 3.3 hereof.   If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) business

days prior to the applicable expiration date (as may have been extended previously), Merchant, DIP Agent, on behalf of the DIP Lenders, and/or Pre-Petition Agents, on behalf of the Pre-Petition Lenders, shall have the right to make a drawing under the Letter of Credit in an amount or amounts equal to the undisputed amounts Merchant asserts are then owing to Merchant in accordance with the terms of Section 3.3(f).

8.8    Force Majeure.  If any casualty, act of war or terrorism, or act of God prevents the conduct of business in the ordinary course at any Store for a period in excess of five (5) consecutive days (a "Force Majeure Event"), such Store and the Merchandise located at such Store shall be eliminated from the Sale and considered to be deleted from this Agreement as of the first date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale that is not the subject of insurance proceeds or consolidated by Agent into another Store(s) and, to the extent Agent has paid the Guaranteed Amount, Merchant (or to the extent received by (and not on a joint and several basis) the DIP Agent, on behalf of the DIP Lenders, or the Pre-Petition Agents, on behalf of the Pre-Petition Lenders) shall reimburse Agent for the amount by which the Guaranteed Amount is so reduced prior to the end of the Sale Term.  If a Store is eliminated from the Sale due to a Force Majeure Event, Agent will use its commercially reasonable efforts to transfer therefrom all Merchandise that is not the subject of insurance proceeds and include such Merchandise in the Sale at other Stores.

8.9    E-Commerce Platform.  With respect to the e-commerce sales platform related to or associated with www.gandermountain.com (the "E-Commerce Platform"), Merchant agrees that: (i) (x) until the closing of the Camping World APA, neither Merchant nor any other person or entity shall complete any sale of goods for Merchant's or any other person's or entity's account utilizing the E-Commerce Platform and (y) from and after the closing of the Camping World APA, Camping World may complete sales of goods utilizing the E-Commerce Platform during the Sale Term (provided that Camping World shall not sell or advertise the sale of any goods through the E-Commerce Platform at prices less than, or discounts greater than, those offered by Agent at any Store in connection the Sale; provided further that Merchant shall not be deemed to be in breach of this provision so long as Camping World changes any price or discount in violation of this the immediately preceding proviso to be in compliance therewith within 24 hours of receiving notice thereof from Agent) and (ii) Merchant shall, as a Central Service and at no cost or expense to Agent (other than as part of Central Service Expenses), maintain the E-Commerce Platform with limited functionality for the limited purposes set forth in Section 8.1(f).

8.10    Additional Agent Merchandise.

(a)    Agent shall have the right to supplement the Merchandise in the Sale with additional goods procured by Agent which are of like kind, no lesser quality, and first quality to the Merchandise in the Sale ("Additional Agent Merchandise"); provided that (x) Agent shall be responsible for payment of the costs associated with procuring any Additional Agent Merchandise, (y) Agent shall pay for all costs and expenses related to, or incurred in connection with, obtaining, handling, marketing and sale of the Additional Agent Merchandise, which costs

- 35 -

shall not constitute Expenses and (z) Additional Agent Merchandise shall be purchased by Agent at Agent's sole expense (and such purchase price shall not constitute an Expense hereunder).

(b)     Agent and Merchant intend that the transactions relating to the Additional Agent Merchandise are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes.  Subject solely to Agent's obligations to pay to Merchant the Additional Agent Merchandise Fee, at all times and for all purposes the Additional Agent Merchandise and the Additional Agent Merchandise Proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Merchandise or the Additional Agent Merchandise Proceeds.  The Additional Agent Merchandise shall be at all times remain subject to the exclusive control of Agent.

(c)     If requested by Agent, Merchant shall, at Agent's expense, insure the Additional Agent Merchandise and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.  Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Merchandise.

(d)     Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Merchandise shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code in the State of Minnesota (the "UCC").  Subject to Agent's obligation to pay the Additional Agent Merchandise Fee, if any, Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Merchandise and (ii) the Additional Agent Merchandise Proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required or desirable notices and file all necessary or desirable financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Merchandise and the Additional Agent Merchandise Proceeds as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Merchandise and Additional Agent Merchandise Proceeds).

(e)     DIP Agent, on behalf of the DIP Lenders, and Pre-Petition Agents, on behalf of the Pre-Petition Lenders, hereby acknowledge receipt of notice of the consignment of the Additional Agent Merchandise and consent to the payments to Agent of Additional Agent Merchandise Proceeds (subject to Agent's obligation with respect to Additional Agent Merchandise Fee payable hereunder).

(f)     Sales of Additional Agent Merchandise shall be run through Merchant's cash register systems, provided however, Agent shall mark the Additional Agent Merchandise using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Merchandise from the sale of Merchandise.  Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Merchandise are marked in such a way that a reasonable consumer could identify the Additional Agent Merchandise as non-Merchant goods.  Additionally, Agent shall provide signage in the Stores notifying customers that the Additional Agent Merchandise have been included in the Sale.

Section 9.    Employee Matters.

9.1    Merchant's Employees.   Subject to the applicable provisions of the Approval Order and any other provisions in this Agreement relating to employees, Agent may use Merchant's Store employees in the conduct of the Sale to the extent Agent deems expedient, and Agent may select and, after consulting with Merchant, schedule the number and type of Merchant's employees required for the Sale.   Agent shall identify any such Store employees to be used in connection with the Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date.   Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent.   Merchant and Agent agree that except to the extent that wages, payroll taxes, benefits, and other costs relating to the employment of Retained Employees constitute Expenses hereunder and except as otherwise expressly provided in this Agreement, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims, and other termination-type claims and obligations, or any other amounts required to be paid by statute or law (except to the extent such items are amounts for which Merchant is entitled to indemnification pursuant hereto), nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.   Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments to, any of the Retained Employees, except as otherwise provided in this Agreement.

9.2    Termination of Employees by Merchant.   Agent may in its discretion stop using any Retained Employee at any time during the Sale.   In the event Agent determines to discontinue its use of any Retained Employee in connection with the conduct of the Sale, Agent will provide written notice to Merchant at least seven (7) days prior thereto, except for termination "for cause" (such as dishonesty, fraud, or breach of employee duties), in which case the seven (7) day notice period shall not apply; provided, however, that Agent shall notify Merchant of the basis for such "cause".   During the Sale Term, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent (which consent shall not be unreasonably withheld).   Notwithstanding any other provision hereof, Agent will indemnify Merchant with respect to any claims by Retained Employees arising from Agent's actionable treatment of such Retained Employees as provided for in Section 13.2 below.

9.3    Payroll Matters.   Subject to Section 4.1 hereof, during the Sale Term Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.   Each Wednesday prior to the date on which such payroll is payable (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, in the amount required under Section 4.1(b) and (c).

9.4    Employee Retention Bonuses.   Agent shall pay, as an Expense hereunder, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes but

- 37 -

as to which no benefits shall be payable) up to a maximum of approximately ten percent (10%) of base payroll, to certain Retained Employees who do not voluntarily leave employment and are not terminated "for cause", as Agent shall determine in its sole discretion.  The amount of such Retention Bonuses, which will be payable within thirty (30) days after the Sale Termination Date, shall be in an amount to be determined by Agent, in its discretion, and shall be processed through Merchant's payroll system.  Agent shall provide Merchant with a copy of Agent's Retention Bonus plan within three (3) business days after the Sale Commencement Date.  Agent shall not utilize the Retention Bonus as a mechanism to encourage Retained Employees to act contrary to Merchant's best interests.

Section 10.    <u>Conditions Precedent</u>.

10.1    <u>Conditions to Agent's Obligations</u>.  The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(a)    All representations and warranties of Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date;

(b)    No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement (including, without limitation, the Sale);

(c)    The Bankruptcy Court shall have entered the Approval Order, in substantially the form annexed hereto as <u>Exhibit 10.1(c)</u>, on or before May 4, 2017;

(d)    The Bankruptcy Court shall have entered one or more interim and/or final orders, inter alia, approving a debtor-in-possession financing or cash collateral facility sufficient, in the good faith opinion of Agent, to enable Merchant to perform its obligations under this Agreement during the Sale Term;

(e)    This Agreement shall have been duly executed and delivered by all Parties, the DIP Agent, on behalf of the DIP Lenders, and the Pre-Petition Agents, on behalf of the Pre-Petition Lenders, shall have executed this Agreement in the space provided therefor; and

(f)    Merchant shall have obtained an order approving its motion ("<u>Lease Extension Motion</u>") pursuant to Section 365(d)(4) of the Bankruptcy Code, inter alia, extending the Merchant's time to assume or reject the leases for the Stores to a date not sooner than the Sale Termination Date.

(g)    Merchant and Camping World shall have entered into a Camping World APA and a related designation rights agreement, each substantially in the forms attached hereto as <u>Exhibit 10.1(g)(1)</u> and otherwise in form and substance reasonably acceptable to Agent, and each of which shall be the legal, valid and binding obligation of each of Merchant and Camping World.  The Bankruptcy Court shall have entered an order in substantially the form attached

hereto as <u>Exhibit 10.1(g)(2) and otherwise in form and substance reasonably acceptable to Agent, approving the entry into such agreements.</u>

10.2    <u>Conditions to Merchant's Obligations</u>.  The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant:

(a)    All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date, in each case solely as a result of Agent's conduct;

(b)    The Bankruptcy Court shall have entered the Approval Order;

(c)    This Agreement shall have been duly executed and delivered by all Parties, and the DIP Agent, on behalf of the DIP Lenders, and the Pre-Petition Agents, on behalf of the Pre-Petition Lenders shall have executed this Agreement in the space provided therefor.

Section 11.    <u>Representations, Warranties and Covenants</u>.

11.1    <u>Merchant's Representations, Warranties, and Covenants</u>.    Merchant hereby represents, warrants, and covenants in favor of Agent as follows:

(a)    Merchant (i) is a corporation duly organized, validly existing, and in good standing under the laws of the Minnesota or North Carolina; (ii) has all requisite power and authority to own, lease, and operate its assets and properties and to carry on its business as presently conducted and to grant the rights intended to be granted herein as provided herein; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which any Store is located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Subject to the entry of the Approval Order, Merchant has the right, power, and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "<u>Agency Documents</u>") and to perform fully its obligations hereunder.  Subject to the entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval on the part of Merchant is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Subject to the issuance and entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid, and binding obligation of Merchant, enforceable in accordance with its terms.  Subject to the entry of the Approval Order, no court order or decree of any federal, state, local, or provincial governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for Merchant's consummation of, the transactions

- 39 -

contemplated by this Agreement, and no consent of any third party that has not been obtained is required therefor, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Other than for any consent as shall be obtained prior to the Sale Commencement Date, and any contracts or agreements identified by Merchant to Agent on or prior to the Sale Commencement Date, no contract or other agreement to which Merchant is a party or by which Merchant is otherwise bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)     Merchant (i) except as set forth on Exhibit 11.1(c), owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise, Merchant Consignment Goods and Owned FF&E free and clear of all liens, claims, and encumbrances of any nature; provided that, the liens identified in Exhibit 11.1(c) shall attach only to the Guaranteed Amount, Additional Agent Merchandise Fee, if any, amounts paid or reimbursed to Merchant on account of Expenses and such other amounts due Merchant hereunder in the same extent and priority that such liens had in the Merchandise, Merchant Consignment Goods and Owned FF&E; and (ii) Merchant shall not create, incur, assume, or suffer to exist any security interest, lien, or other charge or encumbrance upon or with respect to any of the Merchandise, Merchant Consignment Goods, Owned FF&E, Additional Agent Merchandise, the Proceeds, the Additional Agent Merchandise Proceeds and the proceeds of the sale of Merchant Consignment Goods and the sale of Owned FF&E, in each case, except (other than with respect to the Additional Agent Merchandise and the Additional Agent Merchandise Proceeds) for such pre-existing liens and security interests as shall have been disclosed by Merchant to Agent and identified in Exhibit 11.1(c) hereof, which liens and security interests shall, pursuant to the Approval Order, attach only to the Guaranteed Amount, the Additional Agent Merchandise Fee, Expenses, and any other amounts payable to Merchant hereunder.

(d)     Merchant has maintained its pricing files at all Stores in the ordinary course of business, and prices charged to the public for goods (whether in-store, by advertisement, or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein (without consideration of any point of sale markdowns, advertised sales, and other customary in-store promotional or clearance activities).  All pricing files and records (including, without limitation, the Cost File and the Retail Price File) are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods (without consideration of Excluded Pricing Adjustments) as of the dates and for the periods indicated therein.  All pricing files and records (including, without limitation, the Cost File and the Retail Price File) relative to the Merchandise have been made available to Agent.  Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes; (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider; and (iii) the Cost File and the Retail Price File do not include Excluded Price Adjustments (other than with respect to the Retail Price File, as expressly provided for in the definition of Excluded Price Adjustments).  Merchant has taken hard markdowns (including, without limitation, on clearance inventory) in the ordinary course of

business and such hard markdowns are reflected in Merchant's pricing and records (including, without limitation, the Cost File and the Retail Price File).

(e)     Merchant shall ticket or mark all items of inventory received at the Stores prior to the Sale Commencement Date in a manner consistent with similar Merchandise located at the Stores and in accordance with Merchant's past practices and policies relative to pricing and marking inventory.

(f)     To the best of Merchant's knowledge, all Merchandise is in material compliance with all applicable federal, state, and local product safety laws, rules, and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.   Merchant owns or possesses all right, title and interest in and to all material permits, licenses, franchises, orders, consents, authorizations, registrations, certificates, variances, exceptions, approvals and similar rights obtained from governments and governmental agencies relating to the Stores and the Distribution Centers or the operations conducted at the Stores and the Distribution Centers, and all deposits or bonds in connection therewith (collectively, the "Permits") that are necessary to own and operate the Stores and the Distribution Centers, including, without limitation, all Permits required under any federal, state or local law relating to public health and safety, employee health and safety, pollution or protection of the environment, other than failures to so own or possess all right, title and interest that would not prevent or materially impair the Merchant's consummation of the transactions contemplated by this Agreement.  The Merchant is in compliance with the terms and conditions of such material Permits and has received no notices (nor does it have any knowledge of any threatened notice) that it is in violation of any of the terms or conditions of such Permits, except for any noncompliance or violation that would not prevent or materially impair the Merchant's consummation of the transactions contemplated by this Agreement.  Merchant has conducted and continues to conduct its business, in all material respects, in accordance with all applicable laws and governmental orders applicable to Merchant or any of its assets or properties, and to the best of its knowledge Merchant is not in material violation of any such law or governmental order, including, without limitation, any law, now or hereafter in effect and as amended, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to the environment, labor, health, safety or hazardous materials, except for any noncompliance or violation of any applicable laws and governmental orders that would not prevent or materially impair Merchant's consummation of the transactions contemplated by this Agreement.

(g)     Subject to the provisions of the Approval Order, Agent shall have the right for the duration of the Sale Term to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores and Distribution Centers, the assets currently located at the Stores and the Distribution Centers, and the utilities and other services provided at the Stores and the Distribution Centers.  Merchant shall not assign, reject or otherwise terminate any lease relating to any such Store or Distribution Center or vacate any such Store or Distribution Center until the applicable Sale Termination Date or Vacate Date.  Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair (at its own expense, except as expressly set forth herein) all cash registers, POS systems, heating systems, air conditioning systems, elevators, escalators, alarm systems and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Stores.  Except as otherwise restricted by the Bankruptcy Code or

as provided herein and absent a bona fide dispute, throughout the Sale Term Merchant shall remain current on all expenses and payables necessary for the conduct of the Sale.

(h)      Subject to the Approval Order, Merchant has paid and shall continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Stores' employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(i)      Supplies have not been, since March 31, 2017, and shall not be, prior to the Sale Commencement Date, transferred by Merchant to or from the Stores so as to alter the mix or quantity of supplies at the Stores from that existing on such date, other than in the ordinary course of business.

(j)      Except for inventory not constituting Merchandise located at the Fee Stores or Camping World Locations, since March 31, 2017, Merchant (i) has not marked up or raised (and shall not mark up or raise) the price of any items of Merchandise, (ii) has not taken any hard mark-down price or otherwise permanently reduced the price (and shall not take any hard mark-down price or otherwise permanently reduce the price) on any items Merchandise, (iii) has sold (and shall continue to sell) inventory during such period at customary prices consistent with the ordinary course of business, and (iv) has not removed or altered (and shall not remove or alter) any tickets or any indicia of clearance merchandise or point of sale promotion, except in the ordinary course of business.

(k)      Except for (i) the Bankruptcy Case and (ii) the matters set forth on Exhibit 11.1(k), no action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would materially adversely affect the conduct of the Sale; provided that any closure of a Store or Distribution Center shall be deemed to materially adversely affect the Sale.

(l)      Merchant is not a party to any collective bargaining agreements with its employees.  No labor unions represent Merchant's employees at any Store, the Distribution Centers or the COs.  There are currently no strikes, work stoppages, or other labor disturbances affecting any Store, the Distribution Centers, or the COs.

(m)      As of the date of this Agreement, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing (or the result of which is to increase materially) the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(n)      Except for the Merchandise located at the Fee Stores and Camping World Locations, since March 31, 2017, Merchant has operated, and, except as otherwise restricted by the Bankruptcy Code or as provided herein (including as described in Section 11.1(c)), through the Sale Commencement Date Merchant covenants to continue to operate, the Stores in all

- 42 -

material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not returning inventory, supplies, fixtures, furniture or equipment to vendors and not transferring inventory, supplies, fixtures, furniture or equipment out of or to the Stores; and (iii) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores.

(o)     To Merchant's knowledge, formed after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(p)     No Store lease or similar occupancy agreement has expired, nor shall expire at any time until the conclusion of the Sale Term in such Store (by its terms or otherwise).

(q)     Since March 31, 2017, Merchant has not shipped any material amount of Excluded Defective Merchandise or inventory relating to the Consulting Agreement from or to the Stores.  Merchant shall not ship any Excluded Defective Merchandise or any inventory relating to the Consulting Agreement from the date of this Agreement from the Distribution Centers to the Stores, except with the agreement of the Agent.

(r)     Merchant (i) at the Sale Commencement Date will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the other Agency Documents, and (ii) at the Sale Commencement Date, will not have incurred any obligation, commitment, restriction or liability of any kind which would impair or adversely affect such funds, resources and capabilities.

(s)     Merchant agrees and covenants that it shall retain sufficient funds to enable Merchant to fully satisfy and perform its obligations under this Agreement and Merchant shall use those funds to fully satisfy and perform its obligations under this Agreement.

(t)     Except as set forth on Exhibit 11.1(t), since March 31, 2017, Merchant has not offered (and shall not offer) any promotions or discounts at the Stores or through the E-Commerce Platform (including, without limitation, point-of-sale discounts and other similar promotions, regardless of whether consistent with Merchant's ordinary course of business.

(u)     Merchant agrees and covenants that it shall negotiate and enter into such agreements among Agent, Camping World and Merchant that are necessary to implement the terms of this Agreement, notwithstanding the consummation of the Camping World APA, with such agreements including, but not limited to, transition services agreements.

11.2    Agent's Representations, Warranties and Covenants.  Each entity comprising Agent hereby represents, warrants, and covenants in favor of Merchant as follows:

(a)     Each entity comprising Agent (i) is a limited liability company duly and validly existing and in good standing under the laws of the state of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be

- 43 -

duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)     Each entity comprising Agent has the right, power, and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Each entity comprising Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of any entity comprising Agent for such entity to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by each entity comprising Agent and constitutes the legal, valid, and binding obligation of such entity enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).  No court order or decree of any federal, provincial, state, or local governmental authority or regulatory body is in effect that would prevent or impair or is required for each entity comprising Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein.  No contract or other agreement to which any entity comprising Agent is a party or by which any entity comprising Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against any entity comprising Agent, or has been settled or resolved, or to the knowledge of any entity comprising Agent, has been threatened against or affects any such entity, which questions the validity of this Agreement or any action taken or to be taken by any such entity in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon the ability of any entity comprising Agent to perform its obligations under this Agreement.

(d)     No change shall be made to the ticketed price, shelf price, hang-tag price, stickered, PLU or other hard-marked price of any Merchandise at any Store as provided in Section 3.1(d)(i)(a) on and after the Sale Commencement Date through the Inventory Date for such Store.

(e)     Tiger Capital Group, LLC shall constitute the lead agent for purposes of communicating and coordinating with Merchant the Sales or other transactions to be consummated in accordance with the terms of this Agreement.

(f)     Agent agrees and covenants that it shall use commercially reasonable efforts to negotiate and enter into such agreements among Agent, Camping World and Merchant that are necessary to implement the terms of this Agreement, notwithstanding the consummation of the Camping World APA, with such agreements including, but not limited to, transition services agreements; provided that Agent shall not be required to pay any amounts, incur any liabilities or waive any rights of any kind in connection with, or under, any such agreements.

Section 12.   <u>Insurance</u>.

12.1   <u>Merchant's Liability Insurance</u>.   Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, general liability, products liability, comprehensive public liability, auto liability, and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Stores, and shall use best efforts to cause Agent to be named an additional insured with respect to all such policies.   Prior to the date that is two business days after the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.   Except for Merchant's general liability policy that expires on May 31, 2017, all such policies shall require at least thirty (30) days prior notice to Agent of cancellation or non-renewal.   Merchant shall obtain, prior to May 31, 2017, a replacement general liability policy with at least equivalent coverage which shall cover the remainder of the Sale Term following being obtained.   The DIP Agent and the Pre-Petition Agents consent to the obtaining of policy and the payment of associated premiums. In the event of a claim under any such policies, (a) Merchant shall be responsible for the payment of all deductibles, retentions, or self-insured amounts to the extent such claim arises from or relates to the alleged acts or omissions of Merchant or its employees (other than Retained Employees acting on Agent's instructions), agents (other than Agent's employees), or independent contractors (other than Agent and Supervisors hired by Agent in conjunction with the Sale) and (b) Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts (which amounts shall constitute Expenses) to the extent such claim arises from or relates to the alleged acts or omissions of Agent or its employees, agents, or independent contractors, including Retained Employees acting on Agent's instructions.

12.2   <u>Merchant's Casualty Insurance</u>.   Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, fire, flood, theft, and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the Cost Value thereof, which coverage shall be reduced from time to time to take into account the sale of Merchandise.   In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise (net of any deductible) shall constitute Proceeds.   Prior to the date that is two business days after the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof in form and substance reasonable satisfactory to Agent.   All such policies shall require at least thirty (30) days prior notice to Agent of cancellation or non-renewal.   Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date (as may be extended from time to time as set forth herein) without Agent's prior written consent.

12.3   <u>Worker's Compensation Insurance</u>.   Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.   Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

12.4    <u>Agent's Insurance</u>.  As an Expense of the Sale, Agent shall maintain throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability, and automobile insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies.  Prior to the date that is two business days after the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under such policies, Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts thereunder, to the extent such claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or Supervisors.

12.5    <u>Risk of Loss</u>.  Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Stores, Distribution Centers, or the assets located therein or associated therewith, or of Merchant's employees located at the Stores or Distribution Centers, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing.  Agent shall not be deemed to be a successor employer. Merchant and Agent agree that, subject to the terms of this Agreement, Merchant shall bear all responsibility for liability claims of customers, employees, and other persons arising from events occurring at the Stores during and after the Sale Term, except to the extent any such claim arises directly from the acts or omissions of Agent, or its supervisors, agents, independent contractors, or employees located at the Stores (an "<u>Agent Claim</u>").  In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement.  To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant.  In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the address designated for delivery of notices hereunder.

Section 13.    <u>Indemnification</u>.

13.1    <u>Merchant Indemnification</u>.  Merchant shall indemnify and hold Agent and each Agent Indemnified Party harmless from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from or related to:

(a)    Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

- 46 -

(b)     any failure of Merchant to pay to its employees any wages, salaries, or benefits due to such employees during the Sale Term or other claims asserted against Agent by Merchant's employees resulting from Merchant's (and not Agent's) treatment of its employees;

(c)     subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof;

(d)     any consumer warranty or products liability claims relating to Merchandise;

(e)     any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act);

(f)     any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its employees or representatives; and

(g)     the gross negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents (other than Agent), or representatives.

The indemnification obligations set forth in this Section 13.1 shall be in addition to (and shall not limit) any other indemnification obligations of Merchant set forth in this Agreement, including without limitation those set forth in Section 8.3(a).

13.2    <u>Agent Indemnification</u>.  Agent shall jointly and severally indemnify and hold harmless Merchant and the Merchant Indemnified Parties from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Merchant resulting from or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of Agent):

(a)     Agent's material breach of or failure to comply with any Safety Laws (as defined in the Approval Order) or any of its agreements, covenants, representations, or warranties contained in any Agency Document;

(b)     any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its employees, agents, independent contractors, Supervisors, or other officers, directors, or representatives of Agent;

(c)     any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

(d)     any Agent Claims;

(e)    any Additional Taxes and Penalties arising out of Agent's failure to collect and/or remit to Merchant correct amounts of Sales Taxes;

(f)    the gross negligence, willful misconduct, or fraud of Agent or any of its officers, directors, employees, agents, or representatives; and

(g)    any consumer warranty or products liability claims arising out of or related to the sale of Additional Agent Merchandise.

The indemnification obligations set forth in this Section 13.2 shall be in addition to (and shall not limit) any other indemnification obligations of Agent set forth in this Agreement, including without limitation those set forth in Section 8.3(a).

Section 14.    Defaults.

The following shall constitute "Events of Default" hereunder:

(a)    Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party;

(b)    any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made or at any time and throughout the Sale Term;

(c)    the filing of a motion by any party to convert or dismiss or the dismissal or conversion of the Merchant's bankruptcy case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or the filing of a motion by any party to appoint or the appointment of a chapter 11 trustee; or

(d)    subject to Section 8.8 hereof, the Sale is terminated or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent or (ii) any other material breach or action by Agent not authorized hereunder.

In the event of an Event of Default, the non-defaulting party (in the case of (a) or (b) above, or the Agent in the case of (c) or (d) above) may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder in the event such cure is not effected by the defaulting party.

Section 15.    Fixtures.

(a)    Subject to the provisions of the Approval Order and except as otherwise provided in the Approval Order, with respect to any furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking) owned by Merchant and located at the Stores, the Distribution Centers, and the COs and in which (i) U.S. Bank National Association, in its capacity as originating lender, and all subsequent lenders party thereto (the "Certain FF&E Lenders") under the certain Master Loan Agreement dated July 26, 2013 with Merchant and (ii) Fifth Third Bank

by assignment from U.S. Bank National Association ("Fifth Third") under that certain Master Lease Agreement with Merchant do not have an unavoidable first-priority security interest (collectively, the "Owned FF&E"), Merchant shall elect (the "FF&E Sale Option"), and Agent shall sell, the Owned FF&E either (i) on a commission basis (the "FF&E Commission Option"), or (ii) on a guaranteed recovery basis (the "FF&E Guaranty Option"); provided that, the FF&E Guaranty Option shall be subject to the Merchant (in consultation with the DIP Agent, the Pre-Petition Agents) and Agent agreeing on a mutually acceptable guaranteed amount and FF&E/asset listing; provided, further, that, with respect to the Distribution Centers and the COs, the Merchant and Agent mutually agree on the timing of any sales of furniture, fixtures and equipment located therein.  For the avoidance of doubt, Merchant shall only be required to exercise either the FF&E Commission Option or the FF&E Guaranty Option with respect to the Owned FF&E at the Stores.  Merchant shall exercise the aforementioned FF&E Sale Option by written notice to Agent by the date that is not later than ten (10) calendar days after the Sale Commencement Date (such date being defined as the "FF&E Sale Election Deadline").  In the event Merchant elects the FF&E Commission Option, Agent shall be entitled to receive a commission equal to seventeen and one-half percent (17.5%) of the gross proceeds (net of applicable Sales Taxes) from the sale of such Owned FF&E ("Agent's FF&E Commission"); provided, however, in such case Merchant shall be responsible for payment of expenses incurred in connection with the disposition of the Owned FF&E ("FF&E Disposition Expenses") in accordance with a budget to be mutually agreed upon between Merchant and Agent ("FF&E Disposition Budget"), and all proceeds realized from the disposition of the Owned FF&E, after deduction of applicable Sales Taxes, Agent's FF&E Commission, and the FF&E Disposition Expenses (collectively, the "Net FF&E Proceeds"), shall be paid to Merchant.  In the event Merchant elects the FF&E Guaranty Option, Agent shall pay Merchant a lump sum payment in an amount to be agreed by Merchant (in consultation with the DIP Agent and the Pre-Petition Agents) and Agent (hereinafter, the "FF&E Guaranty Amount"), in which case all costs and expenses associated with the disposition of Owned FF&E shall be borne by Agent (and which shall not constitute Expenses hereunder), and all proceeds realized from the sale or other disposition of the Owned FF&E (after payment of the applicable FF&E Guaranty Amount and net of any applicable sales taxes) shall be retained by Agent for its sole account.

(b)     Anything in this Agreement to the contrary notwithstanding and except as otherwise provided in the Approval Order, Agent shall be authorized to abandon any and all unsold Owned FF&E (and all other furniture, fixtures, and equipment at the Stores, the COs, and Distribution Centers) in place without any cost or liability to Agent.  Agent shall have no responsibility whatsoever with respect to furniture, fixtures, and equipment located at the Stores, the COs, or the Distribution Centers which are not owned by Merchant.

(c)     Merchant hereby represents to Agent that:  (i) subject to the Approval Order, all Owned FF&E may be sold by Agent on Merchant's behalf, free and clear of all claims, liens and encumbrances of any kind; and (ii) all such Owned FF&E is devoid of Hazardous Materials.

(d)     Anything in this Agreement to the contrary notwithstanding, Agent will not have any obligation whatsoever to purchase, sell, make, store, handle, treat, dispose, generate, transport or remove any Hazardous Materials that may be located at the Stores, the Distribution Centers, the COs or otherwise.  Agent shall have no liability to any party for any

environmental action brought:  (i) that is related to the storage, handling, treatment, disposition, generation, or transportation of Hazardous Materials, or (ii) in connection with any remedial actions associated therewith or the Stores, the COs, or the Distribution Centers.  Merchant (and not Agent) shall be solely responsible to remove from the Stores, the COs, or the Distribution Centers all Hazardous Materials.   For purposes of this Agreement, the term "Hazardous Materials" means, collectively, any chemical, solid, liquid, gas, or other substance having the characteristics identified in, listed under, or designated pursuant to (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C.A. 9601(14), as a "hazardous substance", (ii) the Resource Conservation and Recovery Act, 42 U.S.C.A. 6903(5) and 6921, as a "hazardous waste", or (iii) any other laws, statutes or regulations of a government or political subdivision or agency thereof, as presenting an imminent and substantial danger to the public health or welfare or to the environment or as otherwise requiring special handling, collection, storage, treatment, disposal, or transportation.

Section 16.     Miscellaneous.

16.1    Notices.    All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by e-mail, and/or a recognized overnight delivery service, as follows:

If to Agent:

Tiger Capital Group, LLC
340 N. Westlake Boulevard, Suite 260
Westlake Village, CA 91362
Attn:   Dan Kane; Michael McGrail
Facsimile: (805) 497-2211
Email: DKane@TigerGroup.com; mmcgrail@TigerGroup.com

Great American Group
21860 Burbank Blvd
Woodland Hills, CA 91367
Attn:    Scott Carpenter, President GA Retail
         Alan N. Forman, EVP & GC
Facsimile: (818) 746-9170
Email: scarpenter@greatamerican.com;
         aforman@brileyfin.com

Gordon Brothers Retail Partners, LLC
Prudential Tower
800 Boylston Street
Boston, MA 02119
Attn: Mackenzie Shea
Email: mshea@gordonbrothers.com

Hilco Merchant Resources, LLC
5 Revere Drive, Suite 206

Northbrook, IL 60062
Attention: Ian Fredricks
Email: ifredricks@hilcoglobal.com

With a copy to (which shall not constitute notice):

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY  10019
Attn:    Scott K. Charles, Esq.;
         Neil M. Snyder, Esq.
Facsimile: (212) 403-2000
Email: skcharles@wlrk.com;
       nmsnyder@wlrk.com

Riemer | Braunstein LLP
Seven Times Square, Suite 2506
New York, New York 10036
Attention: Steven Fox
Email: sfox@riemerlaw.com

If to Merchant:

Gander Mountain Company
180 East 5th Street, Suite 1300
St. Paul, MN  55101
Attention:  Eric R. Jacobsen
Email:  eric.jacobsen@gandermountain.com

with a copy (which shall not constitute notice) to:

Lighthouse Management Group Inc.
900 Long Lake Rd, Suite 180
New Brighton, MN  55112
Attention:  James A. Bartholomew
Email:  jbartholomew@lighthousemanagement.com

-and-

Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402
Attention:  Clinton E. Cutler, Esq.
Email:  ccutler@fredlaw.com

-and-

Faegre Baker Daniels LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402
Attention:  W. Morgan Burns, Esq.
Email:  Morgan.Burns@FaegreBD.com

If to DIP Agent:

Wells Fargo Bank, National Association
One Boston Place, 18th Floor
Boston, MA  01208
Attention:  Peter A. Foley
Email:  Peter.Foley@wellsfargo.com

With a copy to (which shall not constitute notice):

Choate, Hall & Stewart LLP
Two International Place
Boston, MA  02110
Attention:  Sean M. Monahan, Esq.
Email:  smonahan@choate.com

If to Revolving Agent:

Wells Fargo Bank, National Association
One Boston Place, 18th Floor
Boston, MA  01208
Attention:  Peter A. Foley
Email:  Peter.Foley@wellsfargo.com

With a copy to (which shall not constitute notice):

Choate, Hall & Stewart LLP
Two International Place
Boston, MA  02110
Attention:  Sean M. Monahan, Esq.
Email:  smonahan@choate.com

<u>If to Term Loan Agent</u>:

Pathlight Capital LLC
18 Shipyard Drive
Hingham, Massachusetts  02043
Attention:  David Storer
Email:  dstorer@pathlightcapital.com

With a copy to (which shall not constitute notice):

Morgan. Lewis & Bockius LLP
One Federal Street
Boston, Massachusetts  02110
Attention:  Mark D. Silva
Email:  mark.silva@morganlewis.com

<u>If to Camping World</u>:

CWI, Inc.
c/o Camping World Holdings, Inc.
250 Parkway Drive, Suite 270
Lincolnshire, Illinois 60069
Attention:    Brent Moody, Chief Operating Officer and Chief Legal Officer
Email: bmoody@campingworld.com

With a copy (which shall not constitute notice) to:

Latham & Watkins LLP
330 North Wabash Ave., Suite 2800
Chicago, IL 60611
Attention:    Zachary Judd and Caroline Reckler
Email: zachary.judd@lw.com and caroline.reckler@lw.com

16.2    <u>Governing Law; Consent to Jurisdiction</u>.  This Agreement shall be governed and construed in accordance with the laws of the State of Minnesota without regard to conflicts of laws principles thereof.   The parties hereto agree that the Bankruptcy Court (and the District Court and Circuit Court of Appeal with appellate jurisdiction over the Bankruptcy Court) shall retain exclusive jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

16.3    <u>Entire Agreement</u>.    This Agreement, the Exhibits hereto, and the Agency Documents (subject, in each instance, to the Approval Order) contain the entire agreement between the Parties with respect to the transactions contemplated hereby and supersede and

cancel all prior agreements, including but not limited to all proposals, letters of intent, or representations, written or oral, with respect thereto.

16.4    <u>Amendments</u>.  This Agreement, the Exhibits hereto, and the Agency Documents may not be modified except in a written instrument executed by each of Merchant and Agent; <u>provided</u>, <u>however</u>, that no modification may be made to Section 3.3(e) or modify or amend any other provision of this Agreement to add obligations of the DIP Agent, DIP Lenders, Pre-Petition Agents and/or Pre-Petition Lenders, or limit or eliminate any rights expressly granted hereunder to the DIP Agent, DIP Lenders, Pre-Petition Agents and/or Pre-Petition Lenders, in each case, without the express written consent of the DIP Agent and the Pre-Petition Agents; provided that any modification to any provision that would adversely affect Camping World in any material respect shall also require the written agreement of Camping World.

16.5    <u>No Waiver</u>.  No party's consent to or waiver of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

16.6    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of Agent and Merchant, including but not limited to any chapter 11 or chapter 7 trustee.  No party to this Agreement shall be permitted to assign its obligations under this Agreement.  For the avoidance of doubt, any entity comprising Agent may assign its right to receive payments under this Agreement collaterally to its lender as security.

16.7    <u>Execution in Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

16.8    <u>Section Headings</u>.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.9    <u>Survival</u>.  All representations, warranties, covenants and agreements made herein shall be continuing, shall be considered to have been relied upon by the Parties and shall survive the execution, delivery, and performance of this Agreement.

16.10    <u>Termination</u>.  This Agreement may be terminated at any time before the Sale Commencement Date as follows:

(a)    upon written notice by Agent or Merchant, if the Sale Commencement Date has not occurred on or prior to May 5, 2017 and the failure of the Sale Commencement Date to occur is not caused by or the result of a material breach of this Agreement by the party giving such notice;

(b)    by mutual written consent of the Merchant and the Agent;

- 54 -

(c)     automatically and without any action or notice by either Agent or Merchant, immediately upon the issuance of a final and non-appealable order by any agency, division, subdivision, audit group, procuring office, or governmental or regulatory authority, or any adjudicatory body thereof, of the United States or any state thereof, any foreign government or state or any municipal or other political subdivision thereof to restrain, enjoin, or otherwise prohibit the transfer of the assets contemplated hereby; or

(d)     upon written notice by Agent, upon an order of the Bankruptcy Court approving, or the filing by or on behalf of Merchant of a motion or other request to approve, any financing, refinancing, acquisition, divestiture, public offering, recapitalization, business combination or reorganization of or involving all or a material portion of, collectively, the Merchandise and the Owned FF&E or any standalone plan of reorganization for Merchant involving the retention of all or a material portion of, collectively, the Merchandise and the Owned FF&E;

(e)     upon written notice by Agent if Agent is not in material breach of this Agreement and there has been a material violation or breach by Merchant of any representation, warranty, covenant or agreement contained in this Agreement that (A) has rendered the satisfaction of any condition to the obligations of Agent set forth in Section 10.1 impossible, (B) has not been waived by Agent, and (C) is not capable of being cured or, if capable of being cured, is not cured in all material respects within seven (7) days following receipt of written notification thereof by Agent;

(f)     upon written notice by Merchant if Merchant is not in material breach of this Agreement and there has been a material violation or breach by Agent of any representation, warranty, covenant or agreement contained in this Agreement that (A) has rendered the satisfaction of any condition to the obligations of Merchant set forth in Section 10.2 impossible, (B) has not been waived by Merchant, and (C) is not capable of being cured or, if capable of being cured, is not cured in all material respects within seven (7) calendar days following receipt of notification thereof by Merchant.

In the event that this Agreement is validly terminated as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination; provided, however, that the provisions of Section 16 shall survive any such termination and shall be enforceable hereunder; provided further, however, that nothing in this Section 16.10 shall be deemed to release any party from liability for any breach of its obligations under this Agreement arising prior to any such termination.

16.11     [Intentionally Omitted.]

16.12     Agent's Security Interest.

(a)     In consideration of and effective upon payment by Agent of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit to the DIP Agent, on behalf of the DIP Lenders (and upon payment in full of the obligations under the DIP Credit Agreement, to the applicable Pre-Petition Agent, on behalf of the relevant Pre-Petition Lenders), as Merchant's designee, Merchant hereby grants to Agent first priority, senior security interests

in and liens (subject to the subordination provisions set forth herein below) upon: (i) the Merchandise; (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 hereof; (v) in the event Merchant elects the FF&E Guaranty Option, the Owned FF&E and the proceeds realized from the sale or other disposition of Owned FF&E after payment of the FF&E Guaranty Amount; or, alternatively, the FF&E Commission; and (vi) all "proceeds" (within the meaning of Section 9-102(a)(64) of the UCC) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder. Upon entry of the Approval Order, payment of the Initial Guaranty Payment on the Payment Date, and delivery of the Letter of Credit to the DIP Agent, on behalf of the DIP Lenders, the security interest granted to the Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(b)  Without any further act by or on behalf of the Agent or any other party (including (without limitation) DIP Agent, the DIP Lenders, the Pre-Petition Agents, the Pre-Petition Lenders and Merchant), the Agent's security interests and liens in the Agent Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other liens and security interests, provided, however, that (x) until the Merchant receives payment in full of the Guaranteed Amount, the Additional Agent Merchandise Fee, Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to Merchant hereunder, the security interest granted to Agent hereunder shall be junior and subordinate in all respects to the security interests of the DIP Agent, on behalf of the DIP Lenders, and the Pre-Petition Agents, on behalf of the Pre-Petition Lenders in the Agent Collateral but solely to the extent and amount of the unpaid portion of the any of the Guaranteed Amount, the Additional Agent Merchandise Fee (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to Merchant hereunder, and (y) upon payment in full of the Guaranteed Amount, the Additional Agent Merchandise Fee (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to Merchant hereunder, any security interest or lien of the DIP Agent, the DIP Lenders, the Pre-Petition Agents, or the Pre-Petition Lenders in the Agent Collateral shall be junior and subordinate in all respects to the security interest and liens of Agent in the Agent Collateral. Merchant shall cooperate with Agent with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement.

(c)  Merchant will not sell, grant, assign or transfer any security interest in, or permit to exist any encumbrance on, any of the Agent Collateral other than in favor of the Agent and DIP Agent, for the benefit of the DIP Lenders, and Pre-Petition Agent, for the benefit of the Pre-Petition Lenders.

(d)  In the event of an Event of Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in

addition to all other rights and remedies, the rights and remedies of a secured party under the UCC.

16.13   <u>Third Party Beneficiaries</u>.  Except with respect to the DIP Agent, DIP Lenders, Pre-Petition Agents, Pre-Petition Lenders and Camping World, this Agreement shall not be deemed to confer any rights or remedies upon any person or entity (including any landlord of Merchant) that is not a party hereto.

16.14   <u>Consulting Agreement</u>.  For the avoidance of doubt, the Consulting Agreement shall govern the terms of the sales at the Fee Stores.  No provision of this Agreement constitutes an agreement between Merchant and Agent to conduct liquidation sales at the Fee Stores.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

**TIGER CAPITAL GROUP, LLC**

By: _____
Name: _____
Title: _____

-and-

**GREAT AMERICAN GROUP WF, LLC**

By: _____
Name: _____
Title: _____

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____
Name: _____
Title: _____

**HILCO MERCHANT RESOURCES, LLC**

By: _____
Name: _____
Title: _____

**MERCHANT:**
GANDER MOUNTAIN COMPANY, Debtor and Debtor in Possession, by Lighthouse Management Group Inc., its Chief Restructuring Officer

By: _____
Name:
Title:

**MERCHANT:**

OVERTON'S, INC., Debtor and Debtor in Possession, by Lighthouse Management Group Inc., its Chief Restructuring Officer

By: _____

Name:

Title:

**THE PROVISIONS OF THIS AGREEMENT ARE HEREBY CONSENTED AND AGREED TO IN ALL RESPECTS:**

**DIP AGENT, on behalf of itself and all DIP Lenders:**

**WELLS FARGO BANK, N.A.,**
As Agent

By: _____
Name: _____
Title: _____

**PRE-PETITION AGENTS, on behalf of itself and all Pre-Petition Lenders:**

**Pre-Petition ABL Agent**
**WELLS FARGO BANK, N.A.,**
As Agent

By: _____
Name: _____
Title: _____

**Pre-Petition Term Agent**
**PATHLIGHT CAPITAL, LLC,**
As Agent

By: _____
Name: _____
Title: _____

61273392_6.docx

**EXHIBIT 2(C)**

**FIREARM AND AMMUNITION SALES**

Agent expressly, unconditionally, and irrevocably agrees to use its best efforts to adhere to, assist with, and follow (to fullest extent possible) all instructions, restrictions, and recommendations, with respect to firearm and ammunition sales and operations provided by Merchant's ATF compliance officer.

Merchant shall remain solely responsible for firearm and ammunition security and for the lawful transfer of the same for the duration of the Sale Term. Firearm and ammunition security will continue to receive the highest priority by Merchant and Agent and their agents, employees, subcontractors, independent contractors, designees, and other representatives. In that regard, Merchant shall designate one employee at each Store during the Sale to maintain dominion and control over all firearms operations, provided however, such employee must be listed as the Responsible Person ("RP") with the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") for such Store's Federal Firearms Licensee ("FFL") and will remain directly accountable to Merchant with regard to firearms operations and will in no way be an agent, employee, subcontractor, independent contractor, designee, or other representative of Agent with respect to firearms operations as regulated by Chapter 44 of Title 18, United States Code, and state and local law.

Agent expressly acknowledges that a missing or stolen firearm is considered a grave threat to public safety and will be thoroughly investigated by agents of the ATF. Merchant will be solely responsible for reporting such loss and or theft, and Agent will take no action that would impede or obstruct the required reports to be made. Agent further expressly acknowledges that it is a Federal felony to steal a firearm from the inventory. See 18 U.S.C. § 922(u).

Merchant shall continue to ensure all firearm and ammunition sales are made in full accordance with all applicable laws. This includes, without limitation, complying with all necessary waiting periods and State and/or Federal background checks. Merchant shall continue to ensure all firearms sold or transferred are disposed (logged out of Merchant's firearm log) at the close of business each day or, at the latest, prior to each Store opening the following day. This includes, without limitation, a thorough and accurate review of the applicable ATF Form 4473s or FFL(s), document scanning, and appropriate filing of such forms. Merchant shall continue to ensure all multiple handgun sales or transfers to the same non-licensee within five consecutive business days are properly reported by completing and complying with all instructions on ATF Form 3310.4. Merchant shall ensure a complete firearm inventory is completed at each Store at the close of business each day during the Sale. Any missing firearm(s) of which Agent becomes aware must be immediately reported to Merchant.

61310499

**EXHIBIT B**

**SALE GUIDELINES**

A.      The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

B.      The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

C.      On "shopping center" property, Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that Agent may solicit customers in the Stores themselves. On "shopping center" property, Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

D.      At the conclusion of the Sale, Agent shall vacate the Stores in broom clean condition; provided that Agent may abandon any furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking) ("FF&E") not sold in the Sale at the Stores, the Distribution Centers or the COs at the conclusion of the Sale, without cost or liability of any kind to Agent.  Any abandoned FF&E left in a Store, Distribution Center or CO after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant.  For the avoidance of doubt, as of the Sale Termination Date or Vacate Date, as applicable, Agent may abandon, in place and without further responsibility or liability of any kind, any FF&E located at a Store, Distribution Center or CO.

E.      Following, and subject to, the entry of the Approval Order, Agent may advertise the Sale as a "going out of business", "total liquidation", "store closing", "sale on everything", "everything must go", "everything on sale" or similar-themed sale, as dictated by the Approval Order.

F.      Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and Agent shall not use neon or day-glo on its display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Merchant and Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4

feet x 40 feet. In addition, the Merchant and Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Approval Order. Nothing contained in these Sale Guidelines shall be construed to create or impose upon Agent any additional restrictions not contained in the applicable lease agreement.

F.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

G.      Except with respect to the hanging of exterior banners, Agent shall not make any alterations to the storefront or exterior walls of any Stores.

H.      Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

I.      Agent shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

J.      Subject to the provisions of the Agreement, Agent shall have the right to sell all Owned FF&E at the Stores, the Distribution Centers and the COs. Agent may advertise the sale of the Owned FF&E in a manner consistent with these guidelines at the Stores, the Distribution Centers and the COs. The purchasers of any Owned FF&E sold during the sale shall be permitted to remove the Owned FF&E either through the back shipping areas at any time, or through other areas after applicable business hours. For the avoidance of doubt, as of the Sale Termination Date or the Vacate Date, as applicable, Agent may abandon, in place and without further responsibility, any FF&E at the Stores, the Distribution Centers and the COs.

K.      Agent shall be entitled to include Additional Agent Merchandise in the Sale in accordance with the terms of the Approval Order and the Agreement.

L.      At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases. The Merchant, Agent and their agents and representatives shall continue to have access to the Stores as provided for in the Agreement.

M.      Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease. Agent shall have no responsibility to the landlords therefor.

N.      The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

O.      If and to the extent that the landlord of any Store affected hereby contends that Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant, JV Agent and Purchaser as follows:

If to JV Agent:

Tiger Capital Group, LLC
340 N. Westlake Boulevard, Suite 260
Westlake Village, CA 91362
Attn:   Dan Kane; Michael McGrail
Facsimile: (805) 497-2211
Email: DKane@TigerGroup.com; MMcGrail@TigerGroup.com

Great American Group
21860 Burbank Blvd
Woodland Hills, CA 91367
Attn:    Scott Carpenter, President GA Retail
         Alan N. Forman, EVP & GC
Facsimile: (818) 746-9170
Email: scarpenter@greatamerican.com;
         aforman@brileyfin.com

Gordon Brothers Retail Partners, LLC
Prudential Tower
800 Boylston Street
Boston, MA 02119
Attn: Mackenzie Shea
Email: mshea@gordonbrothers.com

Hilco Merchant Resources, LLC
5 Revere Drive, Suite 206
Northbrook, IL 60062
Attention: Ian Fredericks
Email: ifredericks@hilcoglobal.com

with a copy (which shall not constitute notice) to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY  10019
Attn:    Scott K. Charles, Esq.;
         Neil M. Snyder, Esq.
Facsimile: (212) 403-2000
Email:  skcharles@wlrk.com;
         nmsnyder@wlrk.com

Riemer | Braunstein LLP
Seven Times Square, Suite 2506
New York, New York 10036
Attention: Steven Fox

Email: sfox@riemerlaw.com


If to Merchant:

Gander Mountain Company
180 East 5th Street, Suite 1300
St. Paul, MN  55101
Attention:  Eric R. Jacobsen
Email:  eric.jacobsen@gandermountain.com

with a copy (which shall not constitute notice) to:

Lighthouse Management Group Inc.
900 Long Lake Rd, Suite 180
New Brighton, MN  55112
Attention:  James A. Bartholomew
Email:  jbartholomew@lighthousemanagement.com

-and-

Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402
Attention:  Clinton E. Cutler, Esq.
Email:  ccutler@fredlaw.com

-and-

Faegre Baker Daniels LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402
Attention:  W. Morgan Burns, Esq.
Email:  Morgan.Burns@FaegreBD.com

61031893