UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Jointly Administered Under Case No. 17-30673 |
| Gander Mountain Company, | Case No. 17-30673 |
| Overton's, Inc., | Case No. 17-30675 |
| Debtors. | Chapter 11 Cases |

MEMORANDUM DECISION

At Minneapolis, Minnesota, August 7, 2019.

On November 29, 2018, the Court held a hearing on a motion by the Gander Mountain Liquidating Trust (the "Trust") in which the Trust objected to claims filed by certain individuals known throughout these proceedings as the "Key Executives."[1] The Key Executives filed a timely response. After the hearing, the Court granted the parties until January 18, 2019, to submit supplemental briefs, and until February 1, 2019, to file any replies. The parties did so in a timely manner. The Court took this matter under advisement, and it is now ready for resolution.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (I) and the Court has jurisdiction under 28 U.S.C. §§ 157(b)(2)(B), (I) and 1334. This memorandum decision is based on all the information available to the Court and constitutes the Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052, made applicable to this contested matter by Fed. R. Bankr. P. 9014(c).

---

[1] As it is used here, this term includes Darrell ("Jay") Tibbets, Brian Kohlbeck, Joseph Fusaro, Michael Kalck, Ronald Stoupa, Robert Walker, and Eric Jacobsen.

For the reasons stated herein, the Trust's motion objecting to certain claims of the Key Executives is **GRANTED**, and the claims identified on the Trust's Motion's Exhibit A are disallowed.

## BACKGROUND

The Plan of Liquidation (the "Plan") in this case provided for the substantive consolidation of the estates of the debtors, and they will therefore be referred to herein as a singular "debtor." ECF No. 1572, Art. IV, A. By operation of the Plan's terms, the Trust was created and became the successor to the debtor in possession ("DIP") on the Plan's "Effective Date," defined as February 8, 2018; at that time, the debtor irrevocably transferred its assets to the Trust. ECF No. 1359, Art. IV, B. META Advisors, LLC was appointed to serve as the Liquidating Trustee in the order confirming the Plan. ECF No. 1572, Q. 28.

On April 14, 2017, the Court approved the Key Employee Retention Plan ("KERP") and the Key Employee Incentive Plan ("KEIP"), as follows:

> 2. The Debtors' Key Employee Retention Plan, substantially in the form attached to the Declaration of Steven R. Kinsella dated April 13, 2017 [Doc. No. 431] (the "Kinsella Declaration") as Exhibit A (the "KERP Tier I") and Exhibit B (the "KERP Tier II," and together with the KERP Tier I, the "KERP"), is approved.
>
> 3. The Debtors' Key Employee Incentive Plan, substantially in the form attached to the Kinsella Declaration as Exhibit C (the "KEIP"), is approved.

ECF No. 436.

The KERP and KEIP (collectively, the "Key Employee Plans") had been negotiated and entered into by each of the Key Executives with the debtor and the Creditors Committee. ECF No. 1845. The relevant material provisions of the Key Employee Plans as they appear in the Kinsella Declaration are substantially identical; together they provide a structure through which the Key Executives could earn bonuses during Gander Mountain's reorganization under the

2

Bankruptcy Code. ECF No. 436. Each of the Key Executives agreed to and signed his respective contract on either April 13, 2017, or April 17, 2017.[2] ECF No. 1853. The structure detailed in the Key Employee Plans includes four tiers: (1) a "Threshold Bonus," (2) a "Target Bonus," (3) a "Stretch Bonus," and (4) a "Maximum Bonus." ECF No. 436.

The Key Employee Plans are each the length of just one double-sided page. ECF No. 436. The substantive provisions relevant here are as follows:

> 1. **[KERP/KEIP] Bonus Payment**. You are eligible to earn [KERP/KEIP] bonus payments as set forth herein. Your level of bonus opportunity as a percent of your Base Salary for meeting the respective metrics associated with Threshold, Target, Stretch, and Maximum performance is set forth below:
>
>     A. **Threshold**. You will earn an amount equal to 50% of your current base salary upon the Company closing on (i) one or more asset sales under Section 363 of the Code or (ii) one or more consulting or agency agreement(s) for the conduct of going out of business or similar sales, or a combination of (i) and (ii), for substantially all of the Company's assets (the "Sale").
>
>     B. **Target**. You will earn an additional amount equal to 25% of your base salary if (i) the cash or value of other property estimated to be available for distribution on allowed claims of general unsecured creditors as of the date of confirmation of the Company's Plan of Reorganization and/or Liquidation (the "Plan") is equal to or exceeds 5%; and at least 35 stores are sold or transferred by the Company to one or more parties, and it is contemplated at the time of such transaction(s) that such stores will be operated as retail stores under one or more trade names selling sporting goods, with a prominent or seasonal emphasis on hunting, camping, fishing, shooting, marine, or outdoor recreational products (a "Going Concern Sale").
>
>     C. **Stretch**. You will earn an additional amount equal to 25% of your base salary if (i) the cash or value of other property estimated to be available for distribution on allowed claims of general unsecured creditors as of the date of confirmation of the Plan is equal to or exceeds 10%; or (ii) at least 60 stores are sold by the Company as a Going Concern Sale.
>
>     D. **Maximum**.
>
>     (1) You will earn an additional amount equal to 25% of your base salary if (i) the cash or value of other property estimated to be available for distribution to

---

[2] Eric Jacobsen, Brian Kohlbeck, and Darrell ("Jay") Tibbets signed their agreements on April 13, 2017; whereas Joseph ("Joe") Fusaro, Michael Kalck, Ronald J. Stoupa, and Robert Walker signed their agreements on April 17, 2017. ECF No. 1853.

general unsecured creditors as of the date of confirmation of the Plan is equal to or exceeds 10%; <u>and</u> (ii) at least 70 stores are sold by the Company as a Going Concern Sale.

(2) In the event the cash or value of other property estimated to be available for distribution on allowed claims of general unsecured creditors as of the date of confirmation of the Plan is at least 5% of such allowed claims but less than 10% of such allowed claims, the applicable bonus amount for the Maximum opportunity shall be a pro rated amount calculated as the product of your Maximum opportunity bonus amount multiplied by a fraction, the numerator of which is the percentage of cash or value of other property estimated to be available for distribution to general unsecured creditors as of the date of confirmation of the Plan and the denominator of which is 10%.

E. **Payment Provisions**.

(1) Each level of opportunity beyond the Threshold amount, if earned, is independent and will be in addition to any bonus earned under another opportunity (i.e., if you earn your Threshold opportunity you may earn an additional 25% if you satisfy any one of the Target, Stretch, or Maximum opportunities). In no event will the total incentive payments earned or received exceed 125% of you base salary. The Company shall have no obligation to make any bonus payment unless you sign this Agreement which includes a mutual release of claims.

(2) Any [KERP/KEIP] bonus amounts earned under the Threshold opportunity shall be paid as follows: 50% of the bonus will be paid upon closing of the Sale and the remaining 50% of the bonus will be paid upon the earlier of the effective date of the Plan or termination of the employee by the Company without cause.

(3) Any [KERP/KEIP] bonus amounts earned under the Target, Stretch or Maximum opportunities ***shall be paid on the effective date of the Plan***.

ECF No. 436 (emphasis added).

There is no dispute that the Key Executives satisfied the requirements for the first tier, the threshold bonus, and were awarded the corresponding bonuses of approximately $1,250,000.00, in full, between May and September 2017. ECF Nos. 1821, 1845. The issue here lies in whether the Key Executives have met the requirements for receiving an additional $1,875,000.00 under any of the remaining three bonus tiers. ECF Nos. 1821, 1845. This determination comes down to the contract language in the Key Employee Plans, including several provisions concerning the

sale or transfer of certain numbers of stores, as well as the cash value of property estimated to be available for distribution on the allowed claims of general unsecured creditors under the Plan.

On May 4, 2017, the Court entered an Order Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Rights, Encumbrances, and other Interests ("Sale of Assets Order"), ECF No. 691, which authorized the debtor to sell certain assets to CWI, Inc. ("CWI" or "Camping World") c/o Camping World Holdings, Inc. ("CWH"). ECF No. 691. The Sale of Assets Order also approved a Designation Rights Agreement ("Designation Agreement") between the debtor and CWI, which granted CWI the right to act as the debtor's agent for the purpose of assigning the debtor's real property leases, and required that CWI would assign a minimum of 17 of the debtor's store leases to itself or its affiliates. ECF No. 691. The requirement that CWI assign a minimum of 17 store leases to itself was a notable provision, since CWI did not automatically take on the leases through the sale. As will be discussed further herein, it is not entirely clear whether the Key Executives argue that the Sale of Assets Order could qualify as the kind of "sale or transfer" required by the Key Employee Plans, but the Court nevertheless finds that it did not.

From May to October 2017, the Court issued three different orders approving the assumption and assignment of certain executory contracts and unexpired leases; these orders ultimately authorized the assignment of 19 of the debtor's store and distribution center leases to CWI. ECF Nos. 730, 965, and 1299. As of January 26, 2018, the date the Plan was confirmed in this case ("Confirmation Date"), those 19 transferred stores were the only stores the record shows were assumed by the debtor and assigned to any party. Similarly, as of the Confirmation Date, the estimated value available for distribution to general unsecured creditors was

5

represented by a range: 2.2% – 6.4%. ECF No. 1359. There is nothing in the record to indicate that these numbers changed by the Plan's Effective Date. ECF No. 1359, Art. I, A. 38.

The Trust argued that the Court should disallow the Key Executives' claims regarding the unearned bonuses because the debtor's estate fully satisfied all obligations to the Key Executives when the Trust paid the Key Executives the threshold bonus under the Key Employee Plans. ECF No. 1845. In making this argument, the Trust points to the plain language of the Key Employee Plans, arguing that it is unambiguous and, therefore, no external evidence is necessary for interpreting the relevant provisions. ECF No. 1845.

In response, the Key Executives argue that the Key Employee Plans are ambiguous, and that extrinsic evidence should therefore be admitted to interpret their provisions. ECF No. 1821. In the alternative, the Key Executives argue that it would be premature for the Court to interpret the contract provisions of the Key Employee Plans, since the facts make an otherwise unambiguous contract provision uninterpretable. ECF No. 1821.

## DISCUSSION

### I. *Contract law prevails here, and the contracts at issue unambiguously require payment of bonuses on the Plan's Effective Date.*

As with many areas of the law, contract law encompasses a variety of its own uniquely-tailored rules and requirements; the parol evidence rule is one of those rules. It is not the rule of evidence that many suppose it to be – rather, it is a substantive rule of contract interpretation. Anchor Casualty Co. v. Bird Island Produce, Inc., 249 Minn. 137, 82 N.W.2d 48 (1957).

The parol evidence rule specifically prohibits extrinsic evidence from being admitted to explain or contradict the meaning of an unambiguous contract. Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn., 664 N.W.2d 303 (Minn. 2003). This notion that a

6

contract should be judged within its own "four corners" is fundamental to contract law. Magistrate Judge Franklin Noel succinctly summarized this concept in Rockway, Inc. v. Stampe:

> When an agreement has been reduced to an unambiguous, integrated writing, the parties' intent must be determined from the language of the written contract alone. In other words, if "the contract is clear and unambiguous, then the language is given its plain and ordinary meaning." The Court looks to the contract as a whole in interpreting the intent of the parties.

Rockway, Inc. v. Stampe, No. CV 03-5282 (MJD/FLN), 2015 WL 9672916 (D. Minn. Nov. 4, 2015), aff'd, No. CV 03-5282 ADM/FLN, 2016 WL 81791 (D. Minn. Jan. 7, 2016) (internal citations omitted). See also In re Heine Feedlot Co., 107 F.3d 622 (8th Cir. 1997), citing to Quick v. Bakke, Kopp, Ballou & McFarlin, Inc., 380 N.W.2d 364, 366 (S.D. 1986) ("Further, the 'written agreement supersedes all previous understandings and the intent of the parties must be ascertained therefrom, except, of course, in cases involving fraud, mistake, or ambiguity.'"). Contract law also firmly concludes that readings of contract provisions that would result in absurdist results should not be allowed to prevail. Rockway, Inc. v. Stampe, 2015 WL 9672916.

In this case, there has been considerable argument by both the Trust and the Key Executives about the supposed ambiguity in the Key Employee Plans concerning the timing of the contract provisions; more specifically, the parties have debated at what point the contract provisions should be interpreted. The Key Executives claim that the Key Employee Plans are "ambiguous because they fail to establish crucial deadlines," and "there is no deadline for selling or transferring the stores . . . the 'Going Concern Sale' does not specify when the sale or transfer must be effectuated." ECF No. 1922. Essentially, the Key Executives argue that because no deadline is included in close proximity to the term "Going Concern Sale" in the Key Employee Plans, the deadline for such a sale cannot reasonably incorporate the Plan's Confirmation Date. ECF No. 1922. As the Key Executives state in their supplemental memorandum of law:

7

> To the contrary, that deadline is only tied to the question of the contemplated amount of the distribution to be made to the unsecured and the contemplated number of stores to be reopened under the CWH banner. As a result, when the stores need to be sold or transferred is not defined and is subject to multiple interpretations.

ECF No. 1922.

This construction, however, ignores the plain and unambiguous contract language of the Key Employee Plans, which *does* define when stores need to be sold or transferred, and is therefore determinative of the questions at issue here:

> *(3) Any [KERP/KEIP] bonus amounts earned under the Target, Stretch or Maximum opportunities* **shall be paid on the Effective Date of the Plan**.

ECF No. 431 (emphasis added). In the context of the Key Employee Plans, "the Plan" is a defined term that refers to Gander Mountain's Plan of Reorganization and/or Liquidation. As was discussed above, the Plan defines the Effective Date as February 8, 2018. ECF No. 1359.

Therefore, outside of where the contact language specifies otherwise, all of the bonus amounts under the Target, Stretch, and Maximum Bonus tiers of the KEIP and KERP are to be determined as of the Effective Date of the Plan – February 8, 2018. The language is unambiguous, and leaves no room for interpretation: the bonuses **shall** be paid on the Effective Date. This means that the bonuses must also be <u>determined</u> as of the Effective Date. The Key Executives completely disregard this plain language in their attempt to create ambiguity out of what is otherwise unambiguous. To construe this language outside of its plain meaning, however, would create a conflicting and absurdist interpretation of the language of these agreements: bonuses would have to be calculated after they had already been paid. Therefore, external evidence is not necessary here, because there is no ambiguity to be resolved.

The plain language of the Key Employee Plans clarifies how its provisions should be read, thereby resolving issues of potential ambiguity. Therefore, no further evidence is needed. All that remains is to determine whether the Key Executives satisfied the explicit requirements of each of the three remaining bonus tiers. Since the Payment Provisions section of the Key Employee Plans state that each tier exists independently of one another, the next step of this analysis must include an examination of whether each of these individual tiers is separately met.

## II.     *As of the Effective Date of the Plan, the requirements for the Target Bonus had not been met.*

The Target Bonus provision of the Key Employee Plans states:

> B.    **Target**.  You will earn an additional amount equal to 25% of your base salary if (i) the cash or value of other property estimated to be available for distribution on allowed claims of general unsecured creditors as of the date of confirmation of the Company's Plan of Reorganization and/or Liquidation (the "Plan") is equal to or exceeds 5%; and at least 35 stores are sold or transferred by the Company to one or more parties, and it is contemplated at the time of such transaction(s) that such stores will be operated as retail stores under one or more trade names selling sporting goods, with a prominent or seasonal emphasis on hunting, camping, fishing, shooting, marine, or outdoor recreational products (a "Going Concern Sale").

ECF No. 431.

This test is a conjunctive one, since the bonus is earned only if both components are met; the estimate for the cash or value available to unsecured creditors must be five percent or more, ***and*** at least 35 stores must be sold or transferred by the Effective Date.

As was previously discussed, the estimate of the value available for distribution to general unsecured creditors was 2.2% – 6.4%. There has been much debate about whether the 2.2% – 6.4% range is enough to satisfy a provision that requires an estimate that "is equal to or exceeds 5%." The plain language of that provision suggests that the range could meet the requirement – after all, the range does include estimates that meet and exceed 5%. However, due

9

to the conjunctive nature of this provision, it is not necessary to go so far as to make a finding on this issue if the second part of the Target Bonus tier is not met.

The record shows that, as of the Plan's Effective Date, February 8, 2018, 19 stores had been assumed and assigned. The Key Executives stated that "The claim amounts were based on information . . . that CWH intended to open more than 35 Gander Mountain/Overton stores." ECF No. 1845. Their argument is this: they met the requirements of this tier simply because, ". . . at the time of confirmation of the Debtor's Chapter 11 Plan CWH had already contemplated reopening upwards of 70 Gander Mountain stores." ECF No. 1845. Although the Key Executives supplied ample evidence that the opening of such stores was *contemplated*, including that such statements were made officially to the SEC and in press releases, the Executives did not fully address the issue most relevant to this inquiry: how many stores were actually "sold or transferred" as of the Effective Date? The assertion that mere contemplation of opening stores could satisfy the requirements of the bonus tiers in the Key Employee Plans is a misinterpretation of the plain language of the contracts, which states that ". . . at least 35 stores **are** sold or transferred by the Company to one or more parties . . ." ECF No. 431 (emphasis added). The term "contemplated" appears only in the context of defining a "Going Concern Sale" – it is irrelevant in determining whether stores had actually been transferred, as is required under the contract language.

It appears possible that the Key Executives may be arguing, as a somewhat ambiguous and circuitous afterthought, that the Order Authorizing the Sale of Certain Assets, ECF No. 691, met the "sold or transferred" requirement of the Key Employee Plans. ECF No. 1930, 1845. However, the Court agrees with the Trust's interpretation: a natural and plain meaning of the phrase "sold or transferred" must include a requirement for the store leases to be assumed or

10

assigned. ECF No. 1864. As the Trust stated, "A store sold and transferred by Gander Mountain meant that the assignee was curing and assuming the financial obligations associated with the store, including continuing lease obligations." ECF No. 1921. In fact, it appears that here, Camping World specifically did not assume responsibility for stores much beyond the 17 it was required to assume; instead, it allowed the leases to be rejected by standard operation of the bankruptcy case, leaving the estate with millions in rejection damages claims, and then re-engaged with the landlords of the stores to negotiate those very same leases after the Effective Date had passed. ECF No. 1864.

While the Key Executives correctly point out that "The Terms '[assumption] and assignment' are no where to be found in the KEIPs or the KERPs," ECF No. 1845, a sale or transfer of a store cannot occur without the assumption of that store's lease. This fact is shown most clearly by the Trust's representation that the estate here faced some $150 million in rejection damages claims when none of the leases outside of the 19 discussed here were assumed. ECF No. 1864. Through the Sale of Assets Order, the debtor's assets were sold to CWI, and CWI was granted the ability to act as the debtor's agent in assigning store leases. Put simply, neither acquiring the ability to assign leases nor acquiring ownership of inventory and equipment assets qualifies as a "sale or transfer" of a store itself. Notably, the ability to assign leases would not have needed to be included in the order at all if Camping World were, indeed, taking on the stores themselves simply by operation of the Sale of Assets Order. Additionally, there would have been no need for the provision requiring CWI to assign 17 of the leases to itself or its affiliates if Camping World acquired these stores by simple operation of the Sale of Assets Order. Finally, the language of the Key Employee Plans requires that "the Company" make the sale or transfer of the stores, and the "Company" is defined as Gander Mountain. Importantly, after the Plan was

11

confirmed and the Liquidating Trust became the successor of the DIP, Gander Mountain itself no longer had the ability to take such actions. Therefore, any assumption or assignment of leases after the Plan Confirmation Date could not operate to fulfill the store requirements at issue here – even without the contract's payment provision setting the Effective Date as the deadline.[3]

The Key Executives point to the fact that Camping World acquired equipment and inventory through the Sale of Assets Order that remained in some of the store locations where leases were not assumed or assigned. ECF No. 1930. They argue that "[i]f the leases were truly rejected, the landlords would not allow the inventory and equipment to remain on the premises while a new lease was negotiated." ECF No. 1930. They further argue that "it defies logic to hold that these contracts were rejected as a matter of law." This argument, however, ignores the language of the Plan – and the Bankruptcy Code, for that matter – which states just that:

> Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, upon the Effective Date, all executory contracts and unexpired leases that exist between one or both of the Debtors and any Person or Entity shall be deemed rejected by the Debtors, except for any executory contract or unexpired lease (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date . . . Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such assumption or rejection pursuant to section 365(a) of the Bankruptcy Code . . .

ECF No. 1359 at Art. VII, A. p. 35. Further, the landlords clearly did not sit on their laurels as equipment and inventory remained in these stores – hence, the $150 million in claims for rejection damages.

---

[3] Following the Effective Date, Gander Mountain could not, nor did it, sell or transfer any additional stores as required by the Key Employee Plans. Indeed, under § 365(d)(4)(A), following confirmation of the Plan, the debtor had no power to assume or assign any additional stores. See In re Nevel Properties Corp., 765 F.3d 846, 849 (8th Cir. 2014); In re Kreger, 296 B.R. 202, 207 (Bankr. D. Minn. 2003), aff'd, 307 B.R. 106 (B.A.P. 8th Cir. 2004); Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 46 (2008). Cf. Mission Prod. Holdings, Inc. v. Tempnology, LLC, 2019 WL 2166392 (U.S. 2019) (both the text of § 365 and fundamental principles of bankruptcy law command that rejection has the same consequences as a contract breach occurring outside of bankruptcy).

As discussed above, the plain language of the Key Employee Plans requires that the calculation of the number of stores that were actually sold or transferred be determined as of the Effective Date. Therefore, the actual count for determining whether the requirements have been met under this tier is 19 stores. Obviously, 19 is less than 35, and satisfying the first component of this tier is irrelevant without satisfaction of the second component. Therefore, the Key Executives failed to meet the requirements to be compensated under the Target Bonus tier.

### III. *As of the Effective Date of the Plan, the requirements for the Stretch Bonus had not been met.*

The Stretch Bonus provision of the Key Employee Plans states:

> C. **Stretch**. You will earn an additional amount equal to 25% of your base salary if (i) the cash or value of other property estimated to be available for distribution on allowed claims of general unsecured creditors as of the date of confirmation of the Plan is equal to or exceeds 10%; *or* (ii) at least 60 stores are sold by the Company as a Going Concern Sale.

ECF No. 431.

Unlike the Target Bonus tier, the Stretch Bonus tier is disjunctive – it can be successfully met if either of two options is met – either the value estimated to be available for distribution to unsecured creditors is equal to or exceeds 10% *or* at least 60 stores are sold as of the Effective Date.

It is possible that the 2.2% – 6.4% estimated range of value available for distribution could meet a requirement that the estimate be 5% or more. However, the 2.2% – 6.4% range absolutely could not meet a requirement that the estimate be 10% or more, despite the Key

13

Executives' best attempts to argue otherwise.[4] Therefore, the Key Executives cannot successfully meet the requirements of this bonus tier based on the first option. However, due to this tier's disjunctive nature, the Key Executives could still satisfy this tier's requirement based solely on the second component.

The second component requires that 60 stores be sold as of the Effective Date. However, as was already discussed under the Target Bonus tier, only 19 stores had been assumed and assigned as of that date. Therefore, the second option for meeting this bonus tier is also unsatisfied, meaning that the Key Executives failed to meet the requirements to be compensated under the Stretch Bonus tier.

### IV. *As of the Effective Date of the Plan, the requirements for the Maximum Bonus had not been met.*

The Maximum Bonus provision of the Key Employee Plans states:

> D. **Maximum**.
>
> (1)  You will earn an additional amount equal to 25% of your base salary if (i) the cash or value of other property estimated to be available for distribution to general unsecured creditors as of the date of confirmation of the Plan is equal to or exceeds 10%; and (ii) at least 70 stores are sold by the Company as a Going Concern Sale.
>
> (2)  In the event the cash or value of other property estimated to be available for distribution on allowed claims of general unsecured creditors as of the date of confirmation of the Plan is at least 5% of such allowed claims but less than 10% of such allowed claims, the applicable bonus amount for the Maximum opportunity shall be a pro rated amount calculated as the product of your Maximum opportunity bonus amount multiplied by a fraction, the numerator of which is the percentage of cash or value of other property estimated to be available for

---

[4] More specifically, the Key Executives argue that the Court should wait until "all claims have been adjudicated or otherwise allowed or disallowed." ECF No. 1845. They argue that there is no way to quantify the proper distribution percentage until that time, and it is therefore "too premature for the Court to rule on the Trust's objection until all claims have been resolved." Waiting until all claims have been fully determined, however, would require the Court to ignore the plain language of the Key Employee Plans, which requires the application of the percentage estimated "as of the date of confirmation of the Company's Plan of Reorganization and/or Liquidation." ECF No. 1359.

distribution to general unsecured creditors as of the date of confirmation of the Plan and the denominator of which is 10%.

ECF No. 431.

The Maximum Bonus tier presents another conjunctive test, as it can only be satisfied if the estimated value available for distribution to unsecured creditors is equal to or exceeds 10% ***and*** at least 70 stores are sold as of the Effective Date.

The previous analysis from the Target Bonus and Stretch Bonus tiers shows that neither of these requirements is met; the 2.2% – 6.4% range cannot be read to satisfy a 10% estimate requirement, and the 19 stores that had been assumed and assigned as of the Effective Date fall well short of the 70-store requirement to satisfy this tier.

The Maximum Bonus tier does have a caveat, however; it states that some part of the bonus may be available if the estimate of value available for distribution to unsecured creditors is between 5% and 10%. However, this provision only becomes relevant in relation to "the applicable bonus amount for the Maximum opportunity." Since the store requirement for the Maximum Bonus tier is not met, there is no bonus amount for this tier, and this caveat does not apply. As with the Target Bonus and Stretch Bonus tiers, the Key Executives failed to satisfy the requirements to receive their bonuses under the Maximum Bonus tier.

## CONCLUSION

The Court does not doubt that, as the Key Executives asserted in their pleadings, "The energy, time, and work expended by each of the Key Executives was instrumental in preserving the value of the estate, allowed for the sale of the assets of the debtor, and otherwise allowed the debtor to continue operating with the continuity necessary to enhance the value of the estate for the benefit of not only the bankruptcy estate, but all creditors as well, including unsecured creditors." ECF No. 1845, p. 6.

Still, contract law is somewhat singular in the legal world for its brazen constructs: with few exceptions, whatever language is in a contract becomes "the law" under which the parties to the contract must operate.  Here, then, the "law" states that bonus amounts <u>shall</u> be paid on the Plan's Effective Date of February 8, 2018.  Any activities completed or contemplated after that date – including completed activities that may have otherwise been relevant to calculating the bonuses under the contract terms – were rendered irrelevant by the plain language of the contracts.  The provisions governing the payment of bonuses under these Key Employee Plans "matured" on February 8, 2018, and on that date, only the requirements for the "Threshold" bonus tier had been achieved.  As a result, the Trust dutifully and properly paid the Key Employees the $1,250,000.00 they earned, but – as the requirements for awards under the other tier amounts had not been met – appropriately refused to pay them any further amounts under the contract.

Accordingly,

IT IS HEREBY ORDERED that the Trust's Omnibus Objection to Claims Filed by Certain Former Key Executives is **GRANTED**, and the claims identified in the Trust's Motion's Exhibit A are disallowed.

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *08/07/2019*
Lori Vosejpka, Clerk, by MJS

*/e/ Michael E. Ridgway*
Michael E. Ridgway
Chief United States Bankruptcy Judge